## Docket No. 24-2933

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

AMERICANS FOR PROSPERITY and
AMERICANS FOR PROSPERITY FOUNDATION,

*Plaintiffs-Appellants,*

v.

DAMIEN R. MEYER, in his official capacity as Chairman of the
Citizens Clean Elections Commission, et al.,

*Defendants-Appellees,*

VOTERS' RIGHT TO KNOW and
ATTORNEY GENERAL OF THE STATE OF ARIZONA,

*Intervenors-Defendants-Appellees.*

_____

*Appeal from a Decision of the United States District Court for the District of Arizona,
No. 2:23-cv-00470-ROS · Honorable Roslyn O. Silver*

## APPELLANTS' OPENING BRIEF

DOMINIC E. DRAYE, ESQ.
GREENBERG TRAURIG, LLP
2375 East Camelback Road, Suite 800
Phoenix, Arizona 85016
(602) 445-8425 Telephone
drayed@gtlaw.com

DEREK L. SHAFFER, ESQ.
CHRISTOPHER G. MICHEL, ESQ.
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
San Diego, California 92101-4397
(202) 538-8000 Telephone
derekshaffer@quinnemanuel.com
christophermichel@quinnemanue.com

*Attorneys for Appellants Americans for Prosperity and Americans for Prosperity Foundation*

 COUNSEL PRESS INC. · (213) 680-2300          PRINTED ON RECYCLED PAPER 

## CORPORATE DISCLOSURE STATEMENT

Americans for Prosperity Foundation has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.  Americans for Prosperity likewise has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

TABLE OF CONTENTS

Corporate Disclosure Statement .................................................. ii

Table of Authorities ............................................................... vi

Introduction ......................................................................... 1

Jurisdictional Statement ........................................................... 8

Statement Of The Issues ........................................................... 9

Statement Of The Case ............................................................ 10

    A.    Proposition 211 ........................................................ 10

        1.    Definitions And Triggers ...................................... 10

        2.    Disclosures And Disclaimers ................................. 12

        3.    Opt-Out Notices And Exemptions .......................... 14

        4.    Recordkeeping Requirements ................................. 15

        5.    Penalties And Enforcement ................................... 16

    B.    The Commission's Rulemaking And Advisory Opinions ...... 17

    C.    Americans For Prosperity, Americans For Prosperity Foundation, And Their Donors .............................. 20

    D.    Procedural History ................................................. 23

    E.    Parallel State Proceedings ........................................ 25

Summary Of The Argument ....................................................... 26

Standard Of Review ............................................................... 28

Argument ............................................................................ 28

I. Proposition 211 Is Facially Invalid Under The First Amendment. ...................................................... 28

    A. The District Court Misconstrued Supreme Court Jurisprudence Strictly Limiting Compelled Disclosure. ...... 31

    B. Proposition 211 Is Not Substantially Related To A Sufficiently Important Interest. ............................... 38

        1. Proposition 211 Does Not Substantially Relate To Any Accepted Informational Interest. ...................... 40

        2. Proposition 211 Does Not Substantially Relate To Any Anti-Corruption Interest. ...................................... 52

    C. The Strength Of The State's Interest Does Not Reflect The Serious Burdens On First Amendment Rights. ........... 53

    D. Proposition 211 Is Not Narrowly Tailored. .......................... 56

        1. Proposition 211's Disclosures And Disclaimers Are Overbroad. ...................................................... 57

        2. Proposition 211's Opt-Out Provisions Do Not Make It Narrowly Tailored. ............................................ 59

        3. Proposition 211's Triggers Are Overbroad. ................. 59

        4. Proposition 211 Covers Forms Of Media Much Broader Than Federal Law. .......................................... 66

        5. Proposition 211 Applies Even If Electioneering Is Not A Major Purpose Of The Group. ........................... 66

        6. Proposition 211 Is Underinclusive. ........................... 68

        7. Proposition 211's Monetary Thresholds Are Low. ........ 69

II. Proposition 211 Is Unconstitutional As Applied To Appellants. .................................................................... 71

iv

III.   Proposition 211 Unconstitutionally Compels Association
       Facially and As Applied. ................................................. 74

Conclusion ................................................................................ 77

Statement of Related Cases ...................................................... 79

Form 8. Certificate of Compliance for Briefs ......................... 80

Certificate of Service ............................................................... 81

TABLE OF AUTHORITIES

Page

## Cases

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) .................................................................... *passim*

*Ams. for Prosperity v. Grewal,*
  2019 WL 4855853 (D.N.J. Oct. 2, 2019) ...................................... 22, 72

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................ 28

*Baird v. State Bar of Ariz.,*
  401 U.S. 1 (1971) ............................................................................ 29

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) .................................................................. 68, 73

*Brown v. Socialist Workers '74 Campaign Comm. (Ohio),*
  459 U.S. 87 (1982) .......................................................................... 73

*Buckley v. Valeo,*
  424 U.S. 1 (1976) .................................................................... *passim*

*California Medical Association v. Federal Election
  Commission,*
  453 U.S. 182 (1981) ............................................................. 37, 38, 41

*Center for Arizona Policy Inc. v. Arizona Secretary of State,*
  Ariz. Ct. App., No. 24-0272 ............................................................ 26

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ................................................................ *passim*

*Crowe v. Or. State Bar,*
  989 F.3d 714 (9th Cir. 2021) ......................................................... 75

*First Nat'l Bank of Bos. v. Bellotti,*
  435 U.S. 765 (1978) ........................................................................ 53

vi

*Gaspee Project v. Mederos,*
13 F.4th 79 (1st Cir. 2021) ............................................................ 52, 59

*Hotel & Motel Ass'n of Oakland v. City of Oakland,*
344 F.3d 959 (9th Cir. 2003) .............................................................. 72

*Human Life of Wash. Inc. v. Brumsickle,*
624 F.3d 990 (9th Cir. 2010) .............................................................. 67

*IMDb.com Inc. v. Becerra,*
962 F.3d 1111 (9th Cir. 2020) ............................................................ 68

*Indep. Inst. v. Williams,*
812 F.3d 787 (10th Cir. 2016) ............................................................ 36

*Janus v. AFSCME,*
585 U.S. 878 (2018) ........................................................................... 75

*John Doe No. 1 v. Reed,*
561 U.S. 186 (2010) ........................................................................... 30

*McConnell v. FEC,*
540 U.S. 93 (2003) ............................................................................. 36

*McCutcheon v. FEC,*
572 U.S. 185 (2014) ...................................................................... 37, 41

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995) .................................................... 33, 34, 36, 44

*NAACP v. Alabama ex rel. Patterson,*
357 U.S. 449 (1958) ............................................................ 31, 32, 46

*NAACP v. Button,*
371 U.S. 415 (1963) ........................................................................... 28

*NAACP v. City of Richmond,*
743 F.2d 1346 (9th Cir. 1984) ...................................................... 6, 47, 49

*NEA v. Finley,*
524 U.S. 569 (1998) ........................................................................... 30

*No on E v. Chiu¸*
    85 F.4th 493 (9th Cir. 2023) ..................................................... *passim*

*Pilz v. Inslee,*
    2022 WL 1719172 (W.D Wash. May 27, 2022) ................................. 72

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ........................................................ 31, 46

*Rosen v. Port of Portland,*
    641 F.2d 1243 (9th Cir. 1981) ...................................................... 29

*Ryan S. v. UnitedHealth Grp., Inc.,*
    98 F.4th 965 (9th Cir. 2024) ........................................................ 28

*Shuttlesworth v. City of Birmingham,*
    394 U.S. 147 (1969) .................................................................. 47

*Smith v. Helzer,*
    95 F.4th 1207 (9th Cir. 2024) ................................................. 51, 52

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014), *on remand* 814 F.3d 466 (6th Cir.
    2016) ................................................................................ 56

*Toma v. Fontes,*
    553 P.3d 881 (Ariz. Ct. App. 2024) ............................................... 25

*United States v. Salerno,*
    481 U.S. 739 (1987) .................................................................. 30

*United States v. Stevens,*
    559 U.S. 460 (2010) .................................................................. 30

*Van Hollen, Jr. v. FEC,*
    811 F.3d 486 (D.C. Cir. 2016) ................................................. 36, 42

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) .................................................................. 30

*Wis. Right To Life, Inc. v. Barland,*
    751 F.3d 804 (7th Cir. 2014) ....................................................... 67

*Wyo. Gun Owners v. Gray,*
  83 F.4th 1224 (10th Cir. 2023) ........................................................... 37

## Statutes

A.R.S. § 16-971 .................................................................... *passim*

A.R.S. § 16-972 .................................................................... *passim*

A.R.S. § 16-973 .................................................................... *passim*

A.R.S. § 16-974 .......................................................... 13, 16, 39, 71

A.R.S. § 16-976 ............................................................................. 16

A.R.S. § 16-977 .................................................................... *passim*

A.R.S. § 16-1022 ........................................................................... 43

2 U.S.C. § 434 .............................................................................. 35

28 U.S.C. § 1291 ............................................................................. 8

28 U.S.C. § 1331 ............................................................................. 8

28 U.S.C. § 1343 ............................................................................. 8

52 U.S.C. § 30101 ......................................................................... 70

52 U.S.C. § 30102 ......................................................................... 70

52 U.S.C. § 30104 .................................................................... 66, 71

52 U.S.C. § 30122 ......................................................................... 43

## Rules

Cir. R. 28.1-1 ............................................................................... 80

Cir. R. 29-2 ................................................................................. 80

Cir. R. 32-1 ................................................................................. 80

Cir. R. 32-2 ................................................................................. 80

Cir. R. 32-4 ................................................................... 80

Fed. R. App. P. 29 ........................................................ 80

Fed. R. App. P. 32 ........................................................ 80

Fed. R. Civ. P. 12 ........................................................ 28

## Regulations

Ariz. Admin. Code R2-20-801 .................................... 17

Ariz. Admin. Code R2-20-803 ......................... 17, 18, 48

Ariz. Admin. Code R2-20-805 ............................. 18, 45

Ariz. Admin. Code R2-20-808 .................................... 18

## Other Authorities

A.O. 2024-01 ........................................................ 19, 65

A.O. 2024-02 ........................................................ 19, 48

A.O. 2024-04 ........................................................ 19, 65

Arizona Secretary of State, *2016 Initiatives, Referendums &
Recalls-Initiative, Referendum and Recall Applications-
No. I-22-2016* ...................................................... 61

Jonathan Weisman, *S.E.I.U. Plans $200 Million Effort to
Aid Biden and Democrats*, N.Y. Times (Mar. 13, 2024).
htm ...................................................................... 68

Lorraine Longhi, *The fight for the preserve is over:
Scottsdale voters overwhelmingly approve Prop. 420*, The
Arizona Republic (Nov. 9, 2018) ............................ 61

Stacey Barchenger, *Campaign spending in governor race
breaks Arizona record*, The Arizona Republic (Jan. 20,
2023) ................................................................... 69

# INTRODUCTION

The First Amendment safeguards Americans' right to donate to charitable and advocacy organizations without undue risk of being disclosed or otherwise chilled by the government. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 610–12 (2021). Yet Proposition 211 trammels that right in unprecedented fashion, invading the privacy of Americans nationwide and across the spectrum, and subjecting them to government-sponsored doxxing. *See* Ariz. Rev. Stat. ("A.R.S.") § 16-971 *et seq*.

While purporting to regulate "[c]ampaign media spending," *id.* § 16-971(2), the law extends far beyond electioneering, sweeping more broadly and invasively than any such disclosure law ever blessed by the Supreme Court. If upheld, this law would allow the First Amendment rule—which enables citizens to associate privately and to express themselves anonymously without being outed by the government—to be swallowed by a vastly expanded "campaign finance" exception, which (properly understood) permits disclosures only in limited circumstances that the district court has distended. If Arizona can upend the established constitutional rule, then so can every other jurisdiction, thereby

exponentially compounding the chill on advocacy organizations, their donors, and their speech.

Under Proposition 211, regulated groups must publicly disclose not only their donors, but their donors' donors (and so on) back to the "original source[]" of funding. A.R.S. § 16-973(A)(6)–(7). These disclosures are required even if the "original sources" never foresaw or intended that their donations to *one* group would later be transferred and used by *another* group for something Arizona now calls "[c]ampaign media spending." *Id.* § 16-971(2).

Such "campaign media spending"—triggering the law's disclosure and other requirements—stretches far beyond election-related activity. Triggers include any public communication that "promotes, supports, attacks or opposes a candidate" within "*six months*" of a primary or general election. *Id.* § 16-971(2)(a)(ii) (emphasis added). They also include a communication that merely "*refers* to a clearly identified candidate" within "ninety days before a primary election *until the time of the general election*," thus covering critical periods when the legislature is in session. *Id.* § 16-971(2)(a)(iii) (emphases added). Traps are likewise sprung by advocacy for or against any "state or local initiative or

referendum," or that "supports, attacks, or opposes the recall of a public officer"—as would arguably be true for *any* public statements directed at current officeholders. *Id*. § 16-971(2)(a)(iv), (v).

Then there is a catch-all covering any "other partisan campaign activity," an undefined category that potentially ensnares *any* issue advocacy that arguably correlates with a political party's positions (such as, for example, discussing either side of the raging immigration debate). *Id*. § 16-971(2)(a)(vi). Finally, the statute covers activities like "[r]esearch, design, production, polling, data analytics, mailing or social media list acquisition" or "any other activit[ies] conducted in preparation for or in conjunction with" the foregoing. *Id*. § 16-971(2)(a)(vii).

Worse, Proposition 211 empowers private parties to weaponize the law pursuant to their own boundary-expanding interpretations. *Id*. § 16-977. Arizona voters can file "a verified complaint" with the Citizens Clean Elections Commission, *id*. § 16-977(A), which the Commission must "investigate" and pursue wherever plausible, *id*. § 16-977(B). Otherwise, a private complainant can sue the Commission to "compel" enforcement. *Id*. § 16-977(C).

Proposition 211 imposes other onerous burdens on covered organizations, which must provide their direct donors an "opt out" notice, and then sit silent for up to 21 days unless donors consent to funding "campaign media spending." *Id.* § 16-972(B). Atop its various disclosure requirements, the law mandates preservation of records of direct and indirect donors who contribute over $2,500 for a period of five years. *Id.* § 16-972(D). Proposition 211 imposes these burdens even if electioneering is not a group's major purpose, *see Buckley v. Valeo*, 424 U.S. 1, 79 (1976) (per curiam), while carving out unions for preferential treatment, A.R.S. § 16-971(1)(b), 7(b)(ii). Arizona's anomalous regulatory approach—under which the purest issue advocacy is deemed a nail deserving to be hammered by "campaign finance" regulation—sets a chilling precedent while threatening to erase established protections against disclosure nationwide.

Plaintiffs-Appellants Americans for Prosperity and Americans for Prosperity Foundation challenged Proposition 211, alleging it unconstitutionally infringes freedom of speech and compels association both facially and as applied to Appellants. The district court dismissed each claim. For the facial challenge, Judge Silver held that Proposition

211's requirements sufficiently relate to the State's "interest in knowing who is funding campaign media spending," that the strength of this interest sufficiently reflects the seriousness of the burden on Appellants' rights, and that the law's requirements are narrowly tailored to the State's asserted interest. ER-32. Not once did the court below cite the Supreme Court's recent, seminal decision in *Bonta*, which confirms the First Amendment imperative to protect Americans from compelled disclosure. Much less did the court attempt to reconcile its "anything goes" approach to disclosure with the Supreme Court's latest teaching.

Every premise of the decision under review is out of step with governing precedent and First Amendment principles. To begin, this is not a law that is designed to yield any useful information concerning electioneering and certainly not one that illuminates ties between Arizona candidates and donors to whom they may be beholden—the defining rationale for upholding targeted disclosure requirements. Proposition 211 compels disclosure of countless donors who have no intent or even awareness that their donations will wind up being used for "campaign media spending" in Arizona. Such disclosures neither inform Arizona's electorate nor bear any relation to actual or perceived

corruption.  Instead, they stand to mislead voters on both the amounts spent on electioneering and who is supposedly "behind" such spending, while publicly tying donors and businesses to speech from which they are otherwise divorced.  The enterprise of compelling election-related disclosures is not one where "more is more."  To the contrary, inundating voters with voluminous, extraneous disclosures inflicts grave harm without achieving appreciable good.

Nor does the purported informational interest reflect Proposition 211's grave burdens on First Amendment rights.  The law will compel the disclosure of donors nationwide while imposing onerous burdens on covered organizations.  The opt-out requirements are particularly concerning for political advocacy, where "delay may permanently vitiate the expressive content" of a message.  *NAACP v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984).  Proposition 211's profound burdens far outweigh any interest in spurious disclosures.

At a minimum, the disconnect between the disclosures and Proposition 211's purported purpose precludes any plausible claim of narrow tailoring.  The law not only ensnares individuals who are vastly removed from Arizona but also stretches far beyond electioneering

through its expansive definition of "campaign media spending." Although the district court was somehow sure that the law's vaguely worded provisions would not be interpreted broadly, Proposition 211 expressly empowers private parties to enforce the law expansively and aggressively. For these reasons and more, the court erred in dismissing Appellants' facial challenge.

The court further erred in denying Appellants' as-applied challenge, which requires showing a "reasonable probability" that their "members would face threats, harassment, or reprisals if their names were disclosed." *Citizens United v. FEC*, 558 U.S. 310, 370 (2010) (citation omitted). According to Judge Silver, Appellants needed to offer "more detailed factual allegations," ER-32, notwithstanding their specific allegations of "bomb threats, protests, stalking, and physical violence" that Appellants and their donors have faced, ER-143 (citation omitted). Not only were those allegations spelled out in the complaint, ER-142–44, but they have been catalogued by the Supreme Court as emblematic of First Amendment chill. *See Bonta*, 594 U.S. at 617. It is telling that the precise factual allegations that moved the Supreme Court in *Bonta*—

involving one of the Appellants here—have been deemed, by the court below, inadequate at the pleading stage.

Finally, the court improperly dismissed Appellants' compelled association claim. Without requiring intent or even knowledge, Proposition 211 ties organizations and their donors to candidates and causes irrespective of their actual beliefs. Although the court noted that organizations can take measures to prevent disclosure of secondary donors, First Amendment rights should not be left to the whims of third parties.

Because Proposition 211 unconstitutionally burdens speech and associational rights both facially and as applied, according to well-pleaded allegations, this Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). This Court has jurisdiction under 28 U.S.C. § 1291. On March 20, 2024, the district court granted dismissal with limited leave to amend. ER-165. Plaintiffs-Appellants submitted they would rest on their complaint on April 9, 2024, ER-165, whereupon final judgment

entered on April 10, ER-165. On May 6, 2024, Plaintiffs-Appellants noticed a timely appeal. ER-165.

## STATEMENT OF THE ISSUES

I.     Whether the district court erred in concluding that Proposition 211 is facially valid even though its disclosures are untethered to electoral activity, its burdens surpass the strength of the State's asserted interest, and its requirements are not narrowly tailored to the problems it purports to solve.

II.     Whether the district court erred in concluding that Proposition 211 is valid as applied to Appellants, even though Appellants alleged a reasonable probability that disclosure of their donors' names will subject them to threats, harassment, or reprisals.

III.     Whether the district court erred in concluding that Proposition 211 does not compel association even though its disclosure requirements tie organizations and their donors to candidates and causes irrespective of their actual beliefs.

9

**STATEMENT OF THE CASE**

**A.      Proposition 211**

Proposition 211 imposes disclosure requirements and onerous burdens on "[c]overed person[s]" who engage in specified amounts of "campaign media spending."  *See* A.R.S. § 16-971(7).

**1.      Definitions And Triggers**

The law defines a "[c]overed person" as any person or entity "whose total campaign media spending or acceptance of in-kind contributions to enable campaign media spending, or a combination of both, in an election cycle is more than $50,000 in statewide campaigns or more than $25,000 in any other type of campaigns."  *Id.*  And under Proposition 211, an "[e]lection cycle" encompasses the two-year period "beginning the day after general election day in even-numbered years and continuing through the end of general election day in the next even-numbered year." *Id.* § 16-971(8).

Proposition 211's definition of "campaign media spending" is sweeping.  It reaches, *e.g.*,:

> (ii) A public communication that promotes, supports, attacks or opposes a candidate within six months preceding an election involving that candidate.

10

(iii) A public communication that refers to a clearly identified candidate within ninety days before a primary election until the time of the general election and that is disseminated in the jurisdiction where the candidate's election is taking place.

(iv) A public communication that promotes, supports, attacks or opposes the qualification or approval of any state or local initiative or referendum.

(v) A public communication that promotes, supports, attacks or opposes the recall of a public officer.

(vi) An activity or public communication that supports the election or defeat of candidates of an identified political party or the electoral prospects of an identified political party, including partisan voter registration, partisan get-out-the-vote activity or other partisan campaign activity.

(vii) Research, design, production, polling, data analytics, mailing or social media list acquisition or any other activity conducted in preparation for or in conjunction with any of the activities described in items (i) through (vi) of this subdivision.

*Id.* § 16-971(2)(a)(ii)–(vii). In turn, a "[p]ublic communication" is broadly defined as "a paid communication to the public by means of broadcast, cable, satellite, internet or another digital method, newspaper, magazine, outdoor advertising facility, mass mailing or another mass distribution, telephone bank or any other form of general public political advertising or marketing, regardless of medium." *Id.* § 16-971(17)(a).

Proposition 211 also features anomalous carveouts, *e.g.*, for organizations "that spend only their own business income for campaign

11

media spending," *id.* § 16-971(7)(b)(ii); it also defines "[b]usiness income" as "[m]embership or union dues *that do not exceed $5,000 from any one person in a calendar year*," *id.* § 16-971(1)(b) (emphasis added).

## 2. Disclosures And Disclaimers

Proposition 211 requires disclosure of not only donors who give to covered entities "directly," but also donors whose funds are later transferred to the entity "indirectly" as well. *Id.* § 16-973(A)(6)–(7). Specifically, each "covered person" must file a public report with the Arizona Secretary of State disclosing "[t]he identity of each donor of original monies who contributed, directly or indirectly, more than $5,000 of traceable monies or in-kind contributions." *Id.* § 16-973(A)(6). The report must also include "[t]he identity of each person that acted as an intermediary and that transferred . . . traceable monies of more than $5,000 from original sources to the covered person." *Id.* § 16-973(A)(7).

In other words, "when a donation consisted of a series of earlier donations, each prior donation of $5,000 or more" must be reported. ER-10. "The donors and intermediaries must be identified" back to the "source of 'original monies,'" defined as "the person or entity that derived the funds from either regular business income or personal income." *Id.*;

12

*see* A.R.S. § 16-973(A)(6) (requiring disclosure of "donor of original monies"); *id.* § 16-971(12) (defining "[o]riginal monies" as business income or personal monies).

Critically, disclosing a donor's "[i]dentity" means specifying "the name, mailing address, occupation and employer of" individual donors, or the "name, mailing address, federal tax status and state of incorporation, registration or partnership" of institutional donors. A.R.S. § 16-971(10)(a), (b). Moreover, "[a]ll disclosure reports" must be made available "electronically to the secretary of state and to any other body as directed by law," and "[o]fficials shall promptly make the information public and provide it to the commission electronically." *Id.* § 16-973(H).

Proposition 211 also requires "covered persons" to make disclaimers in their "public communications" that include "the names of the top three donors who directly or indirectly made the three largest contributions of original monies during the election cycle." *Id.* § 16-974(C). These disclosures are required regardless of whether the person who directly or indirectly gave the "original monies" intended, desired, controlled, or knew whether the direct donor would contribute their monies to a covered person. *See id.*

13

3.   **Opt-Out Notices And Exemptions**

Proposition 211 requires covered persons to afford direct donors an opportunity to opt out of having their donations used for campaign media spending.  A "covered person" must notify donors of "an opportunity to opt out of having the donation used or transferred for campaign media spending" in order to avoid disclosure.  *Id.* § 16-972(B).  "The notice required … may be provided to the donor before or after the covered person receives a donor's monies, but the donor's monies may not be used or transferred for campaign media spending until at least twenty-one days after the notice is provided or until the donor provides written consent pursuant to this section, whichever is earlier."  *Id.* § 16-972(C).  No opt-out procedure is applicable for indirect donors or publicly-broadcasted disclaimers.  *See id.*

Proposition 211 theoretically permits "original source[s]" to avoid disclosure if they can "demonstrate[] to the satisfaction of the commission" that "there is a reasonable probability that public knowledge of the original source's identity would subject the source or the source's family to a serious risk of physical harm."  *Id.* § 16-973(F).

14

### 4. **Recordkeeping Requirements**

Donors who give "more than $5,000 in traceable monies in an election cycle" to a "covered person" must "inform that covered person in writing, within ten days after receiving a written request from the covered person, of the identity of each other person that directly or indirectly contributed more than $2,500 in original monies being transferred and the amount of each other person's original monies being transferred." *Id.* § 16-972(D).

Moreover, "[i]f the original monies were previously transferred, the donor must disclose all such previous transfers of more than $2,500 and identify the intermediaries." *Id.* "The donor must maintain these records for at least five years and provide the records on request to the Commission." *Id.* Such "transfer records" must include "a written record of the identity of each person that directly or indirectly contributed or transferred more than $2,500 of original monies used for campaign media spending, the amount of each contribution or transfer and the person to whom those monies were transferred." *Id.* § 16-971(19).

15

5.  **Penalties And Enforcement**

Failure to comply with Proposition 211's disclaimer, disclosure, and associated administrative requirements results in significant civil penalties, amounting to "at least the amount of the undisclosed or improperly disclosed contribution" and up to "three times that amount." *Id.* § 16-976(A).

The Commission is "the primary agency authorized to implement and enforce" Proposition 211. *Id.* § 16-974(A). Among other things, it is authorized to "[a]dopt and enforce rules"; "[i]nitiate enforcement actions"; "[i]mpose civil penalties for noncompliance"; "[s]eek legal and equitable relief in court as necessary"; and "[e]stablish the records persons must maintain to support their disclosures" related to Proposition 211. *Id.*

"Any qualified voter in [the] state may file a verified complaint with the commission against a person that fails to comply with the requirements" of Proposition 211. *Id.* § 16-977(A). The Commission must "investigate the allegations and provide the alleged violator with an opportunity to be heard" if it "determines that the complaint, if true, states the factual basis for a violation of [Proposition 211] or rules adopted pursuant to [Proposition 211]." *Id.* § 16-977(B). If "the

16

commission dismisses at any time the complaint or takes no substantive enforcement action within ninety days after receiving the complaint," complainants are permitted to bring civil actions against the Commission to compel it to take enforcement action. *Id.* § 16-977(C).

## B.   The Commission's Rulemaking And Advisory Opinions

Since this suit was filed, the Commission has promulgated rules purporting to implement Proposition 211. Among other things, the Commission promulgated a rule specifying that "research, design, production, polling, data analytics, mailing or social media list acquisition" will constitute campaign media spending only when "these activities are specifically conducted in preparation for or conjunction with" other activities enumerated in Proposition 211. Ariz. Admin. Code ("A.A.C.") R2-20-801(B).

The Commission also promulgated rules concerning Proposition 211's opt-out requirements. The rules specify that, "[i]f a donor does not opt out after the initial notice period, a covered person may make subsequent written notices to a donor of their right to opt out and may set a time for response of no less than 1 day from the date the donor receives the notice." *Id.* R2-20-803(D). They further provide that a

17

"donor may request to opt out at any time after the initial notice period" and "shall be treated as having opted out by the covered person." *Id.*R2-20-803(E). Commission rules further state, contrary to Proposition 211's plain text, that a donor who has opted out need not be included in a public communication's disclaimer:

> Public communications by covered persons shall state the names of the top three donors who directly or indirectly made the three largest contributions of original monies in excess of $5,000 for the election cycle *and who have not opted out pursuant to A.R.S. § 16-972 ….*

A.A.C. R2-20-805(B) (emphasis added).

The Commission additionally promulgated rules allowing "[a]ny person" to request advisory opinions on how Proposition 211 would apply to a "specific transaction or activity that the requesting person plans to undertake or is presently undertaking and intends to undertake in the future." A.A.C. R2-20-808(A)(1)–(2). The rules specify that "[a]ny person who relies upon an advisory opinion and who acts in good faith in accordance with that advisory opinion shall not, as a result of any such act, be subject to any sanction" under Proposition 211. *Id.* R2-20-808(C)(4).

The Commission has subsequently issued advisory opinions purporting to offer safe harbors. One opinion says that "purely internal" activities like "research, polling and data analytics" do not constitute campaign media spending so long as they were not undertaken, at the time, for the purpose of making a communication covered by Proposition 211. *See* A.O. 2024-01[1] at 5; *see also* A.O. 2024-04[2] at 7 (stating that "where an activity is undertaken for another purpose and later used for campaign media spending, it would not be 'specifically conducted' in preparation or in conjunction with campaign media spending").

The Commission has also issued an advisory opinion specifying how "original monies" should be disclosed. *See* A.O. 2024-02.[3] The opinion permits "flexibility" in how organizations reports funds and donors, such that if an interest group "is sitting on a hundred thousand dollars" and "only giv[es] away a subset of that money," then it "should get to choose,

---

[1]     *Available at* https://storageccec.blob.core.usgovcloudapi.net/public/docs/968-Advisory-Opinion--24-01-approved--by-Commission-1_25_24-.pdf.

[2]     *Available at* https://storageccec.blob.core.usgovcloudapi.net/public/docs/1026-AO-24-04-AOR-2402-Approved-5_16_2024-ADLCC.pdf.

[3]     *Available at* https://storageccec.blob.core.usgovcloudapi.net/public/docs/969-Advisory-Opinion-24-02--approved--by-Commission-1_24_25.pdf.

19

among the funds that they[] have who is most appropriately tagged as the original source of that money." *Id.* at 7 (quotation omitted).

### C. Americans For Prosperity, Americans For Prosperity Foundation, And Their Donors

Appellant Americans for Prosperity ("AFP") is a Washington, D.C., nonprofit corporation headquartered in Virginia with its Arizona chapter located in Phoenix, Arizona. ER-94. AFP is dedicated to the belief that every person has a unique set of gifts and the ability to contribute to society in their own way, an idea that has inspired progress since our nation's founding. *Id.* True to this belief, AFP engages in broad-based grassroots outreach to advocate for long-term solutions to the country's biggest problems—including government spending and debt, immigration reform, economic protectionism, and a host of other issues. *Id.* AFP funds its activities by accepting donations from donors throughout the country, including in Arizona. *Id.*

Appellant Americans for Prosperity Foundation ("AFPF") is a Delaware nonprofit corporation headquartered in Virginia. ER-94. For over 20 years, AFPF has been educating and training citizens to be advocates for freedom, creating real change at the local, state, and federal levels. ER-94–95. In communities across the country, AFPF programs

20

share knowledge and tools that encourage participants to apply the principles of a free and open society in their daily lives, believing this maximizes prosperity and well-being for all. ER-95. AFPF funds its activities by accepting donations from donors throughout the country, including in Arizona. *Id.* Consistent with its mission and its tax status, AFPF has taken public positions on hot-button issues in Arizona, such as by running advertisements opposing the passage of Proposition 211. *Id.*

The complaint specifically alleges threats and harassment that Appellants and their donors have faced. ER-142–44. Appellants "and their associates have fierce critics, and their opponents regularly strive to identify the organizations' donors in order to threaten, attack, and sow fear among those who support organizations like [AFP and AFPF]." ER-143. "Once suspected donors are publicly outed, they are empirically at risk of facing boycotts, character attacks, personal threats, and even violence." ER-143 (citations omitted). As a result, Appellants' donors have a "reasonable fear that threats, harassment, and reprisals will result from any disclosure or broadcasting of their donations." ER-142–43.

These risks are heightened "'[i]n a climate marked by the so-called cancel or call-out culture that has resulted in people losing employment, being ejected or driven out of restaurants while eating their meals[,] and where the Internet removes any geographic barriers to cyber harassment of others.'" ER-143 (quoting *Ams. for Prosperity v. Grewal*, 2019 WL 4855853, at *20 (D.N.J. Oct. 2, 2019)). Therefore, in Appellants' case, "'[t]he deterrent effect feared by these organizations is real and pervasive.'" ER-143 (quoting *Bonta*, 594 U.S. at 617). Indeed, their "'supporters have been subjected to bomb threats, protests, stalking, and physical violence,'" ER-143 (quoting *Bonta*, 594 U.S. at 617), as well as "boycotts, character attacks, [and] personal threats," ER-143 (citation omitted).

Given these demonstrated dangers, Appellants have implemented protocols to protect and secure the confidentiality of donor information. *See* ER-110–11. Appellants scrupulously protect donor confidentiality with strict security measures to avoid inadvertent or unauthorized disclosure. ER-144. For example, Appellants maintain donor information in a highly secure database and restrict access for most employees; only those individuals who have a need to know the donor

22

information are given access to the database. *Id.* Appellants have consistently protected the confidentiality of their donor information by training staff members and rarely sharing such information outside of AFP and AFPF. *Id.*

### D. Procedural History

On March 17, 2023, Plaintiffs-Appellants filed suit challenging Proposition 211 in the court below, naming as Defendants the Arizona Secretary of State, the Executive Director of the Arizona Citizens Clean Elections Commission, and the Commission's Chairman and Commissioners. ER-84–85. The complaint sought a declaratory judgment that Proposition 211 is constitutionally infirm and an order enjoining its enforcement. ER-150–51. Plaintiffs-Appellants alleged that Proposition 211 unconstitutionally chills First Amendment rights and compels association, both facially and as applied. *See generally* ER-112–150.

On April 28, 2023, Voters' Right to Know moved to intervene in the case, ER-163, which Plaintiffs-Appellants later opposed, ER-164. That same day, Defendants simultaneously moved to dismiss. ER-163. The Arizona Attorney General also moved to intervene, seeking dismissal.

ER-164. The district court granted both requests for intervention, resulting in three overlapping defenses of Proposition 211. ER-13–14.

On March 20, 2024, almost nine months after briefing concluded and without holding a hearing, ER-165, Judge Silver granted dismissal, with limited leave to amend, ER-35–36. The district court nowhere cited *Bonta* en route to concluding that "Plaintiffs' facial challenges [to Proposition 211] fail" because Proposition 211 "satisfies the demanding requirements of exacting scrutiny . . . because there is first a strong governmental interest in knowing who is funding campaign media spending, the Act furthers that interest, and there is a reasonable fit between the Act's burdens and the governmental interest." ER-32. It also stated that, "[a]t present, the lack of specific factual allegations dooms Plaintiffs' as-applied free speech challenge," ER-33, and that Plaintiffs-Appellants were unable to show that Proposition 211 "compels association," ER-35. Therefore, the court dismissed Plaintiffs-Appellants' complaint but granted leave to amend in part, reasoning that "Plaintiffs may be able to allege additional facts establishing there is a reasonable probability that their members would face threats,

harassment, or reprisals if their names were disclosed." ER-35–36 (quotations omitted).

Plaintiffs-Appellants filed their Notice of Intent to Rest on Complaint, ER-165, setting up entry of final judgment, ER-165, and timely appeal, ER-165.

### E. Parallel State Proceedings

Proposition 211 has also prompted lawsuits in Arizona courts challenging the statute under state law. In *Toma v. Fontes*, two Arizona legislators filed suit alleging that Proposition 211 and several of the Commission's rules violates Arizona's separation of powers doctrine, non-delegation doctrine, and Voter Protection Act. 553 P.3d 881, 886 (Ariz. Ct. App. 2024). On appeal from the denial of a preliminary injunction, the Arizona Court of Appeals ruled that Proposition 211 unconstitutionally insulates the Commission's rules from legislative control, but otherwise upheld the law's provisions. *See id.*

Additionally, the Center for Arizona Policy and the Arizona Free Enterprise Club challenged Proposition 211 under the Arizona Constitution, alleging the law violates free speech rights. That case is currently pending before the Arizona Court of Appeals following denial

of a preliminary injunction. *See Center for Arizona Policy Inc. v. Arizona Secretary of State*, Ariz. Ct. App., No. 24-0272.

## SUMMARY OF THE ARGUMENT

**I.** This Court should reverse the district court's ruling that Appellants' facial challenges to Proposition 211 fail. Proposition 211's vast scope, onerous burdens, and distant relation to any state interest render it facially unconstitutional.

**A.** The district court erroneously concluded that Proposition 211 advances a "strong governmental interest in informing voters about who funds political advertisements." *See* ER-19 (quoting *No on E v. Chiu¸* 85 F.4th 493, 505 (9th Cir. 2023)). In actuality, Proposition 211's disclosures are untethered to electioneering and do not deter corruption in a meaningful way. Accordingly, Proposition 211 does not advance a government interest sufficiently important to justify its disclosure requirements.

**B.** The district court wrongly held that the State's purported interest reflects the seriousness of Proposition 211's burdens on First Amendment rights, which profoundly chill free speech and associational

rights. These burdens far outweigh any interest the State may have in Proposition 211's spurious disclosures.

**C.** The district court wrongly held that Proposition 211 is narrowly tailored. Proper scrutiny reveals this law lacks any reasonable fit to asserted aims given its chilling disclosures and disclaimers, overbroad triggers, low monetary thresholds, application to a wide variety of communications, lack of a major purpose requirement, underinclusiveness, and other onerous burdens.

**II.** This Court should also overturn the district court's dismissal of Appellants' as-applied challenge. Appellants alleged numerous, specific threats of harassment and violence, including bomb threats, they and their donors would face should their identities be publicly disclosed. Contrary to the court's aberrant view, these allegations amply satisfy the liberal pleading standard operative at this stage.

**III.** This Court should overturn the district court's ruling that Proposition 211 does not unconstitutionally compel speech. The law ties organizations and their donors to various issue positions, other organizations, and candidates based on the ultimate use of their fungible donations, irrespective of their own intent or beliefs.

27

## STANDARD OF REVIEW

This Court "review[s] de novo the grant of a motion to dismiss under Rule 12(b)(6)." *Ryan S. v. UnitedHealth Grp., Inc.*, 98 F.4th 965, 970 (9th Cir. 2024). "A court conducting such an inquiry 'accept[s] the factual allegations of the complaint as true and construe[s] them in the light most favorable to the plaintiff.'" *Id.* (quotation omitted). "The motion should be denied if the claim is plausible on its face, that is, if 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

### I. Proposition 211 Is Facially Invalid Under The First Amendment.

Proposition 211 tramples the First Amendment right to donate to charitable and advocacy organizations without undue risk of disclosure. *See Bonta*, 594 U.S. at 610–12. "The 'government may regulate in the [First Amendment] area only with narrow specificity,' and compelled disclosure regimes are no exception." *Id.* at 610 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). "When it comes to 'a person's beliefs and associations,' '[b]road and sweeping state inquiries into these

protected areas . . . discourage citizens from exercising rights protected by the Constitution.'" *Id.* (quoting *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion)).

Therefore, "[r]egardless of the type of association, compelled disclosure requirements [must be] reviewed under exacting scrutiny." *Id.* at 608 (plurality opinion). Under that standard, (1) "there must be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,'" (2) "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights," and (3) the disclosure requirement must "be narrowly tailored to the government's asserted interest." *Id.* at 607–08 (plurality opinion) (citation omitted).[4] Proposition 211's defenders bear the burden of satisfying exacting scrutiny. *See id.* at 611–15; *Rosen v. Port of Portland*, 641 F.2d 1243, 1246 (9th Cir. 1981). They cannot justify the dragnet at issue based on "[m]ere administrative convenience."

---

[4] The concurring opinions in *Bonta* commend strict scrutiny, an even *more* demanding level of scrutiny. *See id.* at 619 (Thomas, J., concurring in part and concurring in the judgment); *id.* at 622–23 (Alito, J., concurring in part and concurring in the judgment).

*Bonta*, 594 U.S. at 615 (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)).

While the district court cautioned that "[f]acial invalidiation" requires satisfying a "heavy burden," ER-19 (quoting *NEA v. Finley*, 524 U.S. 569, 580 (1998)), that standard is eased in the First Amendment context. "Normally, a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,'" *Bonta*, 594 U.S. at 615 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)), or "show that the law lacks 'a plainly legitimate sweep,'" *id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

"In the First Amendment context, however," the Supreme Court "recognize[s] 'a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). Given Proposition 211's enormous scope, onerous burdens, and distant relation to any important state interest, a "substantial number of its

30

applications are unconstitutional" relative to any "plainly legitimate sweep." *See id.*

## A. The District Court Misconstrued Supreme Court Jurisprudence Strictly Limiting Compelled Disclosure.

Under the Supreme Court's jurisprudence, compelled disclosure is the exception, not the rule. The "Court has 'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'" *Id.* at 606 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). "Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Id.* (quoting *Roberts*, 468 U.S. at 622).

It is "hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.* (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)). As the Court has observed, "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and there is a "vital

31

relationship between freedom to associate and privacy in one's associations." *Id.* (quoting *NAACP v. Alabama*, 357 U.S. at 460, 462).

Laws compelling disclosure are therefore invalid unless they withstand "exacting scrutiny" under the First Amendment. *Id.* at 607 (plurality opinion) (quoting *Buckley*, 424 U.S. at 64). Exacting scrutiny requires that a law bear a "substantial relation" to the "sufficiently important" interests asserted by the state. *Id.* (quotation omitted). Not every interest so qualifies. Indeed, the Supreme Court has acknowledged few interests of sufficient "magnitude" to justify disclosure. *Buckley*, 424 U.S. at 66. First, disclosure can be justified if it "provides the electorate with information" relevant to an election, *i.e.*, the contributions to a future lawmaker that may help voters predict in-office decision-making. *Id.* at 66–67. Second, disclosure requirements can be justified when they "deter actual corruption and avoid the appearance of corruption." *Id.* at 67.

The informational interest is carefully circumscribed. Even information that might otherwise be relevant to a voter, such as a candidate's medical records, cannot be compelled. Disclosure can pass muster only if it "provides the electorate with information as to where

political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office." *Id.* at 66–67 (quotations and footnote omitted). The essential premise for upholding a duly tailored disclosure requirement is that "[t]he sources of a candidate's financial support" can "alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office." *Id.* at 67.

But "[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995). *McIntyre* and other precedents protecting anonymity refute the notion that government can compel *any* information it chooses, no matter how sensitive or attenuated, just by invoking a facile informational interest. Otherwise, a law could demand disclosure not only of donors' identities, but even more sensitive information that, while potentially relevant, does not "alert the voter to the interests to which a candidate is most likely to be responsive" (such as medical history and tax returns), *Buckley*, 424 U.S. at 67, or information that is not relevant at all, such as Social Security or

credit card numbers. Such laws would unquestionably chill expression and participation without commensurately benefiting voters.

To be sure, the Supreme Court in *Citizens United* stated that "the informational interest alone" can be "sufficient to justify" disclosure requirements. 558 U.S. at 369. But *Citizens United* in no way overruled *Buckley* and *McIntyre*, or permitted disclosure of *any* and *all* "information." *McIntyre*, 514 U.S. at 348. The Court's statement must be read in context: it concluded the discussion responding specifically to Citizens United's contention that "the governmental interest in providing information to the electorate does not justify requiring disclaimers for any commercial advertisements, including the ones at issue here." *See Citizens United*, 558 U.S. at 368–69. The "informational interest" asserted in *Citizens United* is thus the same limited interest previously articulated in *Buckley* and *McIntyre*, not some new government charter overruling sub silentio those landmark decisions.

It suffices to note that the disclosures in *Citizens United* did not include all donors who donated to Citizens United, let alone its donors' donors, and donors' donors' donors, and so on. *See* 558 U.S. at 366. To the contrary, the disclosures concerned a film that was ruled to be an

34

"electioneering communication" under the Bipartisan Campaign Reform Act of 2002 ("BCRA"). *Id.* at 368 (citation omitted). BCRA's definition of "electioneering communication" in turn was drawn so that it encompassed only a "'broadcast, cable, or satellite communication' that 'refers to a clearly identified candidate for Federal office' and is made within 30 days of a primary or 60 days of a general election." *Id.* at 321 (quoting 2 U.S.C. § 434(f)(3)(A) (2006 ed.)). The *Citizens United* Court concluded that disclosures precisely tied to *those* communications would adequately serve the public's "interest in knowing who is speaking about a candidate shortly before an election." *Id.* at 369.

In sum, *Citizens United* upheld disclosures evidencing a close nexus to electoral advocacy intending to steer individual candidates to victory or defeat. It also permitted disclosure only of organizational speakers and funders who knowingly earmarked their contributions for electioneering (different from an entire network of donors). That holding tracks *Buckley*'s narrow articulation of the informational interest—to help voters determine "the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office." 424 U.S. at 67. Post-*Citizens United*, the Court did not recognize

35

a generalized interest in any potentially "relevant information," no matter how removed from electing individual candidates. *McIntyre*, 514 U.S. at 348. The "informational interest" endorsed in *Buckley* remains narrow, by nature and by design.

Throughout its decisions, the Supreme Court has narrowly permitted: (1) disclosures of contributors to political committees whose major purpose is the nomination or election of a candidate, such as candidate committees, party committees, and Super PACs, or (2) event-based disclosures for independent expenditures or electioneering communications, which include disclaimers noting the name of the organization that paid for the communication and a public filing to the Federal Election Commission disclosing only those persons who earmarked their contributions for electioneering. *See Buckley*, 424 U.S. at 62–84; *McConnell v. FEC*, 540 U.S. 93, 194–202 (2003); *Citizens United*, 558 U.S. at 368–71. And post-*Citizens United*, many courts have emphasized the importance of limiting disclosure to contributions specifically earmarked to support campaign-related advocacy. *See, e.g.*, *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 501 (D.C. Cir. 2016); *Indep. Inst. v.*

*Williams*, 812 F.3d 787, 789 (10th Cir. 2016); *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1247–48 (10th Cir. 2023).

Nor is any legitimate informational interest furthered by look-through provisions that purport to identify the "original source[]" of funding, A.R.S. § 16-973(A)(7), in order to "identify[] 'who is speaking,'" ER-20 (quoting *No on E*, 85 F.4th at 505). The decision below rests on the assumption that, if A gives to B, and B gives to C, and C gives to D … and Z finally engages in electioneering, then A is somehow the "true source" that should be disclosed. But the Supreme Court has already rejected that assumption as "divorced from reality," particularly insomuch as it targets circumvention that is already prohibited. *See McCutcheon v. FEC*, 572 U.S. 185, 215–16 (2014) (plurality opinion).

The Court also rejected similar reasoning in *California Medical Association v. Federal Election Commission*, 453 U.S. 182 (1981) ("*CMA*"). There, the California Medical Association ("CMA") argued that, because its political action committee, CALPAC, was limited to contributing $5,000 to a candidate, there should be no limit on its contributions to the PAC. *Id.* at 195. The Court disagreed, observing

that this line of argument improperly conflated the PAC's speech with the CMA's:

> [A]ppellants' claim that CALPAC is merely the mouthpiece of CMA is untenable. CALPAC instead is a separate legal entity that receives funds from multiple sources and that engages in independent political advocacy. Of course, CMA would probably not contribute to CALPAC unless it agreed with the views espoused by CALPAC, ***but this sympathy of interests alone does not convert CALPAC's speech into that of CMA***.

*Id.* at 196 (emphasis added). In *Buckley*, the Court similarly upheld limits on contributions to candidate committees (as opposed to independent expenditures) in part because "the transformation of contributions into political debate *involves speech by someone other than the contributor*." 424 U.S. at 21 (emphasis added). *Buckley* and *CMA* thus refute the misconception that look-through disclosures serve to "identify the speaker." ER-20.

## B. Proposition 211 Is Not Substantially Related To A Sufficiently Important Interest.

Contrary to the district court's determination, Proposition 211 lacks a "substantial relation to a strong governmental interest." ER-20. Proposition 211 does not meaningfully advance any accepted interest in providing information or deterring corruption. The law's look-through

38

disclosures require countless groups engaged in advocacy, a vast stripe of which is defined to be "campaign media spending" (as discussed *infra* Section I.D), to publicly disclose their donors, as well as their donors' donors, and so on back to the "original source[]" of funding. A.R.S. § 16-973(A)(7). In particular, covered entities must disclose primary and secondary donors who donate more than $5,000, *id.* § 16-973(A)(6)–(7), while also issuing disclaimers identifying their top three "donors" (whether primary or secondary), *id.* § 16-974(C). This is so even if the "original sources" who indirectly provided funds never foresaw or intended that their donations would be used for "campaign media spending." *Id.* § 16-973(A)(6)–(7).

As such, the requisite disclosures and disclaimers are not pegged to any purpose, intent, or even knowledge by a donor that an upstream donation would wind up being used for downstream electioneering—let alone used in Arizona. For these reasons, the district court was wrong to conclude that the law "has a substantial relation to a strong governmental interest of identifying funders of campaign media spending." ER-20.

39

1.   **Proposition 211 Does Not Substantially Relate To Any Accepted Informational Interest.**

*Proposition 211's Disclosures Are Not Sufficiently Tied To Electoral Activity.* No genuine informational interest is furthered by Proposition 211's look-through provisions. A.R.S. § 16-973(A)(6)–(7). The district court wrongly determined that these provisions further the State's interest in "identifying funders of campaign media spending," reasoning that disclosures "are only effective" if they "identify[] 'who is speaking'" and not if they "identify[] only the 'creative but misleading names' of the immediate donors." ER-20 (quoting *No on E*, 85 F.4th at 505). But even if "creative" names do not provide much information standing alone, neither do the names of individual donors. In either case, interested individuals must investigate further. And it is typically straightforward to identify who is "behind" organizations—who incorporated it, what groups it shares an address with, and the press reports of its outspoken leaders. Such information is available to all on the Internet. By contrast, it may be much more difficult to pin down the leanings of individuals.

The flaws in the district court's reasoning go even deeper. *See supra* Section I.A. Presuming that the first in a long chain of donors is somehow

40

the 'true source' is an assumption "divorced from reality," particularly when circumvention via proxy electioneering is already prohibited. *See McCutcheon*, 572 U.S. at 215–16 (plurality opinion). Nor does the downstream use of donations reflect the speech of upstream donors, per the Court's reasoning in *Buckley* and *CMA*. *Supra* Section I.A. These decisions dispel the misconception that Proposition 211's look-through disclosures serve properly to "identify the speaker." ER-20.

The disconnect between an upstream donor and unforeseen electioneering much further downstream is particularly stark and dispositive here. Suppose a business donates to a 501(c)(4) advocacy group in December 2024 because of the group's research on a particular policy issue. In July 2025, the group gives to a separately incorporated, independent organization to support its efforts on a completely different issue. If the independent organization spends $50,000 to promote a ballot initiative in October 2026, there would be no basis to presume the business also supported that ballot initiative—after all, it relinquished all control of its donation, which it gave for different purposes, nearly two years earlier.

41

In this light, the lack of an intent or earmarking requirement further undermines any informational interest purportedly served by Proposition 211. *Cf. Van Hollen*, 811 F.3d at 501. When an individual donates money without strings, that person is not the "true donor" for the organization's electioneering. Instead, an organization's use of unearmarked funds is the organization's speech, *not* that of individual donors. This is particularly true for people who donate to heterodox organizations and may not share all of the organizations' views. Yet Proposition 211 compels the disclosure of donors who had no intent to engage in "electioneering" (spanning sundry forms of political advocacy) based on unforeseeable actions that organizations later undertake. The problem is compounded for secondary donors, whose information will be disclosed based on the activities of downstream organizations to which they lack any meaningful connection. Disclosing such "donors" in no way alerts voters "to the interests to which a candidate is most likely to be responsive." *Buckley*, 424 U.S. at 67.

Although the district court reasoned that the law prevents wealthy interests from routing electoral funding through "misleading[ly] name[d]" intermediaries to hide their identities, ER-20, intentional

42

circumvention is already illegal under both Arizona and federal statute. *See* A.R.S. § 16-1022(B); 52 U.S.C. § 30122.  If preventing circumvention were truly Proposition 211's purpose, the law would include some knowledge or intent requirement.  That it does not betrays the absence of any "substantial relation" to this asserted interest.  *Bonta*, 594 U.S. at 611.

Because Proposition 211 dumps undifferentiated piles of donor data upon the public, it undermines Arizona's interest in "provid[ing] the electorate with information."  *Buckley*, 424 U.S. at 66.  Indeed, the law will affirmatively mislead voters by directly tying named donors to candidates and issues those donors may not support at all.  Suppose a devout Catholic who supports gun control gives to a center-left 501(c)(4) to support a bump-stock ban.  If the 501(c)(4) group then spends money supporting a candidate who advocates for strong abortion rights, the donor may be disclosed as a funder of its ads—even though she is actually pro-life.  Far from helping the electorate understand the interests to which the candidate is "most likely to be responsive," *id.* at 67, the disclosure at best confuses and at worst misleads the electorate.

43

The sheer volume of information to be disclosed under Proposition 211 further undermines any informational interest. Far from adding meaningful information and aiding understanding, a barrage of spurious information far removed from any funds flowing to any candidate can only sow confusion and misperception among the electorate. This does more harm than good for voters' actual understanding.

Simply put, the "information" provided by Proposition 211 serves no salutary purpose and does not further a "sufficiently important" state interest. *Bonta*, 594 U.S. at 618. As the Supreme Court explained, "[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre*, 514 U.S. at 348.

***The Opt-Out Provisions Do Not Save Proposition 211.*** Contrary to the district court's reasoning, Proposition 211's opt-out provisions do not cure its constitutional infirmities. To begin, they do not apply at all to secondary donors or to disclaimers. *See* ER-31 (acknowledging the opt-out procedure applies to "donors giving to a covered person"). Although the Commission's rules state that a donor who has opted out need not be included in a public communication's

44

disclaimer, *see* A.A.C. R2-20-805(B), that interpretation finds no support in Proposition 211's text and is therefore subject to judicial override, particularly when private parties sue to compel enforcement.

Moreover, the law's insistence that donors either *opt out* of their private association expression or else be outed against their will for a donation to a non-profit that engages in a modest amount of "campaign media spending" starkly highlights the intrusion on associational and expressive freedoms. And the obligation to invite donors to opt out *post hoc* hamstrings private associations at critical junctures.

The theory of the opt-out provision is that donors can avoid burdens upon their associational rights by *opting out of exercising their associational rights*. That is no more an answer to the First Amendment problem than saying that donors could avoid Proposition 211 by declining to donate altogether. The value of the freedom to associate lies in enabling members, including those who may be unpopular or subject to discrimination, to band together under a protective umbrella while outsourcing decision-making to trusted, expert leaders. *See Bonta*, 594 U.S. at 606 (noting freedom of association "is especially important in preserving political and cultural diversity and in shielding dissident

expression from suppression by the majority") (quoting *Roberts*, 468 U.S. at 622); *see also id.* (noting that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association") (quoting *NAACP v. Alabama*, 357 U.S. at 460). Businesses, for example, join trade associations precisely so they do not have to take the lead in fighting a government regulation in court, potentially angering a powerful official by opposing a bill, or speaking out for the industry.

Proposition 211's opt-out provisions subvert that protection. They require members to differentiate and separate themselves to protect their anonymity, thereby vitiating the very benefits that make it so valuable for members to associate. In fact, the law *actively pressures* donors to opt out, lest they suffer damaging disclosure. It cannot be that the compelled disclosure struck down in *NAACP v. Alabama* would have been upheld if only Alabama had invited NAACP members to "opt out" of having their dues used to support civil rights in the state. The opt-out procedure thus compounds constitutional concerns.

Furthermore, the opt-out procedure forces speakers to sit silent for up to 21 days before using or transferring donor monies for campaign

media spending. That is a stifling burden on speech—particularly in the context of political issues, where "timing is of the essence" and "it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring). Because "delay may permanently vitiate the expressive content" of such a message, *City of Richmond*, 743 F.2d at 1356, the opt-out procedure poses its own First Amendment offense.

Last, the opt-out provision chills time-sensitive expression by advocacy groups. For a nationwide advocacy group with heterodox views, such as AFP and AFPF, donors may agree with certain positions while disagreeing with others. But if one donor chose to opt out after 21 days, and that donor's funds were deposited in the group's general fund, Proposition 211 could prohibit using *any* funds in the group's general fund. The district court responded that a restriction on using "'the donor's monies'" after an opt-out "cannot plausibly be interpreted to mean 'all funds in the covered person's general treasury,'" ER-24, but it failed to explain how fungible money in a general account can be disentangled. At a minimum, the law's fuzziness on this point casts chill. Although the Commission has issued an advisory opinion permitting organizations to

cherry-pick disclosures,[5] this opinion breaks from the statute's text, is subject to reconsideration, and can be challenged by private complainants. If anything, it is a tacit acknowledgement of the law's overreach.

Worse, the Commission has also promulgated rules that a "donor may request to opt out at any time after the initial notice period" and "shall be treated as having opted out by the covered person." A.A.C. R2-20-803(E). The Commission has yet even to say what a covered entity should do if it spends a donor's money after the initial notice period and the donor thereafter decides to opt out. By enabling donors to opt out even after the 21-day period expires, Proposition 211 compounds uncertainty and chill.

Without denying that Proposition 211 will sometimes require covered entities to sit silent, the court shifted blame to the "decisions made by the 'would-be speakers,' *i.e.* covered persons, or their donors." ER-23. It posited that a group could ask for consent upfront, or a donor could provide "immediate written consent" when asked. *Id.* But

---

[5] A.O. 2024-02 at 6–7, *available at* https://storageccec.blob.core. usgovcloudapi.net/public/docs/969-Advisory-Opinion-24-02--approved--by-Commission-1_24_25.pdf.

reasonable groups may not foresee later using donations for what Arizona now deems "campaign media spending" and donors confronting a novel, unexpected "opt-out" notice may predictably pause over it. Notably, causes that are traditionally uncontroversial can become political flashpoints overnight. As a result, advocacy groups may suddenly need to speak out on an issue for the first time, or on new Arizona terrain, and quickly. In these recurring circumstances, Proposition 211 imposes "delay" that "may permanently vitiate the expressive content" of groups' messages. *City of Richmond*, 743 F.2d at 1356.

***The District Court Erroneously Relied On Inapposite Decisions.*** Nor do any other decisions cited below justify crediting the claimed informational interest. The district court misplaced reliance on *No on E v. Chiu*, 85 F.4th 493 (9th Cir. 2023). ER-16–19. The San Francisco ordinance at issue in *No on E*—a case decided in a preliminary-injunction posture—requires disclaimers listing the top three donors to a PAC and, if one is a committee, its top two contributors. 85 F.4th at 498. That is, it requires disclosure of secondary committees and their donors only when they are "necessarily . . . making an affirmative choice to

engage in election-related activity" by "donating to a primarily formed committee." *Id.* at 510. The disclosures in *No on E* were thus tailored towards electioneering in a way that these are not.

Moreover, *No on E*'s look-through disclosures reach no further than two contributors. *Id.* at 498. That too distinguishes Proposition 211, whose infinite look-through provisions reach all the way back to a donation's supposed "original source[]." A.R.S. § 16-973(A)(6)–(7). Proposition 211 is compelling disclosures and disclaimers for unknowing secondary donors who never intended their money to be used for election-related activity. Simply stated, the organizations covered by San Francisco's ordinance stand quite distinct from the vast, diverse array of nonprofits and other organizations that will be caught in Proposition 211's dragnet, without ever having made an "affirmative choice to engage in election-related activity," *No on E*, 85 F.4th at 510, before being targeted, burdened, and broadcast as the "original source[]" donors, A.R.S. § 16-973(A)(6)–(7).

It also bears noting that the plaintiffs in *No on E* challenged the ordinance's disclaimer requirements, but not the associated disclosure requirements. 85 F.4th at 511. For that reason, this Court concluded

50

that the secondary donors included in the disclaimers under the ordinance would "still . . . be subject to disclosure and publicly visible on government websites" even if the plaintiffs prevailed. *Id.* Because that alone was dispositive, the rest of the opinion is dicta.

This Court also stated that "Defendants have a strong governmental interest in informing voters about who funds political advertisements," because understanding "what entity is funding a communication allows citizens to make informed choices in the political marketplace." *Id.* at 505. Such reasoning does not apply to Proposition 211, where many of those regulated are not even aware that they are funding a group that may subject them to disclosure. To the extent that *No on E* would nonetheless be read as justifying the decision below, it is incompatible with Supreme Court precedent and First Amendment imperatives, and it should be overruled either by this Court en banc or else by the Supreme Court.

The district court's reliance on the ordinance at issue in *Smith v. Helzer*, 95 F.4th 1207 (9th Cir. 2024), is likewise misplaced. ER-18–19. The Alaska statute challenged there did require donors to identify "the true sources of the contribution, and intermediaries, if any." *Helzer*, 95

F.4th at 1212.   As the district court itself admitted, however, the challengers "did not attack the constitutionality of the 'true source' requirement" on appeal.  ER-18 (citing *Helzer*, 95 F.4th at 1212).  Nor did the plaintiffs "even dispute the existence of an important government interest."  ER-18 (citing *Helzer*, 95 F.4th at 1212).  The decision therefore stops well short of indicating whether Proposition 211's look-through disclosures bear a "substantial relation" to a sufficiently important interest in providing relevant information to voters.  ER-20.

Finally, in its discussion of "Substantial Relation and Governmental Interest," the district court passingly cited *Gaspee Project v. Mederos*, 13 F.4th 79, 87 (1st Cir. 2021).  ER-20.  For the reasons discussed *infra* Section I.D.2, however, that out-of-circuit decision is neither instructive nor persuasive.

In sum, the "information" tuned up by Proposition 211 serves no useful purpose and is untethered to a "sufficiently important" state interest.  *Bonta*, 594 U.S. at 618.

### 2.    Proposition 211 Does Not Substantially Relate To Any Anti-Corruption Interest.

Nor does Proposition 211 meaningfully advance any anti-corruption interest.  The district court did not rely on this interest in its decision—

52

and for good reason. Disclosure requirements can be justified where they "deter actual corruption and avoid the appearance of corruption" by exposing "a candidate's most generous supporters," thereby equipping the public to "detect any post-election special favors that may be given in return." *Buckley*, 424 U.S. at 67. Far from spotlighting the flow of money to Arizona candidates, Proposition 211 has no application whatsoever to money given directly to candidates. Meanwhile, requiring disclosures and disclaimers of unwitting, disinterested donors does not meaningfully curb any of the supposed evils attributed to "dark money." Nor can there be *any* anti-corruption interest served for disclosures tied to ballot measures. *See, e.g.*, *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 790 (1978) ("The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue.") (citation omitted).

## C. The Strength Of The State's Interest Does Not Reflect The Serious Burdens On First Amendment Rights.

The "strength of the governmental interest" advanced by Proposition 211 also fails to "reflect the seriousness of [its] actual burden on First Amendment rights." ER-16 (quoting *No on E*, 85 F.4th at 504).

53

As noted above, *supra* Section I.B, the district court erred in concluding that Proposition 211 serves a "'strong' governmental interest." ER-20.

On the other side of the scale, Proposition 211 seriously burdens First Amendment rights. ER-20–24. Not only does the law require covered entities to disclose their donors' identities, employers, and occupations, but it also imposes stifling opt-out requirements and burdensome recordkeeping requirements.

***Opt-Out Procedures.*** As noted, Proposition 211's opt-out provisions impose their own grave burdens on First Amendment rights. *Supra* Section I.B.

***Recordkeeping Requirements.*** Proposition 211's required transfer records also impose undue burdens, imperiling donor privacy in the absence of any provisions that would secure these records. *See* A.R.S. § 16-972. To make matters worse, Proposition 211 mandates that transfer records be retained far beyond the initial election cycle. *Id.* All told, secondary donors who give over $2,500 will have no control or knowledge over the ultimate use of their funds, nor any control over disclosure of their personal information.

The district court discounted these administrative burdens by saying they are "spread across multiple individuals and entities." ER-20–21. But such reasoning is upside-down: Miring multiple parties in administrative quagmire makes the law *more* burdensome, not less. While the court faulted Appellants for supposedly failing to explain their privacy concerns, ER-21, Appellants alleged that Proposition 211's vague "far-reaching yet ill-defined contours" make it impossible for covered entities to tell "what exactly triggers coverage and thus when their personal information will be disclosed," thereby undermining any ability to "ensur[e] privacy." ER-69. Considering that all reasonable inferences needed to be drawn in Plaintiffs' favor at this stage, there should be no dismissing the operative privacy concerns.

***Private Enforcement.*** Proposition 211's private enforcement mechanism also imposes significant First Amendment burdens. According to the district court, it is "factually inaccurate" to say that Proposition 211 "deputiz[es]" voters and "vest[s]" private parties with "enforcement power" because private suits must be filed against the Commission. ER-12. But that technical quibble makes no substantive difference. The point remains that this enforcement mechanism

55

empowers private parties to interpret the law aggressively and expansively, and to have their interpretation judicially enforced over the Commission's contrary views. This deputization sows unpredictability and chill, particularly given the law's broad triggers. The safe harbors promised by the Commission's advisory opinions may prove illusory once private enforcers urge different interpretations and have those imposed *post hoc*, or, alternatively, the Commission's composition or views change. Covered entities therefore face palpable exposure and chill from the law as enacted.

Moreover, the private suits themselves impose First Amendment burdens. Even if the private complainant loses, the charge itself can be damaging, especially when filed near the election. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 152–53, 164–65 (2014), *on remand* 814 F.3d 466, 475 (6th Cir. 2016).

### D. Proposition 211 Is Not Narrowly Tailored.

Nor is Proposition 211 "narrowly tailored" to the asserted interest. ER-24. The law lacks any reasonable fit given its overbroad disclosures and disclaimers, sweeping triggers, indiscriminate approach to media,

lack of any major purpose requirement, underinclusivity, and relatively low monetary thresholds.

>1.     **Proposition 211's Disclosures And Disclaimers Are Overbroad.**

First, Proposition 211 is not narrowly tailored for the same reasons it is not substantially related to the State's purported interest. *See supra* Section I.B.  Proposition 211 compels the disclosure of donors who had no knowledge of or intent to engage in electioneering.  Donors will be disclosed based on unforeseeable actions that organizations later undertake.  The predicament is still worse for secondary donors, whose information may be publicly disclosed based on the activities of groups they never donated to or even knew existed.  *See* A.R.S. § 16-973(A)(6)–(7).

Proposition 211 thus ensnares third parties around the country who have only the faintest connection to Arizona elections.  Someone in Virginia who donated to one group could later discover that her name and home address were publicly tied to a different group she never heard of and never donated to—just because some portion of the money she gave to a different entity, for different reasons, made its way to a group addressing issues in Arizona.  Proposition 211 thus publicizes donors'

information based not on their own speech, but rather the speech of downstream organizations to which they lack any meaningful connection. And it drastically sweeps nationwide so as to ensnare donors in every state in ways that diverge from and even conflict with regulation by the federal government and other states.

Donors may be disclosed up to two years after donating. A.R.S. § 16-971(8). And this disclosure may be based on "campaign media spending" that was unforeseeable when they donated. As such, "donors" may face disclosure years later even though they never intended that downstream organizations would receive their funds, let alone their personal information. Such an indiscriminate, nationwide dragnet does not qualify as "narrowly tailored." *See Bonta*, 594 U.S. at 611.

Proposition 211 also requires disclosure of donors' occupations and employers. A.R.S. §§ 16-973(A)(6)–(7), 16-971(10)(a). It thereby subjects unwitting employers to doxxing based not on their election-related activity, but rather based on the (potentially) unintended actions of their employees. Without earmarking or similar limitations, Proposition 211 is menacingly overinclusive.

2.   **Proposition 211's Opt-Out Provisions Do Not Make It Narrowly Tailored.**

The district court pointed to Proposition 211's opt-out provisions as proof of the law's narrow tailoring. ER-31. This is misconceived for the reasons already noted. *See supra* Section I.B. The court also cited *Gaspee Project v. Mederos*, 13 F.4th 79 (1st Cir. 2021), which upheld a disclosure law that permitted primary donors to "instruct the recipient not to use the donation on election-related communications." ER-30 (citing *Gaspee Project*, 13 F.4th at 89). But *Gaspee Project* likewise overlooked how such provisions subvert associational freedom, pressuring donors to opt out on pain of disclosure which muffles the speech of regulated groups. *See supra* Section I.B. Nor did it explain how opt-out provisions somehow solve the problem that "many general-fund donors may not endorse all of an organization's election-related expenditures." *See Gaspee Project*, 13 F.4th at 89. Because the First Circuit failed to take account of these issues, this out-of-circuit decision is unpersuasive.

3.   **Proposition 211's Triggers Are Overbroad.**

Proposition 211 also is not "narrowly tailored," *Bonta*, 594 U.S. at 611, given the broad definition of "campaign media spending," which triggers the law's crushing burdens. All told, the law regulates and

59

penalizes incidental, issue-oriented references to a staggering variety of state and local officeholders, candidates, and issues.

**A.R.S. § 16-971(2)(a)(iii).** First, "campaign media spending" includes any "public communication that refers to a clearly identified candidate" if it is made "within ninety days before a primary election until the time of the general election" and is "disseminated in the jurisdiction where the candidate's election is taking place." This broad trigger sweeps in issue advocacy well removed from elections—indeed, merely mentioning an elected official between April and November of any even-numbered year suffices. This window corresponds with critical periods when the Arizona legislature is in session. Had Proposition 211 then been in effect, immigration advocacy organizations would have triggered coverage just by mentioning Sherriff Joe Arpaio's contempt proceedings before his 2016 election.

As the district court noted, "electioneering" under federal law also includes mere "reference" to clearly identified candidates. ER-25. But as discussed above, *see supra* Section I.A, federal law confines itself to circumscribed time windows and broadcast mediums. These guardrails better ensure that disclosures are narrowly tailored to election-related

60

activity, and do not dampen vital speech—particularly during critical periods of legislative activity.

**A.R.S. § 16-971(2)(a)(iv).** The trigger for ballot measures is similarly overbroad. Recent state and local measures highlight this trigger's sweep, ranging from issues involving animal welfare (such as the 2016 "Save the Puppies and Kittens" initiative[6]) to nature preservation (such as the 2018 Scottsdale measure protecting the McDowell Sonoran Preserve[7]). Advocating for the humane treatment of animals does not equate with electioneering. Indeed, charitable organizations can engage in such advocacy consistent with their 501(c)(3) status. Under Proposition 211, however, such groups will be equated with electioneering committees and subjected to the law's burdens if a

---

[6]     *See* Arizona Secretary of State, *2016 Initiatives, Referendums & Recalls—Initiative, Referendum and Recall Applications—No. I-22-2016*, *available at* https://apps.azsos.gov/election/2016/general/initiatives.htm.

[7]     *See* Lorraine Longhi, *The fight for the preserve is over: Scottsdale voters overwhelmingly approve Prop. 420*, The Arizona Republic (Nov. 9, 2018), *available at* https://www.azcentral.com/story/news/local/scottsdale/2018/11/06/scottsdale-proposition-420-desert-edge-development-mcdowell-sonoran-preserve-question-1-sales-tax/1809403002/.

measure concerning their area of concern appears on the ballot *at any time*.

The court below stated that "[g]eneric communications that make no reference to an initiative would not be covered" unless the communications expressly advocated for or against a measure. ER-26. But even though the court expressed incredulity about "why any official would ever read the Act as reaching that situation," *id.*, the statute's vague terms pose precisely this risk, particularly given the law's private enforcement mechanism and the specter it poses of opportunistic weaponization by political rivals. A.R.S § 16-977.

**A.R.S. § 16-971(2)(a)(ii), (v).** Proposition 211's coverage can also be triggered by a communication that "promotes, supports, attacks or opposes a candidate within six months preceding an election involving that candidate" or that "promotes, supports, attacks or opposes the recall of a public officer" at any time. A.R.S. § 16-971(2)(a)(ii), (v). Of course, any speech that criticizes or praises an officeholder could potentially be characterized as advocating (at least implicitly) for or against the officeholder's recall.

Below, the court insisted that "[t]he most obvious reading of the Act's language is that it is referring to a recall that already exists," and "[u]ntil then, the Act will not be triggered by Plaintiffs or others merely referencing public officials." ER-26–27. But this narrow reading is by no means dictated by the law's text. It is naïve to think that no officeholder, proxy, or supporter would ever find fault with public criticism that helps spawn a recall. Again, Proposition 211's private enforcement invites such opportunistic interpretations. A.R.S § 16-977.

*A.R.S. § 16-971(2)(a)(vi).* The catch-all trigger for "other partisan campaign activity" similarly invites standardless discretion and weaponization by political adversaries. A.R.S § 16-971(2)(a)(vi). Given our hyper-partisan culture, regulators can target political rivals by deeming advocacy on hot-button issues to be "partisan," as major political parties take positions on pressing issues like immigration, abortion, or election integrity. Again, the district court (without imposing any narrowing construction) expressed certitude that the "partisan" activity mut be akin to partisan voter registration or get-out-the-vote efforts. ER-27. In the court's view, "[t]he possibility that officials will misread the Act and apply it to any speech they deem 'hot-button' is not plausible,"

and "[s]hould that occur, the targeted individuals or entities would be free to make an as-applied challenge." *Id.* But that blithe assurance offers cold comfort to regulated entities and donors, whose First Amendment rights will be burdened by law's vagaries before they might ultimately prevail in any as-applied challenge.

**A.R.S. § 16-971(2)(a)(vii).** Proposition 211 also reaches preparatory activity occurring wholly outside Arizona's borders, including "[r]esearch, design, production, polling, data analytics, mailing [and] social media list acquisition." A.R.S. § 16-971(2)(a)(vii). Proposition 211 thus regulates an out-of-state organization that spends over $50,000 preparing a "public communication" that merely "refers to a clearly identified candidate" in an online post or national newsletter discussing a salient political issue that is "disseminated" in the candidate's jurisdiction during the relevant window. *Id.* § 16-971(2)(a)(iii), 7(a). This is particularly problematic for online posts that are "disseminated" wherever users access the internet. In response, the court misread the "website" exception, ER-28–29, which covers communications *by* "website[s]," in addition to communications "by" newspapers, magazines, and other publishers, *see* A.R.S. § 16-

64

971(2)(b)(i). The exception does **not** extend to communications posted **to** websites if the group is not itself a web-based news publisher (for example, the Huffington Post).

To be sure, the Commission has issued advisory opinions purporting to limit Proposition 211's reach. In particular, the Commission has opined that "purely internal" activities like "research, polling, and data analytics" do not constitute campaign media spending so long as they were not undertaken, at the time, for the purpose of making a communication covered by Proposition 211. *See* A.O. 2024-01[8] at 5; A.O. 2024-04[9] at 7. But those opinions seemingly defy the law's text, which Arizonans are authorized to enforce by filing "a verified complaint" with the Commission, A.R.S. § 16-977(A), and by suing to "compel" enforcement if the Commission declines, *id.* § 16-977(C).

**Private Enforcement.** For the reasons explained above, *supra* Section I.B, Proposition 211's private enforcement mechanism empowers

---

[8]     *Available at* https://storageccec.blob.core.usgovcloudapi.net/ public/docs/968-Advisory-Opinion--24-01-approved--by-Commission-1_25_24-.pdf.

[9]     *Available at* https://storageccec.blob.core.usgovcloudapi.net/ public/docs/1026-AO-24-04-AOR-2402-Approved-5_16_2024-ADLCC.pdf.

complainants to compel broad readings of the law and invalidate safe harbors contained in the Commission's advisory opinions, which themselves are subject to change based on the agency's evolving views or composition.

    4.    **Proposition 211 Covers Forms Of Media Much Broader Than Federal Law.**

Proposition 211 also sweeps up wide-ranging forms of communication. It extends across communications made by means of the "internet or another digital method, newspaper, magazine, outdoor advertising facility, mass mailing or another distribution, telephone bank or any other form of general public political advertising or marketing, regardless of medium." A.R.S. § 16-971(17)(a). That contrasts with BCRA's narrower coverage specifically of "any broadcast, cable, or satellite communication." 52 U.S.C. § 30104(f)(3)(A)(i).

    5.    **Proposition 211 Applies Even If Electioneering Is Not A Major Purpose Of The Group.**

Proposition 211's definition of "covered person" sweeps far beyond "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate," drastically burdening organizations even when their "major purpose[s]" do not

encompass election-related activity. *Buckley*, 424 U.S. at 79; s*ee also Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 839 (7th Cir. 2014). Under Proposition 211, non-profit organizations of any stripe that engage in anything loosely categorized as "campaign media spending" are lumped together with PACs without regard for their primary purposes.

Appellants recognize that this Court has held disclosure requirements need not be limited to organizations with electoral activity as their one, single major purpose. *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1009–10 (9th Cir. 2010). Nevertheless, *Brumsickle* still requires that campaign spending be at least one significant purpose for a covered organization—indeed, *Brumsickle* was not decided in the context of a law, like Proposition 211, that extends to both primary and secondary donors and to groups that only "incidentally engage in [political] advocacy." *See id.* at 1011. Because Proposition 211's $50,000 threshold represents a small fraction of the budgets for many national organizations, it is impermissibly ensnaring groups that only "incidentally engage in [political] advocacy." *Id.*

### 6. **Proposition 211 Is Underinclusive.**

While Proposition 211 goes too far in the above-noted respects, it is strikingly under-inclusive in others due to its conspicuous carve-outs for certain membership organizations. A law is unconstitutionally underinclusive when it regulates some activities while excluding others that are no less integral to the government's claimed interest, "rais[ing] serious doubts about whether the government is in fact pursuing the interest it invokes." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1126 (9th Cir. 2020) (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011)). Organizations "that spend only their own business income for campaign media spending" are not "covered persons" under Proposition 211. A.R.S. § 16-971(7)(b)(ii). And "business income" is in turn defined as "[m]embership or union dues that do not exceed $5,000 from any one person in a calendar year." *Id.* § 16-971(1)(b). Proposition 211 thus unduly preferences labor unions over other advocacy associations.[10]

---

[10] *See* Jonathan Weisman, *S.E.I.U. Plans $200 Million Effort to Aid Biden and Democrats*, N.Y. Times (Mar. 13, 2024), https://www.nytimes.com/2024/03/13/us/politics/seiu-biden-democrats.html.

7. **Proposition 211's Monetary Thresholds Are Low.**

Proposition 211's low monetary thresholds exacerbate First Amendment concerns. The law's requirements apply to entities that spend more than $50,000 in statewide campaigns or more than $25,000 in other campaigns, and only donors that give more than $5,000 are disclosed. *See* A.R.S. §§ 16-971(7)(a), 16-973(A)(6)–(7). Although these numbers may seem reasonable at first blush, they represent aggregate spending across the two-year election cycle, and are a tiny fraction of the election spending in elections that purportedly animate Proposition 211. *See, e.g.*, Stacey Barchenger, *Campaign spending in governor race breaks Arizona record*, The Arizona Republic (Jan. 20, 2023), https://www.azcentral.com/story/news/politics/elections/2023/01/20/campaign-spending-in-governor-race-breaks-arizona-record/69806629007/.

These low thresholds are even more unreasonable considering the sweep of Proposition 211's coverage. Particularly for large entities like religious organizations and environmental-protection organizations that regularly engage in pure issue advocacy, individuals who make modest donations of just $50 per week during a two-year election cycle will be caught up in Proposition 211's dragnet.

69

The threshold is even lower—$2,500—for transfer records. A.R.S. § 16-973(E). Because such records must be provided across all organizations in a funding chain, without any associated confidentiality protections, they raise much the same concerns as the disclosures triggered by the $5,000 threshold.

The district court noted that federal law requires record-keeping of any contribution exceeding $50 or aggregating more than $200 in a calendar year. ER-21; *see* 52 U.S.C. § 30102. But federal law requires record-keeping only for three years, 52 U.S.C. § 30102(d), well short of the five years required by Proposition 211, A.R.S. § 16-972(A). And those are *contributions* made to *political committees* (*i.e.*, are inherently earmarked for political spending), 52 U.S.C. § 30101(4)(A), (8)(A)(i), quite different from general donations to a charitable or social-welfare organization that is primarily (or exclusively) engaged in non-political activity. Indeed, the Federal Election Campaign Act's definition of "contribution" requires an element of intent: something of value given "for the purpose of influencing any election for Federal office." *Id.* § 30101(8)(A). Not even all receipts by a federal political committee qualify as contributions (among other things, interest earned by the bank where

70

the committee keeps its funds is excluded). *See id.* § 30104(b)(2)(J). Moreover, Proposition 211 will require more recordkeeping than federal law, given its significantly broader scope and triggers.

## II. Proposition 211 Is Unconstitutional As Applied To Appellants.

Apart from their facial challenge, Appellants have alleged "a 'reasonable probability' that disclosure of [their] contributors' names 'will subject them to threats, harassment, or reprisals from either Government officials or private parties.'" *Citizens United*, 558 U.S. at 367 (quoting *Buckley*, 424 U.S. at 74).

Proposition 211 requires that public disclaimers accompany covered communications, A.R.S. § 16-974(C), and that "[o]fficials shall promptly make the information" included in the disclosure reports "public," *id.* § 16-973(H). Meanwhile, the complaint alleges that Appellants and their affiliates have "been subjected to bomb threats, protests, stalking, and physical violence." ER-143 (quotation omitted). The complaint further details how these risks have continued mounting, to the point that "'anyone with access to a computer [can] compile a wealth of information about' anyone else, including such sensitive details as a person's home address or the school attended by his children."

*Bonta*, 594 U.S. at 617 (quotation omitted); *see* ER-143. Donors have also been victimized by boycotts and personal threats. ER-110.

Unlike the Supreme Court, the district court dismissed these allegations as "generic," "unrelated," and unable to "plausibly be tied to the Act." ER-32–33. By the district court's telling, there are "no specific factual allegations supporting" the assertions that Appellants' "supporters have been subjected to bomb threats, protests, stalking, and physical violence." *Id.* At the pleading stage, however, Plaintiffs-Appellants need only allege "a specific set of circumstances in which the application of the law resulted in a violation of the plaintiff's rights." *Pilz v. Inslee*, 2022 WL 1719172, at *2 (W.D Wash. May 27, 2022) (citing *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003)).

Appellants' chronicling of boycotts, personal threats, bomb threats, and other violence, as alleged in the complaint and summarized by the Supreme Court, amply satisfies the applicable standard. Appellants need only allege a "reasonable probability" that disclosure will lead to "threats, harassment, or reprisals," *Citizens United*, 558 U.S. at 367 (quotation omitted), a low bar to clear, *see Grewal*, 2019 WL 4855853, at

*20 ("[A] 'reasonable probability' standard strikes the Court as less burdensome . . . ."); *Buckley*, 424 U.S. at 74 (allowing "sufficient flexibility in the proof of injury to assure a fair consideration of their claim").

The district court faulted Appellants for not including even more "specific factual allegations" that the potential harm "can plausibly be tied to the Act." ER-33. This was legal error, as the Supreme Court has rejected similar reasoning. *See Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 101 n.20 (1982). While explaining all the many ways Proposition 211 exposes their donors to expansive, invasive disclosure requirements, Appellants have simultaneously specified the "pattern of threats," "specific manifestations of public hostility," *Buckley*, 424 U.S. at 74, and "instances of recent harassment" that would attend public disclosures and that the Supreme Court has found sufficient for an as-applied challenge to prevail, *Brown*, 459 U.S. at 100–01. Appellants' specific allegations about the types of "threats, harassment, or reprisals" that could reasonably result from disclosure, *Citizens United*, 558 U.S. at 367 (quotation omitted), go well beyond the "generic" and "unrelated," and suffice to progress past the pleading stage.

73

Finally, the district court noted that Proposition 211 permits "original source[s]" to avoid disclosure if they can "demonstrate[] to the satisfaction of the commission" that "there is a reasonable probability that public knowledge of the original source's identity would subject the source or the source's family to a serious risk of *physical* harm." A.R.S. § 16-973(F) (emphasis added); *see* ER-33. But such an onerous showing does not obviate the as-applied First Amendment claim, which is properly founded upon a "reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed," *Citizens United*, 558 U.S. at 370 (citation omitted), regardless whether the feared harm would be "serious" or "physical," A.R.S. § 16-973(F). By its terms, Proposition 211's exemption procedure is incapable of defeating Appellants' as-applied challenge.

## III. Proposition 211 Unconstitutionally Compels Association Facially and As Applied.

It is unconstitutional for Proposition 211 to tie organizations and their donors to various positions, organizations, and candidates based on the downstream use of their fungible donations, without regard for donors' actual intent or beliefs. "The First Amendment protects the basic right to freely associate for expressive purposes; correspondingly, '[t]he

74

right to eschew association for expressive purposes is likewise protected.'" *Crowe v. Or. State Bar*, 989 F.3d 714, 729 (9th Cir. 2021) (quoting *Janus v. AFSCME*, 585 U.S. 878, 892 (2018)).

Because Proposition 211 requires no nexus between any covered donor, on the one hand, and Arizona political speech, on the other, it will falsely compel donors publicly to associate with causes they have no interest in and may even oppose. Donors from New York who contribute to one group aligned with their values will later discover that Arizona has associated their donations with an entirely different group pursuing a distinct mission and activity that Arizona then deemed to be electioneering. This concern looms for Appellants, who donate amounts exceeding $5,000 to organizations that may qualify as covered persons under Proposition 211: those covered persons, and any additional covered persons they subsequently donate to in amounts exceeding $5,000, would need to disclose the identities of Appellants along with their donors. ER-149–50.

As a result, Appellants and their donors will be compelled to associate with various positions, organizations, and candidates even where they did not intend or foresee the ultimate use of their funds when

75

they made their donation to an entirely different entity. It follows that Proposition 211 unconstitutionally compels association.

The district court dismissed this concern by reasoning that donors can "choose not to avoid disclosure" and disclosure can "easily be avoided." ER-33. In particular, the court posited two solutions. First, if a secondary donor "does not wish to have its donations . . . used in campaign media spending, it could inform the organization when the funds are donated." ER-34. Second, the court suggests the downstream recipient "must" provide the direct donor the "opportunity to opt out of having the donated funds used on campaign media spending." *Id.*

Neither proposal is satisfying. In the first, secondary donors have no assurance that downstream groups will track and abide by any restriction initially agreed. A secondary donor would need to rely on the immediate recipient to impose and enforce conditions further downstream. But the court does not suggest how this system could be instituted or enforced without unrealistic prescience and inordinate resort to lawyers and courts to enforce dizzying, unending strings. It is far more plausible that apprehensive secondary donors will opt against

donating funds for fear of downstream associations being drawn by government *ipse dixit*.

Nor does placing the secondary donor's associational rights at the mercy of another party protect associational rights. At best, Proposition 211 would be violating the First Amendment by placing associational rights in the hands of third parties.

Nor do Proposition 211's opt-out provisions obviate the compelled association. Indeed, no opt-out procedure is operative for secondary donors. *See* A.R.S. § 16-972(B). Regardless, the opt-out provisions suffer constitutional infirmities for all the reasons discussed. *Supra* Section I.B. The opt-out procedure "protects" associational freedom only to the extent that donors forbear from exercising it.

## CONCLUSION

For the foregoing reasons, this Court should reverse the dismissal.

September 16, 2024                    Respectfully submitted,

                                      */s/* Derek L. Shaffer
                                      _____
Dominic E. Draye                      Derek L. Shaffer
GREENBERG TRAURIG, LLP                Christopher G. Michel
2375 E. Camelback Rd., Ste. 800       QUINN EMANUEL URQUHART
Phoenix, AZ 85016                     & SULLIVAN, LLP
(602) 445-8425                        1300 I Street, NW, Suite 900
drayed@gtlaw.com                      Washington, DC 20005
                                      202.538.8000
                                      derekshaffer@quinnemanuel.com
                                      christophermichel@quinnemanuel.com

                                      *Counsel for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

AFP and AFPF are not aware of any related cases pending in this Court.

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s)** No. 24-02933

I am the attorney or self-represented party.

**This brief contains 13,987 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[✓] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/* Derek L. Shaffer  **Date** September 16, 2024

80

CERTIFICATE OF SERVICE

I hereby certify that, on September 16, 2024, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


/s/ Derek L. Shaffer
Derek L. Shaffer

*Counsel for Plaintiffs-Appellants*