**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMERICANS FOR PROSPERITY; AMERICANS FOR PROSPERITY FOUNDATION,<br><br>*Plaintiffs - Appellants*,<br><br>v.<br><br>DAMIEN R. MEYER, in his official capacity as Chairman of the Citizens Clean Elections Commission; AMY B. CHAN, in her official capacity as Commissioner of the Citizens Clean Elections Commission; GALEN D. PATON, in his official capacity as Commissioner of the Citizens Clean Elections Commission; MARK KIMBLE, in his official capacity as Commissioner of the Citizens Clean Elections Commission; STEVE M. TITLA, in his official capacity as Commissioner of the Citizens Clean Elections Commission; THOMAS M. COLLINS, in his official capacity as Executive Director of the Citizens Clean Elections Commission; ADRIAN FONTES, in his official capacity as Secretary of State of | No. 24-2933<br><br>D.C. No. 2:23-cv-00470-ROS<br><br>OPINION |

Arizona,

*Defendants - Appellees*,

VOTERS' RIGHT TO KNOW; ATTORNEY GENERAL OF THE STATE OF ARIZONA,

*Intervenor-Defendants - Appellees*.

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted May 15, 2025
Phoenix, Arizona

Filed September 30, 2026

Before: Johnnie B. Rawlinson, Patrick J. Bumatay, and Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sanchez;
Dissent by Judge Bumatay

## SUMMARY*

### First Amendment / Campaign Contributions

The panel affirmed the district court's dismissal of all claims in Plaintiffs' suit asserting facial and as-applied First Amendment challenges against Arizona Proposition 211, known as the Voters' Right to Know Act, which implemented disclosure, recordkeeping, and disclaimer requirements on individuals and entities that expend and fund significant amounts of money on campaign media to influence Arizona elections.

Plaintiffs Americans for Prosperity and Americans for Prosperity Foundation alleged that Proposition 211's compelled disclosure of the original source of campaign media contributions and their intermediaries chills their protected speech and associational rights and is unconstitutionally overbroad.

Applying the exacting scrutiny standard, the panel rejected Plaintiffs' primary contention that Proposition 211 is facially unconstitutional because its compelled disclosure requirements chilled protected speech and associational rights. Under the exacting scrutiny standard, there must be a substantial relation between the disclosure requirement and a sufficiently important governmental interest, and the disclosure requirement must be narrowly tailored to the interest it promotes. To withstand exacting scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment


* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

rights. First, Proposition 211's original disclosure requirement is substantially related to the State's important interest in ensuring that the public has accurate information about the sources of major campaign media spending, and that includes indirect and original sources. Second, Proposition 211 imposes modest burdens on Arizonans' speech and associational rights. Third, Proposition 211's requirements are narrowly tailored because Proposition 211's scope is in proportion to the interest served—Arizona's strong informational interest in disclosing the original sources of major campaign media spending. Accordingly, the panel held that Proposition 211 survives exacting scrutiny.

The panel rejected Plaintiffs' as-applied free-speech challenge because their allegations were conclusory and devoid of any specifics.

Finally, because Plaintiffs' compelled association claim overlaps entirely with their challenge to Proposition 211's disclosure requirements, and in light of the panel's conclusion that Proposition 211 meets exacting scrutiny, the panel affirmed the district court's dismissal of Plaintiffs' facial and as-applied compelled association claims.

Dissenting, Judge Bumatay would hold that Proposition 211 violates the First Amendment. The First Amendment, as originally understood, did not allow the government to forcibly reveal the identities of political speakers or to require them to publish the names of their supporters. Political speech was sacrosanct: A public commentator could not be dragged into the light against his will. Given this original understanding of the freedom of speech, Proposition 211 does not survive exacting scrutiny. First, because Arizona requires disclosure of donor

information many steps removed from any political activity—regardless of the donor's intent to contribute to the specific political activity—the Act's relationship to the purported interest of preventing "corruption" and informing voters fails. Second, Proposition 211's burden on speech is outsized: It requires speakers to investigate their donations' sources through a limitless chain of transfers and across state lines, and it risks doxxing those who had no intention of participating in political activity in Arizona at all. Finally, the law is not narrowly tailored—it broadly sweeps in donors with little connection to political activity in Arizona and excludes favored speakers.

---

## COUNSEL

Derek L. Shaffer (argued) and Christopher G. Michel, Quinn Emanuel Urquhart & Sullivan LLP, Washington, D.C.; Dominic E. Draye, Greenberg Traurig PA, Phoenix, Arizona; for Plaintiffs-Appellants.

Eric M. Fraser (argued), James Smith, Mary R. O'Grady, Alexandria N. Karpurk, and Emma J. Cone-Roddy, Osborn Maledon PA, Phoenix, Arizona; Craig A. Morgan, Shayna Stuart, and Jake T. Rapp, Law Offices of Sherman & Howard LLC, Phoenix, Arizona; for Defendants-Appellees.

David B. Kolker (argued), Elizabeth D. Shimek, and Tara Malloy, Campaign Legal Center, Washington, D.C.; Daniel J. Adelman, Chanele N. Reyes, and Jared G. Keenan, Arizona Center For Law In The Public Interest, Phoenix, Arizona; Nathan T. Arrowsmith, Unit Chief Counsel, Special Litigation Section; Alexander W. Samuels, Principal Deputy Solicitor General; Kathryn E. Boughton and

Shannon H. Mataele, Assistant Attorneys General; Kristin K. Mayes, Arizona Attorney General; Office of the Arizona Attorney General, Phoenix, Arizona; for Intervenor-Defendants-Appellees.

Brett R. Nolan and Alan Gura, Institute for Free Speech, Washington, D.C., for Amicus Curiae Institute for Free Speech.

Stuart C. McPhail and Kayvan Farchadi, Citizens for Responsibility and Ethics in Washington, Washington, D.C., for Amicus Curiae Citizens for Responsibility and Ethics in Washington.

Leslie S. Tuskai, Assistant Counsel; Dustin S. Cammack, Assistant City Attorney; Deryck R. Lavelle, City Attorney; Phoenix Office of the City Attorney, Phoenix, Arizona; for Amicus Curiae City of Phoenix.

Randy Elf, Lakewood, New York, for Amicus Curiae Randy Elf.

## OPINION

SANCHEZ, Circuit Judge:

On November 8, 2022, Arizona voters overwhelmingly approved Proposition 211, known as the Voters' Right to Know Act. As the name suggests, the purpose behind Proposition 211 is to empower the people of Arizona to discover "the original source of all major contributions used to pay" for campaign media spending in an election cycle, "regardless of whether the monies passed through one or more intermediaries." Proposition 211 § 2(A). Proposition 211 was enacted to put an end to the practice of "dark money" in Arizona elections, *i.e.*, "laundering political contributions, often through multiple intermediaries, to hide the original source" of campaign media expenditures. *Id.* § 2(C). To accomplish this aim, Proposition 211 implements disclosure, recordkeeping, and disclaimer requirements on individuals and entities that expend and fund significant amounts of money on campaign media to influence Arizona elections. One of these requirements—the public disclosure of donors who directly or indirectly contribute more than $5,000 in an election cycle for campaign media spending—lies at the heart of this case.

Plaintiffs Americans for Prosperity and Americans for Prosperity Foundation bring facial and as-applied challenges to Proposition 211, alleging that the law's compelled disclosure of the original source of campaign media contributions and their intermediaries chills their protected speech and associational rights and is unconstitutionally overbroad. We affirm the district court's dismissal of all claims. Applying the exacting scrutiny standard, we hold that Proposition 211's requirements are substantially related

to the State's vital interest in ensuring that the public receive accurate information about the sources of campaign media spending, that the burdens imposed by the law are modest and in proportion to the interests served, and that its provisions are narrowly tailored to the State's informational interest.

## I.

We review de novo the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), accepting the factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021). We affirm the district court's grant of a motion to dismiss if the plaintiff's complaint fails to state a plausible claim; that is, if the plaintiff fails to "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

### A.

To understand Proposition 211, we begin with one of the main protagonists of this story: the covered person. A "covered person" is any person[1] "whose total campaign media spending or acceptance of in-kind contributions to enable campaign media spending, or a combination of both, in an election cycle is more than $50,000 in statewide campaigns or more than $25,000 in any other type of

[1] Proposition 211's definition of "Person" "includes both a natural person and an entity such as a corporation, limited liability company, labor organization, partnership or association, regardless of legal form." A.R.S. § 16-971(13).

campaigns." A.R.S. § 16-971(7).[2] Excluded from this definition are individuals who spend their own funds on campaign media spending, any organization that spends its own business income on campaign media spending, any "candidate committee," and any "political action committee" that receives no more than $20,000 "from any one person in an election cycle." *Id.* § 16-971(7)(b). Without a "covered person," none of Proposition 211's disclosure, recordkeeping, and disclaimer requirements are triggered.

Proposition 211 requires every covered person to provide a disclosure report to the Arizona Secretary of State identifying each donor who directly or indirectly contributed more than $5,000 of original monies used for campaign media spending, and the date and amount of each donor's contribution. *Id.* § 16-973(A)(6).[3] When a donation consists of a series of earlier donations, the disclosure report must identify any intermediary that has "transferred, in whole or in part, traceable monies of more than $5,000 from" another source. *Id.* § 16-973(A)(7). Proposition 211 thus requires that the covered person disclose the identities of any intermediate donors and the original source whose

[2] An "election cycle" encompasses the two-year period "beginning the day after general election day in even-numbered years and continuing through the end of general election day in the next even-numbered year." *Id.* § 16-971(8).

[3] "Original monies" means business income or an individual's personal monies. A.R.S. § 16-971(12). "Campaign media spending" is defined as "spending monies or accepting in-kind contributions to pay for" an enumerated list of election-related communications and partisan political activities, such as express advocacy for or against candidates for office, state and local initiatives, and referenda. A.R.S. § 16-971(2)(a)(i)–(vii). For the full definition, *see infra* p. 38 n.16.

contributions exceeded $5,000. *Id.* All disclosure reports are made available to the public by the Secretary of State. *Id.* § 16-973(H).

Proposition 211 also imposes recordkeeping requirements for covered persons. The law requires a covered person to maintain "transfer records" that identify the persons and entities who contribute more than $2,500 toward campaign media spending.[4] *Id.* § 16-972(A). A natural person or entity who donates more than $5,000 to a covered person during an election cycle must, upon the covered person's written request, disclose the identity of every "person that directly or indirectly contributed more than $2,500" of the funds being donated. *Id.* § 16-972(D). The direct donor must also identify any previous transfers of more than $2,500. *Id.* In other words, if a donation larger than $5,000 to a covered person is comprised of other donations that exceed $2,500, the donor must identify the source of those prior donations to the covered person upon request. *Id.* Donors and intermediaries that trigger these spending thresholds must be identified until the source of the "original monies" is identified. *Id.* Transfer records must be maintained by covered persons for at least five years and be made available to the Citizens Clean Elections Commission ("Commission") upon request. *Id.* § 16-972(A), (D).[5]

---

[4] A "transfer record" is "a written record of the identity of each person that directly or indirectly contributed or transferred more than $2,500 of original monies used for campaign media spending, the amount of each contribution or transfer and the person to whom those monies were transferred." *Id.* § 16-971(19).

[5] Transfer records are maintained by covered persons and only provided to the Commission upon request. *See* A.R.S. § 16-972(A). Absent such

Proposition 211 also provides that the Commission "shall establish disclaimer requirements for public communications by covered persons." *Id.* § 16-974(C). "[A]t a minimum," however, the disclaimer must state "the names of the top three donors who directly or indirectly made the three largest contributions of original monies during the election cycle to the covered person." *Id.*

Proposition 211 implements several safeguards for donors to avoid having their donations be unwittingly used for campaign media spending and therefore be subject to public disclosure. First, Proposition 211 provides that "[b]efore the covered person may use or transfer a donor's monies for campaign media spending, the donor must be notified in writing that the monies may be so used and must be given an opportunity to opt out of having the donation used or transferred for campaign media spending." *Id.* § 16-972(B). Notice to such donors must include an advisement that their donations may be used for campaign media spending, that their identifying information may be disclosed to the appropriate government authorities and to the public, and that donors can "opt out of having the donation used or transferred" for campaign media spending. *Id.* § 16-972(B)(1)–(3). A covered person may then use or transfer the donation only if the donor "provides written consent" to the intended use or does not opt out within twenty-one days of receiving notice. *Id.* § 16-972(C).

---

a request, transfer records are not made available to the public. *See Ctr. for Arizona Pol'y Inc. v. Arizona Sec'y of State*, 592 P.3d 75, 103 (Ariz. 2026) (explaining that the "more-than-$2,500 trigger" is an "internal tracing" and recordkeeping provision that does not mandate public disclosure).

Second, if the identity of an original source "is otherwise protected from disclosure by law or a court order," the covered person may not disclose the source's identity. *Id.* § 16-973(F). Third, if the covered person demonstrates to the satisfaction of the Commission that there is "a reasonable probability that public knowledge of the original source's identity would subject the source or the source's family to a serious risk of physical harm," the covered person is prohibited from disclosing the source's identity. *Id.*

As the Arizona Supreme Court recently held, Proposition 211's notice and opt-out provisions apply not only to direct donors of covered persons but also indirect donors as well. *See Ctr. for Arizona Pol'y Inc.*, 592 P.3d at 101–02. Proposition 211's "disclosure obligation is triggered only by 'traceable monies,'" which the statute defines in part as "only monies 'for which no donor has opted out of their use or transfer for campaign media spending.'" *Id.* at 102 (quoting A.R.S. §§ 16-971(18)(a), 16-973(A)(6)). Therefore, "[w]hen donated original monies pass through several hands, the statute continues to account for their source and transfer history but permits disclosure only if the donor contributed 'traceable monies'—that is, monies for which the donor, whether immediate or upstream, was given notice and an opportunity to opt out of permitting the donation to be used or transferred for campaign media spending." *Id.*

Proposition 211 grants the Commission the power "to implement and enforce" its provisions. *Id.* § 16-974(A). The Commission is authorized to "[a]dopt and enforce rules," "[i]nitiate enforcement actions," "[i]mpose civil penalties for noncompliance," "[s]eek legal and equitable relief in court," and "[e]stablish the records persons must maintain to support their disclosures" related to Proposition

211. *Id.* § 16-974(A)(1), (3), (5)–(7). Civil penalties may range from the value of an "undisclosed or improperly disclosed contribution" to "three times [the] amount" of the contribution. *Id.* § 16-976(A).

While the Commission is the primary agency that enforces Proposition 211, the law provides that any qualified Arizona voter may file a verified complaint to report any alleged violations. *Id.* §§ 16-974(A), 16-977(A). A complainant must "state the factual basis for believing that there has been a violation" of law, *id.* § 16-977(A), and if the Commission finds the complaint was based on a true statement of facts, the Commission may pursue further investigation, *id.* § 16-977(B). At that point, the Commission must "provide the alleged violator with an opportunity to be heard." *Id.* If the Commission dismisses the complaint or "takes no substantive enforcement action within ninety days after receiving the complaint, the complainant may bring a civil action against the [C]ommission." *Id.* § 16-977(C). If the court finds, upon de novo review, that the Commission's actions were unreasonable, the court may compel the agency to take enforcement action. *Id.* While the Commission may make a "claim or defense . . . of prosecutorial discretion" as a basis for its dismissal or failure to act upon a complaint, the Commission may not rest on this claim or defense where "the civil penalty for the alleged violation could be greater than $50,000." *Id.*

**B.**

Plaintiffs sued the Commission in federal court asserting facial and as-applied First Amendment challenges against the Act and requesting that the Act be declared

unconstitutional and enjoined in its entirety.[6] The Arizona Attorney General intervened as of right, and the district court granted political action committee Voters' Right to Know's motion to intervene (collectively "Defendants"). The district court dismissed Plaintiffs' facial and as-applied claims, granting Plaintiffs leave to amend their as-applied free speech claim. Plaintiffs declined to amend, rested on their complaint, and timely appealed.

Applying the Supreme Court's exacting scrutiny standard, the district court denied Plaintiffs' free speech and free association facial challenges. The district court concluded that the "Act has a substantial relation to a strong governmental interest of identifying funders of campaign media spending" and that the government's interest was not meaningfully vindicated if disclosure only yielded "creative but misleading names" of immediate donors. The court rejected Plaintiffs' contentions that Proposition 211 imposed "crushing" administrative burdens and "profoundly chill[ed]" their free speech and associational rights, noting that the law's administrative burdens were minimally invasive and spread across multiple individuals and entities, and it gave donors the opportunity to opt out from its effects. The district court also concluded that Proposition 211 was narrowly tailored to the public's strong informational interest and turned back Plaintiffs' challenges to Proposition 211's definition of "campaign media spending," the original-source disclosure requirement, and other claims. In rejecting Plaintiffs' as-applied free speech challenge, the district court

[6] Plaintiff Americans for Prosperity is a nonprofit corporation headquartered in Virginia with a chapter located in Phoenix, Arizona. Plaintiff Americans for Prosperity Foundation is a Delaware nonprofit corporation headquartered in Virginia. Plaintiffs fund their advocacy by accepting donations, including donations made in Arizona.

found that Plaintiffs had failed to allege any facts demonstrating a reasonable probability that their members "would face threats, harassment, or reprisals if their names were disclosed." The court also dismissed Plaintiffs' as-applied association claim, reasoning that the disclosure of certain original or intermediary donors based upon Plaintiffs' choice to engage with other organizations in campaign media spending does not compel association.

## II.

### A.

Since its seminal decision in *Buckley v. Valeo* fifty years ago, 424 U.S. 1 (1976), the Supreme Court has favored disclosure requirements in regulating political campaign spending over contribution and expenditure limitations because it "is a less restrictive alternative to more comprehensive regulations of speech." *Citizens United v. FEC*, 558 U.S. 310, 369 (2010). While "[d]isclaimer and disclosure requirements may burden the ability to speak, [ ] they 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'" *Id.* at 366 (internal citations omitted). Indeed, in *Buckley*, "the Court upheld a disclosure requirement for independent expenditures even though it invalidated a provision that imposed a ceiling on those expenditures." *Id.* at 369 (citing *Buckley*, 424 U.S. at 75–76).

*Buckley* long ago recognized that disclosure enhances the "free functioning of our national institutions" and vindicates governmental interests that are "sufficiently important to outweigh the possibility of infringement [of First Amendment rights]." *Buckley*, 424 U.S. at 66 (quoting *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 97 (1961)). The Court identified three such

governmental interests furthered by the disclosure requirements of the Federal Election Campaign Act (FECA), Pub. L. No. 92-225, 86 Stat. 3 (1972). First and foremost was the public's informational interest. As *Buckley* explained:

> [D]isclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.

*Id.* at 66–67 (internal quotations omitted).

Second, *Buckley* noted that "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Id.* at 67. Third, the Court observed that "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations" of other campaign contribution limitations. *Id.* at 67–68.

In *McConnell v. Federal Election Commission* and in *Citizens United*, the Supreme Court twice upheld federal disclosure requirements under the Bipartisan Campaign

Reform Act (BCRA), Pub. L. No. 107-155, 116 Stat. 81 (2002). In *McConnell*, the Supreme Court held that the substantial governmental interests that prompted the *Buckley* Court to uphold federal disclosure requirements in the FECA—"providing the electorate with information, deterring actual corruption and avoiding any appearance thereof,. . . and gathering the data necessary to enforce more substantive electioneering restrictions"—applied with equal force to the BCRA. *McConnell*, 540 U.S. 93, 196 (2003). The Court upheld the BCRA's disclosure provisions from facial challenge on the basis that the BCRA vindicated "competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace." *Id.* at 197 (internal quotations omitted).

The Supreme Court again upheld the BCRA's disclosure provisions against an as-applied challenge in *Citizens United*, underscoring the importance of the public's informational interest "in knowing who is speaking about a candidate shortly before an election." 558 U.S. at 369.[7] The Court explained that "disclosure . . . can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters. . . . This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Id.* at 370–71.

We too have repeatedly upheld election disclosure laws on several occasions, emphasizing that "by revealing

[7] The BCRA's disclaimer and disclosure provisions under challenge in *Citizens United* required "televised electioneering communications funded by anyone other than a candidate" to include "a disclaimer that '___ is responsible for the content of this advertising'" along with other requirements. *Id.* at 366 (citation modified).

information about the contributors to and participants in public discourse and debate, disclosure laws help ensure that voters have the facts they need to evaluate the various messages competing for their attention." *Hum. Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010). *See, e.g.*, *No on E v. Chiu*, 85 F.4th 493, 505 (9th Cir. 2023) ("We have 'repeatedly recognized an important (and even compelling) informational interest in requiring ballot measure committees to disclose information about contributions.'" (citation omitted)); *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 540 (9th Cir. 2015) (en banc) ("[T]he government's interests in electoral integrity and in providing voters with information . . . . constitute a 'sufficiently important governmental interest' to which the [ ] disclosure requirement bears a 'substantial relation.'") (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)); *Smith v. Helzer*, 95 F.4th 1207, 1215 (9th Cir. 2024) ("[T]he government's interest in an informed electorate is 'sufficiently important' in the campaign finance context to warrant disclosure requirements").

**B.**

Our dissenting colleague resists this conclusion and contends that a free-standing right to anonymous speech under the First Amendment bars the compelled disclosure of donors to campaign media spending. Although much ink has been spilled by our colleague concerning the Founding-era tradition of anonymous *writings* and pamphleting in politics, noticeably absent from the dissent is any evidence of a historical tradition of anonymous *donations* to political campaigns. As we explain below, not only is there little evidence in the historical record that donating anonymously to political campaigns was a widespread practice, the dissent offers *no* evidence that the Founding generation regarded

anonymous campaign donations as an exercise of free speech protected by the First Amendment.

Juxtaposed against a non-existent tradition of anonymous donations is fifty years of Supreme Court precedent emphasizing the substantial public interest of an informed citizenry in our political marketplace and electoral transparency as a means of safeguarding our democratic traditions. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley*, 424 U.S. at 14. Essential to that public discourse is information about a political candidate's messaging and sources of funding and support. *See id.* at 14-15 ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential"); *McConnell*, 540 U.S. at 197 (recognizing the "First Amendment interests of individual citizens seeking to make informed choices in the political marketplace"); *Citizens United*, 558 U.S. at 368 (observing that disclaimer and disclosure requirements "provide the electorate with information and insure that the voters are fully informed about the person or group who is speaking") (internal citations omitted)); *Doe v. Reed*, 561 U.S. at 198 ("[P]romoting transparency and accountability in the electoral process . . . is essential to the proper functioning of a democracy.")

Election disclosure laws have long been preferred by the Supreme Court over other forms of campaign speech regulation because "they 'impose no ceiling on campaign-related activities' and 'do not prevent anyone from speaking.'" *Citizens United*, 558 U.S. at 366 (first quoting *Buckley,* 424 U.S. at 64, then quoting *McConnell,* 540 U.S. at 201); *see id.* at 369 ("[D]isclosure is a less restrictive

alternative to more comprehensive regulations of speech.”). Just recently, the Supreme Court again reaffirmed that campaign finance disclosure laws are a strong “anti-circumvention tool” and are “particularly effective means of arming the voting public with information.” *Nat’l Republican Senatorial Comm. v. Fed. Election Comm’n*, 609 U.S. ___ (2026) (quoting *McCutcheon v. Fed. Election Comm’n*, 572 U.S. 185, 224 (2014). The Supreme Court has been clear and consistent for decades that election spending disclosure laws are a less speech-restrictive and preferred alternative to flat bans or ceilings on the amount of money expended on political speech.

Only once has the Supreme Court recognized a right of anonymous speech in an electoral context, but it bears little resemblance to the issues raised here. *See McIntyre v. Ohio Elections Comm.*, 514 U.S. 334 (1995). In *McIntyre,* the Supreme Court invalidated a state law that prohibited a citizen from publishing and distributing by hand her own anonymous leaflets opposing a school tax levy. 514 U.S. at 357. In doing so, the Court expressly distinguished anonymous pamphleting from the compelled disclosure requirements upheld in *Buckley*. *Id*. at 354–55. *McIntyre* drew a distinction between an independent expenditure disclosure that “entailed nothing more than an identification to the Commission of the amount and use of money in support of a candidate,” and disclosure of “[a] written election-related document” that reflects a “personally crafted statement of a political viewpoint.” *Id.* at 355. “Disclosure of an expenditure and its use, without more, reveals far less information,” the Court explained, and presents a far more modest imposition on speech activity. *Id.*

Both *McConnell* and *Citizens United* upheld the BCRA’s disclosure and disclaimer requirements after *McIntyre* over

dissents arguing that "Congress may not abridge the right to anonymous speech based on the simple interest in providing voters with additional relevant information." *Citizens United*, 558 U.S. at 480 (Thomas, J., dissenting in part) (cleaned up); *McConnell*, 540 U.S. at 275–77 (Thomas, J., dissenting in part) (acknowledging that *McIntyre* distinguished *Buckley* but concluding the Court erred in doing so). And in *Doe v. Reed*, the Supreme Court declined to extend *McIntyre* to protect the anonymity of individuals who sign referendum petitions, finding that only "modest burdens attend the disclosure of a typical petition." 561 U.S. at 202. In short, *McIntyre* does not support our dissenting colleague's view that a right to anonymous speech should bar campaign finance disclosure requirements.[8]

Our dissenting colleague relies on a flawed account of the historical record to attempt to conclude otherwise. While the dissent devotes ample attention to the widespread practice of anonymous political writings in the Founding era, the dissent offers no evidence that the asserted right at issue here—the right to donate anonymously in support of political campaigns—was similarly practiced widely.[9] Nor

---

[8] Indeed Justice Stevens, who authored the majority opinion in *McIntyre*, wrote separately in *Doe v. Reed* to emphasize that "our decision in *McIntyre* posited no such freewheeling right [to anonymous speech]." 561 U.S. at 218 n. 4. "The Constitution protects 'freedom of speech.' . . . The right, however, is the right to speak, not the right to speak without being fined or the right to speak anonymously." *Id.* (citation omitted).

[9] Our dissenting colleague offers the example of Thomas Jefferson secretly funding the anonymous publication of newspaper criticisms of the Washington Administration, and Alexander Hamilton quietly steering government money toward pro-administration publishers. Diss. p.80–81. *See* Akhil Reed Amar, *The Words That Made Us: America's Constitutional Conversation, 1760–1840*, at 431–33 (2021). These

does the dissent point to any evidence from proposed drafts of the Bill of Rights, state constitutions, ratification debates, or other original sources discussing or defining a constitutional right to donate anonymously. *See McIntyre*, 514 U.S. at 360 (Thomas, J., concurring) (acknowledging that "we have no record of discussion of anonymous political expression either in the First Congress, which drafted the Bill of Rights, or in the state ratifying conventions."); *id.* at 367 (Thomas, J., concurring) ("The historical record is not as complete or full as I would desire. For example, there is no evidence that, after the adoption of the First Amendment, the Federal Government attempted to require writers to attach their names to political documents.").

Nor has our dissenting colleague identified any practice by English authorities before ratification or by the Federal Government after the adoption of the First Amendment outlawing or restricting anonymous campaign donations. The most our colleague can point to is the *absence* of campaign finance disclosure laws until the Twentieth century. *See* Diss. p. 81–83. But an absence of government restriction at the Founding does not mean that modern speech regulations are therefore unconstitutional. *See id.* at 373 (Scalia, J., dissenting) ("[T]o prove that anonymous electioneering was used frequently is not to establish that it is a constitutional right. Quite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is *ipso facto* unconstitutional").[10]

---

examples fall far short of establishing a widespread practice, nor do they relate to the matter at hand—anonymous donations to support campaigns in an election period.

[10] Indeed, even the presence of governmental restrictions during the Founding era is not necessarily dispositive. Congress famously

Accordingly, what we are left with is no evidence of a historical tradition or widespread practice of anonymous campaign donations, no evidence that government authorities at the Founding sought to ban or restrict anonymous donations, and no evidence that the Founders regarded anonymous donations to be an exercise of free speech protected by the First Amendment. Such bare evidence in the historical record is insufficient to cast aside fifty years of Supreme Court jurisprudence affirming the importance of campaign finance disclosure laws.

## III.

With this precedent in mind, we assess Plaintiffs' facial and as-applied challenges to Proposition 211 under the First Amendment. In this section, we engage with Plaintiffs' primary contention on appeal: that Proposition 211 is facially unconstitutional because its compelled disclosure requirements chill protected speech and associational rights. Plaintiffs argue that Proposition 211 violates the First Amendment in myriad ways, including that the law requires disclosure of original sources regardless of whether these sources knew their funds would be used for campaign media spending, that its definition of "campaign media spending" triggers disclosure requirements that reach beyond election-related activity, and that various other provisions unduly burden the First Amendment rights of covered persons and donors.

Facial challenges are "disfavored" and "are the most difficult to mount successfully." *Smith*, 95 F.4th at 1214

---

criminalized certain criticism against the Government under the Sedition Act of 1798, which would be unacceptable under modern First Amendment jurisprudence. *See* Alexander Tsesis, *Originalist Framing of Free Speech Doctrine*, 173 U. Pa. L. Rev. 1935, 1945 (2025).

Case: 24-2933, 09/30/2026, DktEntry: 84.1, (24 of 103)



(citations omitted). "A facial challenge seeks to strike down a law in its entirety and must therefore meet a more rigorous standard." *Project Veritas v. Schmidt*, 125 F.4th 929, 940 (9th Cir. 2025) (en banc) (citing *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)). In the context of a First Amendment claim, "a facial challenge is colorable if plaintiffs show that a substantial number of [the law's] applications are unconstitutional, judged in relation to [the statute's] plainly legitimate sweep." *Smith*, 95 F.4th at 1214 (internal quotations omitted). Stated differently, "the law's unconstitutional applications" must "substantially outweigh its constitutional ones." *Moody,* 603 U.S. at 724.

We review First Amendment challenges to disclosure requirements under "exacting scrutiny." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607–08 (2021) (explaining that this standard was first articulated in *Buckley*). Under the exacting scrutiny standard, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," *id.* at 611 (quoting *Reed*, 561 U.S. at 196), and "the disclosure requirement [must] be narrowly tailored to the interest it promotes." *Id.* "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* at 607.

Exacting scrutiny is a less stringent standard than strict scrutiny. *See Smith*, 95 F.4th at 1214. "[E]xacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends." *Bonta*, 594 U.S. at 608. Rather, exacting scrutiny requires tailoring that is "not necessarily perfect, but reasonable." *Id.* at 609 (citation omitted).

**A.**

Plaintiffs do not dispute that the State of Arizona's "informational interest alone" can be "sufficient to justify" election law disclosure requirements. *See Citizens United*, 558 U.S. at 369. Plaintiffs contend, however, that the State's informational interest is narrow and extends only to disclosures "evidencing a close nexus to electoral advocacy" or to "organizational speakers and funders who knowingly earmarked their contributions for electioneering," rather than the disclosure of secondary or tertiary donors. In other words, Plaintiffs assert that no legitimate informational interest is served by "look-through" provisions that require the disclosure of donations by intermediaries and original sources of significant campaign media spending. We disagree.

As discussed above, "[c]ourts have long recognized the governmental interest in the disclosure of the sources of campaign funding." *No on E*, 85 F.4th at 504; *Brumsickle*, 624 F.3d at 1005–06 ("[The] vital provision of information" about "the contributors to and participants in public discourse and debate . . . has been recognized as a sufficiently important, if not compelling, governmental interest."). For the electorate to make informed decisions about candidates for office or issues placed on a ballot measure, it is essential that the public be given "information as to where political campaign money comes from and how it is spent." *Buckley*, 424 U.S. at 66–67 (internal quotations omitted). The disclosure of relevant information about the donors and backers of political causes "alert[s] the voter to the interests to which a candidate is most likely to be responsive," *id.* at 67, and enables the public to "give proper weight to different speakers and messages" and make

"informed choices in the political marketplace." *Citizens United*, 558 U.S. at 367, 370–71.

This vital informational interest does not stop at the edge of direct funders of campaign media spending. As several courts have recognized, independent groups often resort to "broadcast[ing] advertisements designed to influence federal elections" while "concealing their identities from the public" and "hiding behind dubious and misleading names." *McConnell*, 540 U.S. at 196–97; *see, e.g.*, *No on E*, 85 F.4th at 506 (upholding secondary-contributor disclosure requirement because "donors to local [campaign] committees are often committees themselves" that "often obscure their actual donors through misleading and even deceptive committee names"); *ACLU of Nev. v. Heller*, 378 F.3d 979, 994 (9th Cir. 2004) (recognizing that "individuals and entities interested in funding election-related speech often join together in ad hoc organizations with creative but misleading names").[11] As our cases reflect, Defendants have an undoubtedly important governmental interest in disclosing the sources of campaign media expenditures, including funding from indirect sources.[12]

[11] *See also Gaspee Project v. Mederos*, 13 F.4th 79, 88 (1st Cir. 2021) (holding that "Rhode Island's interest in an informed electorate is sufficiently important to satisfy the first imperative of exacting scrutiny" for a campaign finance disclosure law).

[12] Although Defendants assert the additional interest of preventing corruption, we need not address this justification because the informational interest alone is a sufficiently important government interest. *See Citizens United*, 558 U.S. at 369 ("Because the informational interest alone is sufficient to justify application of [BCRA] to these ads, it is not necessary to consider the Government's other asserted interests.").

Proposition 211 is substantially related to the State's informational interest. Proposition 211 seeks to "assist Arizona voters in making informed election decisions by securing their right to know the source of monies used to influence Arizona elections." Proposition 211 § 2(B). One of the obstacles to an informed electorate is the use of "dark money" in politics, defined by the measure as "the practice of laundering political contributions, often through multiple intermediaries, to hide the original source" of campaign media expenditures. *Id.* § 2(C). Proposition 211 enacts recordkeeping, reporting, and agency enforcement provisions that require the disclosure of "original source[s] of all major contributions used to pay" for campaign media spending in an election cycle, "regardless of whether the monies passed through one or more intermediaries." *Id.* § 2(A). *See supra* 8–13. The original source disclosure requirement is substantially related to the State's interest in ensuring that the public receives accurate information about the sources of campaign media spending in Arizona elections.

Our decision in *No on E* is directly on point. There, we considered a San Francisco ordinance that also sought to counteract "dark money" by requiring "ads run by primarily formed independent expenditure and ballot measure committees" to include a "disclaimer listing their top three contributors of $5,000 or more." *No on E*, 85 F.4th at 498. If any of those top three contributors was itself a committee, the ordinance required that the advertisement also disclose "the name of and the dollar amount contributed by each of the top two major contributors of $5,000 or more to that committee"—referred to as "secondary contributors." *Id.* Defendants argued that the secondary-contributor requirement was needed because "[a] committee can

circumvent California's on-advertisement disclaimer requirement and avoid including its top donors in a disclaimer by providing funding to another committee instead of running an advertisement directly." *Id.* at 504. We held that the disclosure of secondary contributors of funds to political committees was substantially related to the government's informational interest because "the interest in learning the source of funding for a political advertisement extends past the entity that is directly responsible." *Id.* at 506.

Similarly in *Smith*, plaintiffs raised a First Amendment challenge to an Alaska law that "addressed the use of 'dark money' in elections" by requiring the disclosure of donors who contribute more than $2,000 to entities that make independent expenditures on behalf of political candidates during an election cycle. *Smith*, 95 F.4th at 1211. Under a "true-source" requirement, the law provided that contributors must report and certify the true sources of the contribution as well as any intermediaries, and a separate donor-disclaimer requirement provided that political advertisements must disclaim when a majority of funding comes from true sources located outside the State of Alaska. *Id.* at 1212. Applying exacting scrutiny, we upheld the challenged disclosure and disclaimer requirements, concluding that these requirements were both substantially related and narrowly tailored to the government's informational interest. *Id.* at 1215, 1221.

Plaintiffs' arguments against the State's informational interest are unpersuasive. Plaintiffs contend that disclosure that reaches the original source of a contribution "in no way alerts voters 'to the interests to which a candidate is most likely to be responsive,'" *Buckley*, 424 U.S. at 67, because the campaign spending is the organization's speech, not that

of indirect donors who may not have intended to engage in campaign messaging. Plaintiffs argue that Proposition 211 actually "undermines Arizona's interest in 'provid[ing] the electorate with information'" because it "dumps undifferentiated piles of donor data upon the public" and thus "will affirmatively mislead voters by directly tying named donors to candidates and issues that those donors may not support at all."

We rejected similar arguments in *No on E*. There, plaintiffs asserted that the secondary-contributor requirement would cause voter confusion by requiring the disclosure of donors who may not have known that their donations would be used to promote the views expressed in political ads. *No on E*, 85 F.4th at 506. But plaintiffs provided no factual basis for the assumption that voters could not differentiate "between supporting a group that broadcasts a statement and supporting the statement itself." *Id.* (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 454–55 (2008) (requiring more than "sheer speculation" for voter confusion)). We explained that disclosure laws further the government's informational interest by "revealing the source of campaign funding, not ensuring that every donor agrees with every aspect of the message." *No on E*, 85 F.4th at 506. The same reasoning holds true here. Proposition 211's original source disclosure requirement is substantially related to the State's important interest in ensuring that the public has accurate information about the sources of major campaign media spending, and that includes indirect and original sources.

**B.**

Under the exacting scrutiny standard, "the strength of the governmental interest must reflect the seriousness of the

actual burden on First Amendment rights." *Reed*, 561 U.S. at 196 (citation omitted). "[T]o support an exemption from a compelled disclosure requirement, Plaintiffs must show more than a 'modest burden.'" *No on E*, 85 F.4th at 508 (quoting *Family PAC v. McKenna*, 685 F.3d 800, 808 (9th Cir. 2012)). In a facial challenge such as this one, the burdens imposed by disclosure must reflect what a substantial number of donors and covered persons would experience under Proposition 211, not simply Plaintiffs here. *See Reed*, 561 U.S. at 200–01 (explaining that in a broad-based challenge, the relevant inquiry was whether disclosure in general violated the First Amendment rights of those who signed "typical referendum petitions").

We conclude that Proposition 211 imposes modest burdens on Arizonans' speech and associational rights. Its disclosure requirements "impose no ceiling on campaign-related activities and do not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (internal citations and quotations omitted). Nor does the law limit how much money can be spent on campaign media or restrict the content of those communications. *Id.* It instead requires disclosure of the original source of funds for major campaign media spending. A.R.S. § 16-973(A). The law also minimizes any potential burdens by permitting direct and indirect donors to opt out of having their contributions used for campaign media spending and by forbidding covered persons from publicly identifying original sources if such disclosure could result in a serious risk of physical harm. *Id.* §§ 16-972(B)–(C), 16-973(F).

Proposition 211 implements nominal recordkeeping and disclosure requirements for covered persons and certain donors. When a covered person receives more than $5,000 from any donor, and upon the covered person's request, the

donor must disclose in writing the source or sources of the donated funds. A.R.S. § 16-972(D). The donor must disclose the identity of all other contributors who donated more than $2,500 to that donation. *Id.* Donors and intermediaries must be identified until the source of the "original monies" is disclosed. *Id.* Transfer records for these large-money donations must be kept by covered persons and direct donors for at least five years. *Id.* § 16-972(A), (D), (E). As the district court found, the administrative burdens imposed by these requirements are minimally invasive, applicable only for large-money donations of more than $5,000 in traceable monies, and spread across several individuals and entities.

Plaintiffs contend that the original source requirement substantially burdens their right to "associate privately and to express themselves anonymously without being outed by the government." According to Plaintiffs, Proposition 211's opt-out provision does not cure its constitutional infirmities because it forces donors to give up their right to associate anonymously. We disagree.

Although disclosure may "deter some individuals who otherwise might contribute . . . disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." *Buckley*, 424 U.S. at 68. Even assuming that some donors will not contribute to campaign media spending as a result of Proposition 211's disclosure requirements, we have held that this imposes only a "modest" burden. *See Family PAC*, 685 F.3d at 806 (holding that disclosure requirements "can deter individuals who would prefer to remain anonymous" but "[t]his burden . . . is modest"). Indeed, "[a]dopting Plaintiffs' view that a modest burden on their right to associate anonymously outweighs

the informational interest would 'ignore[] the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace.'" *No on E*, 85 F.4th at 509 (quoting *McConnell*, 540 U.S. at 197).[13]

Plaintiffs also argue that the opt-out provision chills speech by imposing a 21-day waiting period for covered persons to use donor monies on campaign media spending. But Proposition 211 allows covered persons and donors to control when the funds can be used by simply seeking a donor's written consent when the donation is given. *See* A.R.S. § 16-972(C) (allowing use of donor's funds after twenty-one days or donor's written consent, "whichever is earlier"). Plaintiffs fail to establish that Proposition 211 has prevented timely speech from occurring at all, let alone in a substantial number of applications judged in relation to the law's plainly legitimate sweep. *See Bonta*, 594 U.S. at 615.

Plaintiffs next argue that recordkeeping burdens for covered persons and donors "impose undue burdens" and "imperil donor privacy." Plaintiffs offer no authority for the proposition that maintaining records for five years imposes an undue burden. Indeed, the recordkeeping requirement under Proposition 211 for covered persons is arguably less

---

13 Plaintiffs make the curious argument that Proposition 211 "*actively pressures* donors to opt out, lest they suffer damaging disclosure." Plaintiffs offer no evidence in support of this claim, and common sense would suggest that the opposite is true. The opt-out provision serves to protect direct and indirect donors from having their donations be unwittingly used for campaign media spending. *Ctr. for Arizona Pol'y Inc.*, 592 P.3d at 102. This feature *enhances* associational rights by giving donors who have no intention of funding campaign media to avoid public disclosure. Plaintiffs' actual complaint seems to be that those who want to make large-money donations to campaign media spending cannot do so anonymously behind intermediaries.

burdensome than the recordkeeping requirement for political committees under a federal law that was upheld in *Buckley*, 424 U.S. at 84.[14]

Plaintiffs also raise privacy concerns, asserting that secondary donors who give over $2,500 "will have no control or knowledge over the ultimate use of their funds, nor any control over disclosure of their personal information." As a general matter, the disclosure of a donor's identity is not itself an impermissible burden. To the contrary, the Supreme Court held in *Buckley* that an infringement on associational privacy may be outweighed by significant government interests such as the informational interest vindicated here by Proposition 211. 424 U.S. at 66. Disclosure of a donor's identity is a long-accepted consequence of election disclosure laws without regard to whether the donor ultimately agrees with the message. *See No on E*, 85 F.4th at 506 (citing *Brumsickle*, 624 F.3d at 1005–08, and *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1104–07 (9th Cir. 2003)).

More importantly, the Arizona Supreme Court has since clarified that Proposition 211's disclosure requirements are triggered only when a direct or indirect donor has been given the opportunity to opt out of the use of their donations for campaign media spending. *See Ctr. for Arizona Pol'y Inc.*, 592 P.3d at 102. As the Court explained, disclosure under Proposition 211 is permitted only if a "donor, whether immediate or upstream, was given notice and an opportunity to opt out of permitting the donation to be used or transferred

---

[14] Under federal law, a record of individual donations above $50—a far smaller donation threshold than the over $2,500 threshold in Proposition 211—must be kept for three years, including "the name and address" of any such donor. 52 U.S.C. § 30102(c)–(d).

for campaign media spending." *Id.* Accordingly, Plaintiffs' contention that Proposition 211 may force the disclosure of donors who do not intentionally or knowingly support or oppose specific political activity in Arizona has been foreclosed. *See id.* ("[Proposition 211] therefore cannot be properly interpreted as compelling disclosure of donors who were never given the opportunity to opt out of having their donations used for campaign media."). The Arizona Supreme Court's interpretation of Proposition 211's scope and effect here is controlling. *See Wabakken v. Cal. Dep't of Corr. & Rehab.*, 801 F.3d 1143, 1149 (9th Cir. 2015) ("When interpreting state law, federal courts are bound by decisions of the state's highest court.").

Finally, Plaintiffs contend that Proposition 211 imposes significant burdens by deputizing voters and vesting private parties with enforcement powers. Plaintiffs' arguments misconstrue Proposition 211's enforcement mechanism. Individuals cannot pursue actions directly against purported violators—only the Commission can. A.R.S. §§ 16-974(A), 16-977(A). If the Commission takes no substantive enforcement action in response to a voter's verified complaint, the complainant may bring a civil action "against the Commission" to compel it to pursue the action. *Id.* § 16-977(B)–(C). Plaintiffs cite no evidence or authority for the proposition that because voters can seek court review of the Commission's non-enforcement decision, this imposes constitutionally intolerable burdens on covered persons or donors.[15]

[15] Such private enforcement mechanisms are not unique to Proposition 211. Since 1975, the Federal Election Commission has invited complaints by "[a]ny person who believes a violation of [the Federal Election Campaign Act] . . . has occurred." 52 U.S.C. § 30109(a)(1).

Given the State's vital informational interest and the modest burdens imposed by Proposition 211's original source disclosure requirement, we conclude that the "strength of the governmental interest [] reflect[s] the seriousness of the actual burden on First Amendment rights." *Bonta*, 594 U.S. at 607. Having so concluded, we turn to the final component of exacting scrutiny analysis, whether the disclosure requirement is narrowly tailored to the State's asserted interest.

**C.**

"Where exacting scrutiny applies, the challenged requirement must be narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end." *Bonta*, 594 U.S. at 609–10. Narrow tailoring in this context only requires a "reasonable" fit "that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Smith*, 95 F.4th at 1215 (quoting *McCutcheon*, 572 U.S. at 218). Plaintiffs argue that Proposition 211 "lacks any reasonable fit given its overbroad disclosures and disclaimers, sweeping triggers, indiscriminate approach to media, lack of any major purpose requirement, underinclusivity, and relatively low monetary thresholds." We take each argument in turn.

*i. The original source disclosure is not overbroad.*

Plaintiffs argue that Proposition 211 is overbroad and functions as an "indiscriminate, nationwide dragnet"

---

Under federal law, complainants may file a petition in the federal district court for the District of Columbia if the Commission dismisses their complaint, and the court is empowered to override the Commission's decision. *Id.* § 30109(a)(8)(A)–(C). Other jurisdictions have similar enforcement schemes. *E.g.*, *No on E*, 85 F.4th at 499 (San Francisco); Cal. Gov't Code § 83115 (California).

Case: 24-2933, 09/30/2026, DktEntry: 84.1, (36 of 103)



because it discloses donors' personal information even if they did not foresee that their money would be used for campaign media spending and they did not "earmark" it for such purposes. Plaintiffs' position seems to be that a law is not narrowly tailored if it discloses any donors who did not authorize their money to be spent on a specific instance of campaign media expenditure. But "adopting Plaintiffs' position could call into question the logic underlying decisions that uphold disclosure and disclaimer requirements as applied to primary donors" because it is well-established that even primary donors may not "agree[ ] with every aspect of the message." *No on E*, 85 F.4th at 506 (citing *Brumsickle*, 624 F.3d at 1005–08). Moreover, there is no authority to support the proposition that "a law fails narrow tailoring unless it is limited to the disclosure of earmarked contributions." *Id.* at 510 (alteration in original).

We conclude that the original source requirement is narrowly tailored to the State's interest in disclosing only major contributors to campaign media spending in an election cycle. It requires the disclosure of covered persons and donors only when an entity spends $50,000 or more on campaign media to influence statewide elections or $25,000 or more for other types of elections. A.R.S. § 16-973(A). The law narrows its reach further by requiring disclosure of only direct contributors who give more than $5,000 to a covered person. *Id.* § 16-973(A)(6). Where that donation is comprised of earlier indirect donations of more than $5,000, only then is the original source and intermediaries to that donation also reported to the Commission. *Id.* § 16-973(A)(5)–(6); *see also* § 16-972(D) (requiring "transfer records" that identify persons and entities that contribute more than $2,500 directly or indirectly toward campaign media spending). Finally, the opt-out provision gives direct

and indirect donors the ability to avoid public disclosure by declining to have their donations be used or transferred to an entity for campaign media spending. *Id.* § 16-972(B)(1)–(3). Taken together, Proposition 211 represents a reasonable fit between the State's asserted informational interest and a disclosure mechanism that reaches only major contributors of campaign media spending who have not opted out from disclosure.

While Plaintiffs may prefer that only donors who have earmarked their funds for campaign media spending be disclosed, this would prevent Proposition 211 from achieving its central purpose by creating an obvious workaround for "dark money" donors to avoid disclosure: never earmark. As the Supreme Court has observed, "the hard lesson of circumvention" is evident in "the entire history of campaign finance regulation," *McConnell*, 540 U.S. at 165, and "[p]olitical speech is so ingrained in our culture that speakers find ways to circumvent campaign finance laws," *Citizens United*, 558 U.S. at 364. It is difficult to see how Proposition 211's goal of disclosing the original sources of major campaign media funding would be achieved if disclosures were limited to earmarked funds. Plaintiffs offer no explanation.

*ii. "Campaign media spending" is not overbroad.*

Plaintiffs challenge Proposition 211's definition of "campaign media spending" as overbroad by contesting the

"triggers" that fall within that definition.[16] In doing so, Plaintiffs rely almost entirely on hypothetical situations that stretch Proposition 211's text beyond its plain meaning.

We begin with A.R.S. § 16-971(2)(a)(iii), which defines campaign media spending, in relevant part, as spending for

[16] "Campaign media spending" is defined by Proposition 211 as "spending monies or accepting in-kind contributions to pay for" the following election-related communications and activities:

> (i) A public communication that expressly advocates for or against the nomination, or election of a candidate.
> (ii) A public communication that promotes, supports, attacks or opposes a candidate within six months preceding an election involving that candidate.
> (iii) A public communication that refers to a clearly identified candidate within ninety days before a primary election until the time of the general election and that is disseminated in the jurisdiction where the candidate's election is taking place.
> (iv) A public communication that promotes, supports, attacks or opposes the qualification or approval of any state or local initiative or referendum.
> (v) A public communication that promotes, supports, attacks or opposes the recall of a public officer.
> (vi) An activity or public communication that supports the election or defeat of candidates of an identified political party or the electoral prospects of an identified political party, including partisan voter registration, partisan get-out-the-vote activity or other partisan campaign activity.
> (vii) Research, design, production, polling, data analytics, mailing or social media list acquisition or any other activity conducted in preparation for or in conjunction with any of the activities described in items (i) through (vi) of this subdivision.

A.R.S. § 16-971(2)(a)(i)–(vii).

"[a] public communication that refers to a clearly identified candidate within ninety days before a primary election until the time of the general election." Plaintiffs argue that this definition "sweeps in issue advocacy well removed from elections" because "merely mentioning an elected official between April and November of any even-numbered year suffices." Specifically, Plaintiffs contend that the word "refers" is too broad and the time window is too long.

But federal law imposes similar disclosure obligations for any communication that "*refers* to a clearly identified candidate for Federal office." 52 U.S.C. § 30104(f)(3)(A)(i)(I) (emphasis added). In *Citizens United*, the Supreme Court upheld this disclosure obligation for an advertisement to a political documentary about then-Senator Hillary Clinton, rejecting the argument that the disclosure swept too broadly and should have been limited to "express advocacy." 558 U.S. at 368–69. While Plaintiffs here object that the federal law is limited to "within 30 days of a primary or 60 days of a general election," *see* 52 U.S.C. § 30104(f)(3)(A)(i)(II), they offer no argument as to why federal law should constitute the outer boundary of permissible regulation. Proposition 211's temporal limitation is similar to one found sufficiently tailored by the First Circuit. *See Gaspee Project*, 13 F.4th at 83, 88 (for electioneering communications "within sixty days of a general election or referendum or within thirty days of a primary election").

Next, Plaintiffs take issue with A.R.S. § 16-971(2)(a)(iv), which defines campaign media spending as spending for "[a] public communication that promotes, supports, attacks or opposes the qualification or approval of any state or local initiative or referendum." Plaintiffs contend that this provision sweeps in general advocacy on

any issue where "a measure concerning their area of concern appears on the ballot *at any time*." Plaintiffs offer the example of a generic communication about the humane treatment of animals being swept up by Proposition 211 if there is an initiative on the ballot to ban puppy mills. Plaintiffs' concern is misplaced. The plain text of section 16-971(2)(a)(iv) clearly does not apply to general discussions of issues that make no reference to a specific initiative or referendum. In reviewing facial challenges, courts must "not [ ] go beyond the regulations' facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Smith*, 95 F.4th at 1214 (quoting *Wash. State Grange*, 552 U.S. at 449–50).

Similarly, Plaintiffs challenge A.R.S. § 16-971(2)(a)(v), which defines campaign media spending as spending for "[a] public communication that promotes, supports, attacks or opposes the recall of a public officer."[17] Plaintiffs contend that this provision will sweep too broadly and impose disclosure requirements on "any speech that criticizes or praises an officeholder" because such speech could be characterized as "advocating (at least implicitly) for or against the officeholder's recall." We agree with the district court that the most obvious reading of the statutory text is that it covers communications that specifically refer to an existing recall—not mere criticism of a public officer.

Plaintiffs also object to A.R.S. § 16-971(2)(a)(vi), which defines campaign media spending as spending for "[a]n activity or public communication that supports the election or defeat of candidates of an identified political party or the

[17] While Plaintiffs also cite A.R.S. § 16-971(2)(a)(ii), their argument focuses solely on subsection (v) and the recall of public officers, so we decline to address subsection (ii).

electoral prospects of an identified political party, including partisan voter registration, partisan get-out-the-vote activity or other partisan campaign activity." Plaintiffs contend that the catch-all phrase "other partisan campaign activity" can be read to cover all "advocacy on hot-button issues." Not so. Plaintiffs read this phrase out of context by ignoring the subject of the definition—activities or communications that "support[ ] the election or defeat of candidates of an identified political party or the electoral prospects of an identified political party." Under the canon of *noscitur a sociis*—"a word is known by the company it keeps"—we must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Act[ ]." *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion) (internal citation and quotations omitted). The phrase "other partisan campaign activity" must be understood in relation to its preceding subject and does not include advocacy on unrelated "hot-button" topics. And in the unlikely event that this provision is enforced against other forms of advocacy unrelated to the election or defeat of candidates or partisan political activities, those targeted for enforcement can bring as-applied challenges.

Finally, Plaintiffs challenge A.R.S. § 16-971(2)(a)(vii), which defines campaign media spending as spending for "[r]esearch, design, production, polling, data analytics, mailing or social media list acquisition or any other activity conducted in preparation for or in conjunction with" any of the other listed activities. Plaintiffs contend that this provision would apply to an out-of-state organization that spends over $50,000 preparing a "public communication" that merely references a political candidate in an online post or national newsletter. Plaintiffs raise the specter that a

covered person or organization, located outside Arizona, will become subject to the law by posting something to a website referencing an Arizona candidate. But to qualify as a covered person, Proposition 211 requires an individual or entity to spend more than $50,000 in an election cycle on campaign media spending to influence an election in Arizona. *Id.* § 16-971(7). Indeed, the Arizona Supreme Court has clarified that "the provision reaches only to like expenditures that form part of a discrete chain of activities leading to campaign media. It does not extend to remote, tangential, or generic advocacy activities." *Ctr. for Arizona Pol'y Inc.*, 592 P.3d at 106. And as the district court observed, the law excludes a "news story, commentary or editorial" posted to a "website or other periodical publication." A.R.S. § 16-971(2)(b)(i). Plaintiffs do not plausibly explain how a stray website blog post or commentary about an Arizona candidate would subject a person to the disclosure trigger. On the other hand, should a covered person spend $50,000 or more preparing a "national newsletter" to influence an election in Arizona that does not fall under these exemptions, that is precisely what Proposition 211 seeks to regulate, and the tailored disclosure of the sources of funding for such communications serves the State's important informational interest.

iii. *Proposition 211 is not overbroad for covering more forms of media than federal law does.*

Plaintiffs next contend that Proposition 211 is overbroad because it covers more forms of media than federal law. That is, while federal law covers "any broadcast, cable, or satellite communication," 52 U.S.C. § 30104(f)(3)(A)(i), Proposition 211 also covers paid communications via the "internet or another digital method, newspaper, magazine, outdoor advertising facility, mass mailing or another mass

distribution, telephone bank or any other form of general public political advertising or marketing, regardless of medium," A.R.S. § 16-971(17)(a). Again, Plaintiffs do not offer any explanation as to why the forms of media covered by federal law should constitute the outer boundary of permissible regulation. Moreover, we conclude there is a reasonable fit between Proposition 211's broader coverage of paid media and the informational interest here. Proposition 211 reflects forms of broad-based communication to which our modern society has grown accustomed, and if the law only covered broadcast, cable, or satellite communication, covered persons could easily avoid disclosure by shifting all campaign media spending online.

*iv. Proposition 211 does not violate a "major purpose requirement."*

Plaintiffs argue that Proposition 211 is overbroad because "covered persons" as defined under A.R.S. § 16-971(7) can include organizations who do not have "election-related activity" as at least one of their "major purposes." Plaintiffs rely on our decision in *Brumsickle* and the Supreme Court's decision in *Buckley* to argue that "campaign spending [must] be at least one significant purpose for a covered organization" for disclosure requirements to be constitutionally applied. Plaintiffs are mistaken.

In *Buckley*, the Supreme Court narrowly construed FECA's definition of "political committee" to reach only organizations whose "major purpose" is "the nomination or election of a candidate" in order to avoid an unconstitutionally overbroad application of federal law that reached "groups engaged purely in issue discussion." 424 U.S. at 79. But as our decision in *Brumsickle* clarified,

Case: 24-2933, 09/30/2026, DktEntry: 84.1, (44 of 103)



*Buckley* did not establish a "bright-line rule prohibiting all regulation of groups with 'a' primary purpose of political advocacy." *Brumsickle*, 624 F.3d at 1009. Rather, *Buckley* set the "outer limits" of constitutional regulation by prohibiting the imposition of disclosure requirements on groups "engaged purely in issue discussion." *Id.* at 1010. What is otherwise permissible within those boundaries, we explained, turns on "whether the burdens imposed by the disclosure requirements are substantially related to the government's important informational interest." *Id.* Under this approach, *Brumsickle* held that there was a substantial relationship between the State of Washington's informational interest and its decision to impose disclosure requirements on organizations with "a" primary purpose of political advocacy. *Id.* at 1011–12.

Applying *Brumsickle*, we conclude that Proposition 211's regulation of a "covered person" is constitutionally permissible because the "burdens imposed by the disclosure requirements are substantially related to the government's important informational interest." *Id.* at 1010. As discussed, Proposition 211's disclosure requirements serve Arizona's well-established interest in informing its citizens of the original sources of campaign media spending. Moreover, under Proposition 211, a person or entity qualifies as a "covered person" only after spending more than $50,000 on campaign media in an election cycle to influence statewide campaigns or more than $25,000 to influence any other type of campaign. A.R.S. § 16-971(7)(a). That the definition of "covered person" can only be triggered by a substantial political expenditure reasonably ensures that "groups that only incidentally engage in [political] advocacy" are not swept into Proposition 211's definition. *Brumsickle*, 624 F.3d at 1011. Stated another way, Proposition 211's

regulation of covered persons is not unconstitutionally overbroad because it is clearly targeted at public communications and activities that are campaign related and exceed pure "issue discussion." *Buckley*, 424 U.S. at 79.

*v. Proposition 211 is not underinclusive.*

Plaintiffs contend that Proposition 211 is underinclusive because the law excludes organizations "that spend only their own business income for campaign media spending" and defines "business income" in a way that excludes "[m]embership or union dues that do not exceed $5,000 from any one person in a calendar year." A.R.S. § 16-971(1)(b). According to Plaintiffs, this "unduly preferences labor unions over other advocacy associations." Plaintiffs are mistaken. The plain text of Proposition 211 treats all membership-based organizations that collect dues the same as unions, and Proposition 211 institutes a disclosure trigger on all these organizations if those dues exceed $5,000 per year. *Id.* Moreover, the concerns raised by underinclusive speech regulation are not present here. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes" when "a state fails to narrowly tailor a speech-restrictive law where it eliminates one form of speech 'while at the same time allowing unlimited numbers of other types . . . that create the same problem.'" *IMDb.com, Inc. v. Becerra*, 962 F.3d 1111, 1126 (9th Cir. 2020) (citation omitted). Here, however, information about businesses spending their own income or membership organizations spending their members' dues is not integral to the State's informational interest because it is not "dark money" coming from unknown sources. Because these organizations are reasonably distinguishable from those targeted by Proposition 211, we conclude that the law is not unconstitutionally underinclusive.

*vi. Proposition 211's monetary thresholds are not unconstitutionally low.*

Plaintiffs argue that Proposition 211's low monetary thresholds exacerbate First Amendment concerns. We disagree. Recall that Proposition 211 requires the disclosure of individual donors that give more than $5,000 toward campaign media spending—but only after a covered person has itself spent at least $50,000 to influence a statewide campaign or $25,000 to influence other campaigns. A.R.S. § 16-973(A). As Defendants point out, this disclosure threshold is far higher than other campaign-finance disclosure and recordkeeping thresholds upheld by the Supreme Court, our court, and other circuit courts.[18] Moreover, our precedent firmly establishes that the "threshold at which contributions are disclosed . . . is necessarily a judgment decision, best left to the discretion of the legislature." *Smith*, 95 F.4th at 1218 (citation modified); *see Mangan*, 933 F.3d at 1118 ("The acceptable threshold for triggering reporting requirements need not be high."); *Family PAC*, 685 F.3d at 811 ("[D]isclosure thresholds . . . are inherently inexact; courts therefore owe substantial deference to legislative judgments fixing these amounts."). Under the wide latitude afforded to legislatures, and in light of the high monetary thresholds established under Proposition 211, we find no basis for Plaintiffs'

---

[18] *See, e.g.*, *Nat'l Ass'n for Gun Rts., Inc. v. Mangan*, 933 F.3d 1102, 1118 (9th Cir. 2019) ($250 organizational-spending threshold); *Buckley*, 424 U.S. at 82–84 ($10 recordkeeping threshold and $100 public-disclosure thresholds); *Gaspee Project*, 13 F.4th at 89 ($1,000 organizational-spending threshold); *Smith*, 95 F.4th at 1218 ($2,000 contribution threshold); *No on E*, 85 F.4th at 498 ($5,000 contribution threshold).

contention that these disclosure thresholds are unconstitutionally low.

Accordingly, we conclude that Proposition 211's requirements are narrowly tailored. Its "scope is in proportion to the interest served"—Arizona's strong informational interest in disclosing the original sources of major campaign media spending. *Smith*, 95 F.4th at 1215 (citation omitted). Plaintiffs' scattershot arguments—heavy on hypotheticals and miscasting the plain text of the law—fail to establish that Proposition 211 lacks any reasonable fit.

***

For the reasons discussed, Proposition 211 survives exacting scrutiny. Proposition 211's original source disclosure requirement is substantially related to the State's vital interest in ensuring that the electorate has accurate information about the sources of major campaign media spending. Proposition 211 imposes modest burdens on Arizonans' speech and associational rights, and its disclosure, recordkeeping, and agency enforcement provisions are a reasonable fit to the State's asserted interest. *See Bonta*, 594 U.S. at 607–08. Plaintiffs have been unable to support their facial challenge by demonstrating that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation omitted). We therefore conclude that the district court properly dismissed Plaintiffs' facial challenge to Proposition 211's compelled disclosure requirements.

## IV.

We need not dwell too long on Plaintiffs' as-applied free-speech challenge because Plaintiffs' allegations are

conclusory and devoid of any specifics. "[T]hose resisting disclosure can prevail under the First Amendment" by bringing an as-applied challenge "if they can show 'a reasonable probability that the compelled disclosure [of personal information] will subject them to threats, harassment, or reprisals from either Government officials or private parties.'" *Reed*, 561 U.S. at 200 (quoting *Buckley*, 424 U.S. at 74) (alteration in original). "The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself." *Buckley*, 424 U.S. at 74. Additionally, "[a] pattern of threats or specific manifestations of public hostility may be sufficient." *Id.*

Plaintiffs' complaint is devoid of such proof. They claim that they have "specified the 'pattern of threats,' 'specific manifestations of public hostility,' and 'instances of recent harassment' that would attend public disclosures," yet we strain to find any factual allegations as to any specific instances of harm. Their complaint alleged that "Plaintiffs and their associates have fierce critics, and their opponents regularly strive to identify the organizations' donors in order to threaten, attack, and sow fear among those who support organizations like Plaintiffs. Once suspected donors are publicly outed, they are empirically at risk of facing boycotts, character attacks, personal threats, and even violence."

Plaintiffs' allegations amount to nothing more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citation modified). Indeed, we are unable to ascertain from Plaintiffs' allegations any discrete instances of "threats, harassment, or reprisals." *Reed*, 561 U.S. at 200 (citation

omitted). Such inchoate allegations "do not suffice." *Iqbal*, 556 U.S. at 678.

## V.

Lastly, Plaintiffs argue that Proposition 211 is unconstitutional both facially and as-applied because it compels donors to associate with messages and causes with which they may disagree. Plaintiffs, however, recast the same argument above that Proposition 211's compelled disclosure requirements violate their right to associate freely and anonymously with others. Because donors are not, in fact, being compelled to do anything by Proposition 211, we find no merit to their claims.

"The First Amendment protects the basic right to freely associate for expressive purposes; [and] correspondingly, '[t]he right to eschew association for expressive purposes is likewise protected.'" *Crowe v. Oregon State Bar*, 989 F.3d 714, 729 (9th Cir. 2021) (quoting *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018)). As the Supreme Court has acknowledged, "[g]overnment actions that may unconstitutionally infringe upon [the] freedom [of association] can take a number of forms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

One form is where the state's regulation itself "'intru[des] into the internal structure or affairs of an association' like a 'regulation that forces the group to accept members it does not desire.'" *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (citing *Roberts*, 468 U.S. at 623). In these cases, the state's action compels an association that would not otherwise voluntarily occur. Examples include: prohibiting a parade from excluding a float that the parade would not otherwise accept, *see id.* at 653–55 (discussing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,

515 U.S. 557 (1995)), requiring an organization to accept a member it does not wish to accept, *see id.* at 661; *Roberts*, 468 U.S. at 623, requiring membership in or payment of dues to an advocacy group that one would not otherwise join or pay, *Crowe*, 989 F.3d at 729; *Lathrop v. Donohue*, 367 U.S. 820, 847 (1961), or requiring individuals to distribute a pamphlet that they would not otherwise distribute, *see, e.g.*, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15–16 (1986).

Another form is where the state's action prohibits voluntary associations, *see, e.g.*, *Cousins v. Wigoda*, 419 U.S. 477, 488 (1975) (finding unconstitutional a state law which prohibited the Democratic Party from selecting its preferred delegates to the National Party Convention), or civilly or criminally penalizes individuals because of their voluntary associations, *see Healy v. James*, 408 U.S. 169, 185–86 (1972) ("[T]he Court has consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization.").

Unlike any of the foregoing cases, Plaintiffs point to no aspect of Proposition 211 that compels donors or Plaintiffs themselves to associate with, or penalizes them for associating with, anyone in particular. For example, Proposition 211 does not require donors to make a donation or require covered persons to accept a donation, nor does the law require donors or covered persons to associate with any political message. Plaintiffs' claim is instead that Proposition 211's disclosure requirements "falsely compel donors publicly to associate with causes they have no interest in and may even oppose." This argument, however, is one and the same with Plaintiffs' compelled disclosure claim. As we discussed, compelled disclosure requirements

*can* implicate the right to freely associate, which is why the Supreme Court has applied exacting scrutiny to disclosure requirements. *See Buckley*, 424 U.S. at 64–65; *Bonta*, 594 U.S. at 608 ("Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny."). But Plaintiffs here have not alleged a separate, standalone claim for compelled association. And for the reasons explained at length, Proposition 211 satisfies exacting scrutiny and imposes only minimal burdens on Plaintiffs' right of association.

Plaintiffs do not see it that way. They argue that as a result of Proposition 211's disclosure requirements, "their donors will be compelled to associate with various positions, organizations, and candidates even where they did not intend or foresee the ultimate use of their funds when they made their donation to an entirely different entity." Plaintiffs' theory cannot be squared with a half-century of Supreme Court precedent. Under Plaintiffs' theory, all campaign finance disclosure laws would run afoul of the Constitution because some donors may be disclosed as contributing to a message that they do not fully support or wish to endorse. Nor can Plaintiffs' theory be squared with Proposition 211's opt-out provision, which gives donors control over the use of their funds for campaign media spending. Because Plaintiffs' compelled association claim overlaps entirely with their challenge to Proposition 211's disclosure requirements, and in light of our conclusion that Proposition 211 meets exacting scrutiny, we affirm the district court's dismissal of Plaintiffs' facial and as-applied compelled association claims.

## VI.

"[I]nformed public opinion is the most potent of all restraints upon misgovernment." *Buckley*, 424 U.S. at 67 n.79 (quoting *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936)). In furtherance of this principle, "disclosure requirements have become an important part of our First Amendment tradition." *Brumsickle*, 624 F.3d at 1022. Proposition 211, known as Arizona's Voters' Right to Know Act, fits squarely within this tradition. Proposition 211 is substantially related to Arizona's vital interest in informing the public of the original sources of significant campaign media spending. The strength of that interest is in proportion to the modest burdens that Proposition 211 imposes on the rights of free speech and free association. And Proposition 211's requirements are narrowly tailored to serve Arizona's strong informational interest. Accordingly, the district court's dismissal of all claims is **AFFIRMED**.

BUMATAY, Circuit Judge, dissenting:

Speaking anonymously on matters of public concern is deeply rooted in the American story. Publius,[1] Brutus,[2] a Citizen of the State of New York.[3] Common Sense,[4] a Columbian Patriot,[5] the Pennsylvania Farmer.[6] Helvidius,[7] Pacificus,[8] A Friend of the Union.[9] The list could go on and on. Without the powerful words of the Founding generation's anonymous pamphleteering, who knows if this Nation would have achieved Independence, ratified the Constitution, or enacted the Bill of Rights?

Given the key role of anonymous political speech in our Nation's Founding (and of the unnamed sponsors that often supported this speech), the original meaning of the "freedom of speech" encompasses the right to speak on public affairs

---

[1] John Jay, Alexander Hamilton, and James Madison. Jeff Kosseff, *The United States of Anonymous: How the First Amendment Shaped Online Speech* 21–22 (2022).

[2] Unknown, but believed to be Robert Yates. 2 *The Complete Anti-Federalist* 358 (Herbert J. Storing ed., 1981).

[3] John Jay. 20 *Ratification by the States* 922–23 (John P. Kaminski et al. eds., 2004).

[4] Thomas Paine. Kosseff, *The United States of Anonymous*, at 20–21.

[5] Mercy Otis Warren. *Historic Document: Observations on the New Constitution (1788)*, Nat'l Const. Ctr., https://perma.cc/8YPT-Y9C5.

[6] John Dickinson. Kosseff, *The United States of Anonymous*, at 18–20.

[7] James Madison. Jonathan Turley, *Registering Publius: The Supreme Court and the Right to Anonymity*, 2001–2002 Cato Sup. Ct. Rev. 57, 60.

[8] Alexander Hamilton. *Id.*

[9] John Marshall. 4 Albert J. Beveridge, *The Life of John Marshall* 318–19 (1919).

and to fund that speech without the government forcing public disclosure of one's identity. Indeed, "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). And corollary to that right is the related ability to publicly associate—or not associate—with others' speech in the public square. As we've said, "[t]he First Amendment protects the basic right to freely associate for expressive purposes; correspondingly, the right to eschew association for expressive purposes is likewise protected." *Crowe v. Oregon State Bar*, 989 F.3d 714, 729 (9th Cir. 2021) (simplified).

In stark contrast to this background, the State of Arizona enacted Proposition 211. *See* An Initiative Measure Amending Title 16, Arizona Revised Statutes by Adding Chapter 6.1; Relating to the Disclosure of the Original Source of Monies Used for Campaign Spending ("Proposition 211") (codified at Ariz. Rev. Stat. §§ 16-971–979).[10] Under the law, certain persons who engage in political speech in the State must publicly disclose their donors. *See* Ariz. Rev. Stat. § 16-973(A). While donor disclosure laws are not new, *see, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 60 (1976) (per curiam), Arizona's law constitutes a radical departure from what we've seen before. That's because Arizona requires reporting not only direct donors—but also *indirect* donors—to any person or group that engages in enough campaign spending. *See* Ariz. Rev. Stat. § 16-973(A)(6) ("[A] covered person shall file with the secretary of state an initial report that discloses . . . [t]he

[10] https://perma.cc/5Q4J-4URP.

identity of each donor of original monies who contributed, directly or indirectly, more than $5,000 . . . ."). This is no matter how many intermediaries the donations pass through—requiring looking infinitely back to the original source. *See id.* § 16-973(A)(7); *see also* Proposition 211 § 2(A). So if a person gives more than $5,000 to a group, which later donates to another group, which later contributes to yet a third group, that person's name, address, occupation, and employer could be publicly disclosed if the third group engages in enough political activity in Arizona.

The central issue is that, under the statute's plain text, it doesn't matter whether the indirect donor knew about that political activity or intended to support it. *See* Advisory Opinion to the Democratic Legislative Campaign Committee, Ariz. Citizens Clean Elections Comm'n 2, 9 (Jan. 25, 2024) (advisory op. 2024-02).[11] Proposition 211—by its terms—publicly discloses the identity of indirect donors and publicly associates them with the political speech of another group that they may have never heard of, never wanted to donate to, and never agreed with.

Trying to fix this issue, a narrow majority of the Arizona Supreme Court recently construed Proposition 211 to implicitly include a notice-and-consent requirement. *Ctr. for Ariz. Pol'y Inc. v. Ariz. Sec'y of State*, 592 P.3d 75, 121 (Ariz. 2026). So covered persons only need to publicly disclose sources of "monies for which the donor, whether immediate or upstream, was given notice and an opportunity to opt out of" use for campaign media spending. *Id.* It gave no details, however, for how such a notice-and-consent requirement would work for indirect donors, including what counted as appropriate notice or how consent would be

[11] https://perma.cc/FY2D-BDU8.

collected. *See id.* at 121 (King, J., concurring in part and dissenting in part) ("[T]he opt-out notice simply notes use of the donor's funds 'for campaign media spending,' without identifying the particular candidate, ballot measure, or message the campaign media will support or oppose.").

The risks to the free-speech right are obvious. Proposition 211 mandates public disclosure and forced association of *any* person in *any* State who donates more than $5,000 in two years to *any* organization—charitable, religious, political, or otherwise—if the money could later be linked to enough political activity in Arizona. *See* Ariz. Rev. Stat. § 16-973(A)(6). And without further statutory or judicial guidance, the original donor's lack of agreement to or knowledge of the specific political activity is irrelevant. *See id.* This then exposes the donors and their employers to doxxing, harassment, or worse. The result? Chilled political speech.

The First Amendment, as originally understood, does not tolerate suppressing political speech or compelling association in this way. The Act's infinite look-back-and-disclose regime contradicts our rich constitutional history of anonymous political speech and free expression. Even under our modern precedent, Proposition 211's aggressive reach fails "exacting scrutiny." *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607–08 (2021). Because Proposition 211 discloses even donors who have neither intent nor knowledge of the specific political activity they've indirectly funded, the law doesn't substantially relate to a "sufficiently important" government interest. *See id.* at 607. And the Act's "actual burdens" on free speech far outweigh Arizona's purported interest in informing voters: it saddles advocacy groups with onerous regulations while threatening to expose donors from any part of the country. *See id.*

Finally, Proposition 211 is not narrowly tailored to the State's informational interest—it sweeps in donors with the faintest connection to Arizona political activity while pointedly excluding favored special interests from the law's scope.

Because Proposition 211 violates both the original meaning of the First Amendment and precedent, I respectfully dissent.

## I.

## BACKGROUND

### A.

In November 2022, Arizona voters enacted Proposition 211, the Voters' Right to Know Act. *See* Proposition 211 § 1. It declares that "the People of Arizona have the right to know the original source of all major contributions used to pay, in whole or part, for campaign media spending." *Id.* § 2A. So it contemplates the public exposure of nearly anyone who donates more than $5,000 to an organization if that money eventually makes its way into campaign media spending. *Id.* This is meant "to promote self-government and ensure responsive officeholders, to prevent corruption[,] and to assist Arizona voters in making informed election decisions." *Id.* § 2B. At bottom, the Act's goal is "to stop 'dark money'" in Arizona. *Id.* § C. And to meet this goal, Proposition 211 imposes record-keeping and disclosure requirements on those who engage in a certain amount of "campaign media spending." *Id.* § A.

First, who does Proposition 211 cover? The Act subjects "covered person[s]" engaged in "campaign media spending" to its mandates. Ariz. Rev. Stat. § 16-971(7). A "covered person" is "any person [natural or corporate] whose total

campaign media spending or acceptance of in-kind contributions to enable campaign media spending, or a combination of both, in an election cycle is more than $50,000 in statewide campaigns or more than $25,000 in any other type of campaigns." *Id.* § 16-971(7)(a), (13); *see also id.* § 16-971(8) (defining Arizona's two-year "election cycle"). The Act doesn't cover campaign media spending by individuals who spend only their own money, organizations that spend only their own business income, political candidates' committees, or certain small-dollar political parties or political action committees. *Id.* § 16-971(7)(b)(i)–(iv). The Act expressly exempts labor unions and membership organizations if they collect $5,000 or less in membership dues per year and spend only their own funds on political activity. *See id.* § 16-971(1)(b), (7)(b)(ii).

Second, what does it cover? The Act covers nearly all types of traditional political speech. "Campaign media spending" includes any spending to advocate for or against a candidate, a public officer's recall, a political party, or a referendum. *See id.* § 16-971(2)(a)(i)–(vii). And it includes public communications merely "refer[ring]" to a candidate within ninety days of an election. *Id.* § 16-971(2)(a)(iii). It excludes, among other things, activity by institutional media, *id.* § 16-971(2)(b)(i), and spending for "nonpartisan activit[ies] intended to encourage voter registration and turnout," *id.* § 16-971(2)(b)(ii).

Third, what must a "covered person[]" do? A covered person must report the *original* source of their funds to the Arizona Secretary of State, even if those funds passed through many hands along the way. Within five days of qualifying as a covered person, that person must report "[t]he identity of each donor of original monies who contributed, directly or indirectly, more than $5,000 of traceable monies

or in-kind contributions for campaign media spending during the election cycle to the covered person." *Id.* § 16-973(A)(6). The covered person must also disclose "[t]he identity of each person that acted as an intermediary and that transferred, in whole or in part, traceable monies of more than $5,000 from original sources to the covered person." *Id.* § 16-973(A)(7). This chain of disclosures could be infinite since the Act's requirements apply "regardless of whether the monies passed through one or more intermediaries." Proposition 211 § 2(A).

To help this process, those who directly donate more than $5,000 to a covered person must tell the covered person the identity of anyone who directly or indirectly contributed more than $2,500 within that donation. *Id.* § 16-972(D). Direct donors must also trace back those $2,500-plus contributions to their original sources, regardless of whether that amount stems from many smaller donations put together or whether the funds passed through multiple intermediaries. *Id.* In doing so, the reporting donors must specifically record the date and amounts of any single intermediary transfer of more than $2,500. *Id.* The Act doesn't require that any indirect donor intend the funds to be used for specific "campaign media spending" in Arizona before their identity is reported. *See id.* § 16-973(A)(6)–(7).

The report is no small matter. The report must disclose any individual donor's "name, mailing address, occupation, and employer" and any organizational donor's "name, mailing address, federal tax status and state of incorporation, registration or partnership, if any." *Id.* § 16-971(10)(a)–(b). Barring limited exceptions, the Secretary of State must "promptly" publicize these reports online—without any redaction of donors' names, addresses, contact information, or employers. *See id.* § 16-973(F), (H).

The Act includes a limited opt-out for direct donors. Covered persons must notify their direct donors that their contributions may be used for "campaign media spending." *Id*. § 16-972(B)(2). Only if the covered person receives written consent to use the contribution in this way, or if they hear nothing within 21 days, can the funds be spent or transferred accordingly. *Id*. § 16-972(C). Per the Arizona Supreme Court, indirect donors may also opt out, though these mechanics are not clear. *See Ctr. for Ariz. Pol'y*, 592 P.3d at 102 ("[T]he act does not answer every question about how its notice and tracing provisions operate . . . .").

What else does the Act require? The Act also mandates that covered persons put disclaimers in their "public communications" showing "the names of the top three donors who directly or indirectly made the three largest contributions of [more than $5,000 in] original monies during the election cycle to the covered person." Ariz. Rev. Stat. § 16-974(C). Such disclaimers must be made in any such communication, "regardless of medium." *Id.* § 16-971(17)(a)(1).

Finally, donors and covered persons must keep transfer records for at least five years and make them available to the Citizens Clean Elections Commission on request. *Id.* § 16-972(A). Such records are available to the public upon request. *See id.* § 39-121 ("Public records . . . in the custody of any officer shall be open to inspection by any person at all times during office hours."). The Commission may make regulations under the Act and enforce its provisions upon pain of civil penalties. *Id.* § 16-974(A). It can impose penalties as high as three times the amount of an improperly disclosed donation. *Id.* § 16-976(A). And citizens may compel the Commission to pursue enforcement through a

civil action even when it would otherwise exercise its prosecutorial discretion. *Id.* § 16-977(C).

**B.**

Americans for Prosperity is an advocacy organization headquartered in Virginia with an Arizona chapter based in Phoenix. It does grassroots outreach on many public issues, including government spending, public debt, immigration reform, and economic protectionism. The organization funds its activities by accepting donations nationwide. Similarly, Americans for Prosperity Foundation trains and educates citizens to become advocates for a "free and open society." The Foundation ran advertisements opposing passage of Proposition 211.

Both organizations allege that Proposition 211 violates their First Amendment rights by chilling their expression and the expression of their donors. They fear threats, harassment, and reprisals caused by the Act's disclosure requirements. They predict that once their donors are publicly outed, they will face "boycotts, character attacks, personal threats, and even violence." The organizations allege that their supporters have faced bomb threats, protests, stalking, and physical violence. And they allege that their "opponents regularly strive to identify the organizations' donors in order to threaten, attack, and sow fear among [their supporters]." To protect against this, the organizations keep their donor information in secure databases and promise their donors confidentiality.

In March 2023, Americans for Prosperity and the Foundation sued to enjoin the Act. In April 2024, the district court dismissed their suit for failure to state a claim.

## II.

## HISTORICAL UNDERSTANDING OF THE FIRST AMENDMENT

The First Amendment prohibits the government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I. In determining the scope of constitutional rights, "[t]he Supreme Court has urged [us] to examine the historical record." *Pena v. City of Los Angeles*, 158 F.4th 1033, 1041 (9th Cir. 2025). Indeed, in the First Amendment context, the Court has looked to the "historical importance" of the speech involved. *See Watchtower Bible and Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 162 (2002). "[B]y looking to tradition and history, we see how constitutional text came to be and how the People closest to its ratification understood and practiced the right." *Duncan v. Bonta*, 19 F.4th 1087, 1150 (9th Cir. 2021) (en banc) (Bumatay, J., dissenting). And when later precedent has led us astray, we can use history to "prevent further deviations from the original understanding of the Constitution." *Verdun v. City of San Diego*, 51 F.4th 1033, 1051 (9th Cir. 2022) (Bumatay, J., dissenting) (simplified).

The First Amendment, as originally understood, did not allow the government to forcibly reveal the identities of political speakers or to require them to publish the names of their supporters. The Founding generation repeatedly opposed mandatory disclosure of anonymous political speech because doing so violated their understanding of the rights inherent to citizens of a free republic. Similarly, being forced to associate with the political speech of others could not have coexisted with the liberty of conscience that they saw as a natural right. Political speech was sacrosanct: A

public commentator could not be dragged into the light against his will. That enduring principle should govern this case.

## A.

## Pre-Ratification History

The American colonies matured into a nation against the backdrop of British repression of political speech, which was enforced through coerced disclosures. For hundreds of years, the Tudors and Stuarts censored political speakers by requiring printing presses to register or reveal authors' names if they were to publish at all. W.S. Holdsworth, *Press Control and Copyright in the 16th and 17th Centuries*, 29 Yale L.J. 841, 843, 848, 851 (1920); *see also, e.g.*, Licensing of the Press Act of 1662, 14 Car. 2, c. 33 (Eng. & Wales), *reprinted in* 5 *The Founders' Constitution* 113–14 (Philip B. Kurkland & Ralph Lerner eds., 1987). These laws helped Crown officials suppress or punish disfavored speech. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 225 (2010). As one historian put it, "[t]he main purpose of the licensing penalties was to force printers to inform on seditious authors, who were subject to the death penalty under various treason and felony statutes, especially through the all-embracing ancient device of constructive treason." Irving Brant, *Seditious Libel: Myth and Reality*, 39 N.Y.U. L. Rev. 1, 15 (1964). Authorities in England were not shy about prosecuting disfavored speakers when found. *See generally* Philip Hamburger, *The Development of the Law of Seditious Libel and the Control of the Press*, 37 Stan. L. Rev. 661 (1985) (discussing Crown efforts to prosecute criticism under the laws of treason, heresy, seditious libel, and others from the late-sixteenth through the early-eighteenth centuries). Nor were colonial authorities. *See* Jonathan

Turley, *The Indispensable Right: Free Speech in an Age of Rage* 51 (2024) ("Before 1700, there were 1,244 recorded sedition trials in colonial courts . . . .").

The cost of exposure could be high. For example, in 1591, the Puritan minister John Udall was convicted and sentenced to death for allegedly writing, printing, and publishing anonymous criticisms of the Anglican church under the name "Martin Marprelate." Zechariah Chafee, Jr., *The Blessings of Liberty* 192–97 (1956). In the 1630s, another English Puritan, William Prynne, infamously had his ears cut off and the stumps gouged out for anonymously criticizing the Bishop of Norwich. C.H. Firth, *William Prynne*, *in* 46 *Dictionary of National Biography* 432–33 (Sidney Lee ed., 1896). And during the same period, colonial authorities punished disfavored speech with fines, whippings, floggings, limb-breaking, and mutilation of ears and tongues. Turley, *The Indispensable Right*, at 52–53.

As free speech became a more treasured aspect of English liberty, the licensing laws that required author disclosure fell out of favor. 4 William Blackstone, Commentaries *151–52 (condemning such laws as violating the "liberty of the press . . . essential to the nature of a free state"). In 1695, the House of Commons refused to renew the author-disclosure requirement, despite the Crown's repeated calls to stop the "licentiousness" of the press. *See* Joseph M. Thomas, *Swift and the Stamp Act of 1712*, 31 Publ'ns Mod. Language Ass'n Am. 247, 251–61 (1916) (describing the legislative history of the licensing acts' expiration). And many began to see the specific value of *anonymous* speech for freely criticizing the government; as

the influential "Mr. Spectator" said of a failed 1712 proposal to ban anonymous tracts:

> It has been proposed, *to oblige every Person that writes a Book, or a Paper, to swear himself the Author of it, and enter down in a publick Register his Name and Place of Abode.*
>
> This, indeed, would have effectually suppressed all printed Scandal, which generally appears under borrowed Names, or under none at all. But . . . such an Expedient would not only destroy Scandal, but Learning. . . . [V]ery few, who are capable of Writing, would set Pen to Paper, if they knew, before-hand, that they must not publish their Productions but on such Conditions. For my own part, I must declare, the Papers I present the Publick are like Fairy Favours, *which shall last no longer than while the Author is concealed.*

Joseph Addison, *No. 451*, The Spectator, Aug. 7, 1712 (emphasis added);[12] *see also* Robert G. Natelson, *Does "The Freedom of the Press" Include a Right to Anonymity? The Original Meaning*, 9 N.Y.U. J.L. & Liberty 160, 185–88 (2015) (quoting English and American writers explicitly linking the "freedom of anonymous publication" to the liberty of speech and of the press).

---

[12] Available at *The Project Gutenberg eBook of The Spectator, Volumes 1, 2 and 3, by Joseph Addison et al.*, Project Gutenberg (Jan. 19, 2023), https://perma.cc/MV3V-PQ5C.

The same year that Parliament refused to continue the licensing acts, it enacted what might be considered the first campaign-finance law—without compelling disclosure of political supporters' identities. In 1695, it passed a statute meant to prevent "excessive and exorbitant Expen[s]es" in elections so that voters' choices could be "freely and indifferently made." An Act for Preventing Charge and Expen[s]e in Elections of Members to Serve in P[ar]liament 1695, 7 & 8 Will. 3, c. 4. Under this "anti-treating" law, any parliamentary candidate who "directly or indirectly g[a]ve present or allow[ed] to any [voter] any Money[,] Meat[,] Drink[,] Entertainment[,] or Provision or ma[d]e any Present[,] Gift[,] Reward[,] or Entertainment[,] or shall at any time [have promised the same]" would have their election voided. *Id.* This law, and the similar colonial statutes that followed it, tried to reduce the political influence of "excessive" spending not by limiting citizens' speech, but by prohibiting candidate conduct that was closely tied to bribery and vote-buying. *See id.*; Peverill Squire, *The Rise of the Representative: Lawmakers and Constituents in Colonial America* 131–33 (2017) (ebook) (surveying anti-treating laws of Rhode Island, Connecticut, Maryland, and elsewhere); *see also, e.g.*, An Act for Prevention of Undue Election of Burge[s]ses, *reprinted in* 3 *The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature in the Year* 1619, at 172–75 (William Waller Henning ed., 1823) (1699 anti-treating law); An Act for the Better Regulation of Elections, and Laying a Penalty on All Officers and Other Persons Whatsoever, That Shall by Indirect Practices Endeavour to Obtain Any Election Contrary to the Rights, and Liberties and Privileges of the People, and the True Intent and Meaning of This Act §§ 3–5, *reprinted in* 1 *Acts*

*of the General Assembly of the Province of New-Jersey* 144–45 (Samuel Nevill ed., 1752) (1726 anti-treating law); An Act for Preventing Bribery and Corruption in the Election of Sheriffs and Coroners Within this Province, *reprinted in* 5 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 159–61 (James T. Mitchell & Henry Flanders eds., 1898) (1752 anti-treating law).

Parliament's next campaign-reform law similarly didn't make candidates identify their supporters or make anonymous speakers disclose their identities. *See* An Act for the More Effectual Preventing [of] Bribery and Corruption in the Elections of Members to Serve in Parliament, 2 Geo. 2 c. 24 (1729). Instead, it only required voters to swear that they had not been treated with or promised anything in exchange for their votes. *See id*. This shows once again that Parliament (and colonial legislatures) tried to manage the intersection of money and politics by enacting regulations that rooted out bribery and vote-buying—not by suppressing speech. *See id.*; *see also, e.g.*, An Act to Ascertain the Number of Members of Assembly and to Regulate the Election §§ 2–3, *reprinted in* 2 *Statutes at Large of Pennsylvania* 213–18 (1705 law prohibiting candidates from offering rewards in exchange for votes and voters from "willfully and corruptly making a false affirmation" in declaring eligibility to vote).

In short, the problem of money and politics was not new to our colonial ancestors. While "[t]reating was the main way money flowed into colonial elections," "[p]rovocative publications became campaign staples and a [another] means by which money influenced outcomes." Squire, *The Rise of the Representative* at 116, 128; *see also* Robert J. Dinkin, *Voting in Provincial America: A Study of Elections in the Thirteen Colonies 1689–1776*, at 106–07, 109–11 (1977).

And "one finds [in colonial elections] well-to-do men, like the Browns of Rhode Island, paying election expenses." Chilton Williamson, *American Suffrage from Property to Democracy: 1760–1860*, at 54, 59 (1960).

Yet authorities did not demand public disclosure of those who financially supported a candidate or a cause. Simply, campaign-finance laws in this period were consistent with anonymous political speech, not antithetical to it. "Anonymity proved critical to the development of freedom of the press and the spread of political ideas in eighteenth-century America." Stephen D. Solomon, *Revolutionary Dissent: How the Founding Generation Created the Freedom of Speech* 130 (2016). For instance, anonymous published letters by "Cato" arguing for the liberty of British citizens and against government corruption were "[re]printed in virtually all the newspapers in the colonies and widely quoted in political essays, making them among the most influential political essays for the American founding generation." *Id.* at 43–44. And the *Letters from a Pennsylvania Farmer*—the most widely read political papers written in the colonies as of 1768—were also written under a symbolic pseudonym. Jeff Kosseff, *The United States of Anonymous: How the First Amendment Shaped Online Speech* 18–20 (2022); *see also* Mary Beth Norton, *1774: The Long Year of Revolution* 291–307 (2020) (describing pseudonymous debate between Loyalists and Patriots in the years before Independence). Indeed, a study of colonial political pamphlets from the height of the Stamp Act crisis found that 55% were published anonymously. John Howe, *Language and Political Meaning in Revolutionary America* 130 (2004) (examining pamphlets published between 1765 and 1768). Another study of similar pamphlets published between the Stamp Act's passage and

Independence found that a full 40% were anonymously authored. Thomas R. Adams, *American Independence: The Growth of an Idea* xi, xvii (1965).

As Independence neared, colonial Americans went beyond merely practicing anonymous speech to actively celebrating resistance to forced exposure. They feted New York publisher John Peter Zenger, who was acquitted of seditious libel in 1735 after refusing to reveal anonymous critics of the colonial government. *McIntyre*, 514 U.S. at 361 (Thomas, J., concurring in the judgment). Some of the trials and speeches most widely reported in the colonies arose out of official attempts to expose the author of a pseudonymous critique of King George III. Eric Schnapper, *Unreasonable Searches and Seizures of Papers*, 71 Va. L. Rev. 869, 875–76 (1985) (discussing *Entick v. Carrington*, (1765) 95 Eng. Rep. 807 (K.B.), among others). "[T]he American press was full of [these] trials, tribulations, and speeches, so full indeed that one may go to almost any issue of any newspaper between 1763-1775 and read of John Wilkes, the author of *North Briton No. 45*." *Id.* at 876 n.38 (simplified). And grand juries in Massachusetts in the late 1760s repeatedly refused to return indictments for seditious libel against two publishers of anonymous critiques of the Stamp Act. Solomon, *Revolutionary Dissent*, at 83–87.

**B.**

**Ratification History**

Ratifying the First Amendment signaled Americans' rejection of the British practice of forced disclosures and compelled associations. In introducing his proposed amendments to the First Congress, Madison made his reasons explicit: "The freedom of the press and rights of conscience, those choicest privileges of the people, are

*unguarded* in the British Constitution." Proceedings and Debates of the House of Representatives of the United States, at the First Session of the First Congress, begun at the City of New York, March 4, 1789, 1 Annals of Cong. 436 (1789) (emphasis added). And the Founding generation's lived practice shows that they prized—as core components of the free-speech and free-press rights—both anonymous speech and the ability of speakers to choose with whom they would associate their speech. *See* Natelson, 9 N.Y.U. J.L. & Liberty, at 186–88 (collecting American statements explicitly supporting anonymous and pseudonymous speech as part of the liberty of the press).

The record is clear: anonymous speech was specially celebrated and widely practiced in the newly independent United States. *See* Victoria Smith Ekstrand & Cassandra Imfeld Jeyaram, *Our Founding Anonymity: Anonymous Speech During the Constitutional Debate*, 28 Am. Journalism 35, 53 (2011) (surveying printed materials in the Ratification debates to conclude that "[a]nonymous speech and the nation's founding are inextricably linked"). Cloaked by pen names, writers such as Thomas Paine ("Common Sense"); Mercy Otis Warren ("A Columbian Patriot"); and Alexander Hamilton, John Jay, and James Madison ("Publius") debated the merits of independence from Britain, the ratification of the Constitution, and the Founding charter's meaning. *See supra* nn.1–9; *see also* Turley, 2001–2002 Cato Sup. Ct. Rev., at 59–60. And they were not alone: "Literally thousands" of pseudonyms made their appearance in the Ratification era, drawn from Greco-Roman history ("Cato," "Brutus," "Publius"), contemporaneous occupations ("Centinel," "A Federal Farmer"), and other sources. *Pseudonyms and the Debate over the Constitution*, Ctr. for the Study of the Am. Const. (July 22, 2022)

(simplified).[13] Indeed, "non-disclosure of one's identity was a nearly-universal practice in letters, essays, and pamphlets dealing with political subjects" in the Founding period. Natelson, 9 N.Y.U. J.L. & Liberty, at 179.

This "nearly-universal practice" is striking against the lack of another: in the Ratification period, no federal or state law required disclosure of authors' names or their supporters as the price for joining in political debate. Instead, sporadic government attempts to expose anonymous authors sparked quick backlashes and official retreat. Take an attempt by some in the 1778 Continental Congress to force a printer to reveal the identity of the congressional critic "Leonidas." *McIntyre*, 514 U.S. at 361–62 (Thomas, J., concurring in the judgment). It was quickly aborted as violating American liberties of the press. *See id.* Another attempt in the New Jersey legislature also foundered for similar reasons, with opponents explicitly linking anonymity to the same press freedom. *See id.* at 362.

Even unofficial attempts to force disclosure of speakers' identities sparked similar backlash, as an episode in Boston illustrates. In October 1787, printer Benjamin Russell and other Federalist publishers tried to limit Anti-Federalist writers' contributions by prohibiting anonymous essays about the Constitution. *See id.* at 363–67. But "John De Witt" spoke for many in opposition when he expressed fear that "[t]he name of the man who but lisps a sentiment in objection to [the Constitution] is to be handed to the printer, by the printer to the publick, and by the publick he is to be led to execution." 13 *Commentaries on the Constitution* 313 (John P. Kaminski et al. eds., 1981) (citing *John De Witt*, American Herald (Boston), Oct. 22, 1787). The backlash

[13] https://perma.cc/3TML-FB3F.

against these disclosure policies spread from Massachusetts to New York, Pennsylvania, and Rhode Island, with some saying a policy of mandatory disclosure would violate the "Liberty of the Press . . . which *every Person* in the United States *at present* enjoys." *McIntyre*, 514 U.S. at 366. In fact, one New Yorker wrote that prohibiting anonymity would "REVERSE the important doctrine *of the freedom of the press*," whose "truth" was "universally acknowledged." *Id.* (quoting *Detector*, New York Journal, Oct. 25, 1787); *see also* Natelson, 9 N.Y.U. J.L. & Liberty, at 190–95 (discussing other explicit statements in the Boston newspaper debates linking press freedoms and anonymity). In response, Russell rescinded the policy and resumed publishing anonymous Anti-Federalist essays. *See* 13 *Commentaries on the Constitution*, at 314.

The Founders had multiple reasons to prize anonymous speech. *See* Solomon, *Revolutionary Dissent*, at 130–31. Of course, it prevented official censorship and retaliation. *See id.* at 130. After all, as late as 1770, the London publisher Henry Sampson Woodfall and others were prosecuted for seditious libel because they printed a "daring insult" to King George III penned by the widely read, pro-American critic "Junius." Kosseff, *The United States of Anonymous*, at 11–12; *see also Powell v. McCormack*, 395 U.S. 486, 531 n.60 (1969) (noting the wide circulation of "Junius" in colonial newspapers). In 1771, after the trial, "Junius" wrote to his publisher that "I must be more cautious than ever . . . . I am sure I should not survive a discovery three days; or, if I did, [Parliament] would attaint me by bill." Kosseff, *The United States of Anonymous*, at 10–11 (quoting *Letters of Junius* 57 (Henry Sampson Woodfall ed., 1772)). Similar concerns extended to the other side of the Atlantic: Colonial legislatures and executive councils had sometimes held

printers in contempt for disfavored speech, and the Continental Congress encouraged the newly independent States to pass legislation preventing Americans from being "deceived and drawn into erroneous opinion." *See* Ekstrand & Jeyaram, 28 Am. Journalism, at 56 n.37 (simplified).

But, as the Russell affair demonstrates, anonymous writing also protected unpopular speakers from *unofficial* retaliation. "Authors had very good reason to fear for their safety," along with their economic interests, professional reputations, and families' privacy interests if exposed. *See* Kosseff, *The United States of Anonymous*, at 23. For instance, in the months before Independence, Loyalists in one Massachusetts town who had signed a pledge to defend the British government "were threatened . . . by a mob of 1,500 or more men unless they recanted." Norton, *The Long Year of Revolution*, at 287. And later, in the run-up to Ratification, one Philadelphian warned an anonymous Anti-Federalist "to be wary 'lest his name may yet be known . . . . if he wishes to escape the just resentment of an incensed people, who perhaps may honor him with a coat of TAR and FEATHERS.'" *Pseudonyms and the Debate over the Constitution*, Ctr. for the Study of the Am. Const. (July 22, 2022) (quoting *Tar and Feathers*, Phila. Indep. Gazetteer, Sept. 28, 1787).[14] Mirroring this threat, "Philadelphiensis" wrote in favor of anonymity: "Will a man, for his own sake—or if he has friends, family and endearing connections in life, still more for their sake; venture to expose his interest, his property, and perhaps his life, to the mercy of a revengeful, and probably a powerful party?" *Philadelphiensis (VIII)*, *reprinted in* 3 *The Complete Anti-Federalist* 125 (Herbert J. Storing ed., 1981).

---

[14] https://perma.cc/3TML-FB3F.

Anonymous speech also allowed Americans to conduct debates based on the merits of their ideas, rather than on their personal reputations. *See* Ekstrand & Jeyaram, 28 Am. Journalism, at 45–47. Thomas Paine suggested as much when, in the preface to the third edition of *Common Sense*, he wrote: "Who the Author of this Production is, is wholly unnecessary to the Public, as the Object for Attention is the *Doctrine itself*, not the *Man*." *See Common Sense, Thomas Paine, February 14, 1776*, U. of Minn. Human Rights Library;[15] *see also* Centinel (No. 18), *in The Letters of Centinel: Attacks on the U.S. Constitution* 103 (Samuel Bryan ed., 1998) (refusing to self-identify the author because it was not "in the least material to the argument"). Mercy Otis Warren exemplified this shared attitude: in an era when society restricted women's participation in political life, she became an influential voice in the debates over Independence and constitutional ratification through anonymous satires and pamphlets. Nancy Rubin Stuart, *The Muse of the Revolution: The Secret Pen of Mercy Otis Warren* xi (2008). So did the authors of the Federalist Papers, who did not all enjoy positive reputations in the States that they were trying to persuade to ratify the Constitution. *See* Ekstrand & Jeyaram, 28 Am. Journalism, at 42. In short, Founding-era Americans understood that, by writing anonymously, citizens could offer their ideas to the public on equal footing, whether they were privileged or marginalized, wealthy or poor, educated or not. *See* Douglass Adair, *Fame and the Founding Fathers* 272 n.1 (Trevor Colbourn ed., 1974) ("A gentleman lost caste if he wrote professionally in competition with mere scribblers; and conversely, a lower-class professional writer concealed

[15] https://perma.cc/Z3EK-68W5.

behind a nom de plume could gain authority by writing as if he were a gentleman.”).

The reverence for anonymous speech also shows another deeply rooted value: A speaker could choose to associate their speech with other citizens and ideas without government interference. This flowed from the bedrock assumption that the government could not compel speakers to make statements with which they disagreed. *See* Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 280–81 (2017) (“The freedom of *opinion* was thus, at its core, a freedom against governmental efforts to punish people for their thoughts.”). As explained by St. George Tucker in his edition of Blackstone’s Commentaries, “[t]hought and speech are equally the immediate gifts of the Creator, the one being intended as the vehicle of the other: they ought, therefore, to have been wholly exempt from the coercion of human laws in all speculative and doctrinal points whatsoever: liberty of speech in political matters, has been equally proscribed in almost all the governments of the world, as liberty of conscience in those of religion.” *Of the Right of Conscience*; *and of the Freedom of Speech and of the Press*, *in* 2 William Blackstone & St. George Tucker, *Blackstone’s Commentaries: with Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* 3, 11 (1803) (Note G).

So conscience, rather than coercion, dictated whether a citizen could associate his own speech with others’. And this manifested in the practice of writers remaining anonymous or choosing specific pseudonyms for their own expressive reasons. Solomon, *Revolutionary Dissent*, at 130–31, 189–90; *see also* Ekstrand & Jeyaram, 28 Am. Journalism, at 47 (discussing many Founders’ decisions to associate their

anonymous writings with classical personalities). For example, when the wealthy Philadelphia lawyer John Dickinson wrote as "A Farmer" to protest the Stamp Act, he associated his ideas with the "special patina of virtue and honesty" that his generation ascribed to the profession. Solomon, *Revolutionary Dissent*, at 189–90. Or when Thomas Paine adopted the penname "Common Sense," it appealed to "middling folk" and the "common man," distinguishing himself from other more high-brow writers. *See* Akhil Reed Amar, *The Words That Made Us: America's Constitutional Conversation 1760-1840*, at 95 (2021). Or when Alexander Hamilton wrote under the names of Roman orators like Cicero and Tully, he connected his arguments to notions of antiquity and classical rationality. Adair, *Fame and the Founding Fathers*, at 272–75. Indeed, even potentially misleading names were used: A Boston-based dissident organization that evolved into the Sons of Liberty adopted the name the "Loyal Nine." *See* Solomon, *Revolutionary Dissent*, at 58.

The Founders understood that the freedom to choose to associate with ideas, identities, and other citizens—exemplified by the practice of writing under expressive pseudonyms—demanded a corresponding right to disclaim associations with ideas they did not believe or with people they did not support. Consider that Americans first boycotted the East India Company's tea to avoid being seen as implicitly endorsing Parliament's right to tax the American colonists. *See* Amar, *The Words That Made Us*, at 78–80. Or that Britain's collective punishment of Bostonians after the Tea Party—with no regard to whether individual denizens had endorsed it—was reviled as tyrannical. *See id.* at 83–84; Solomon, *Revolutionary Dissent*, at 202. Or that, later, States exempted conscientious

or religious objectors from oath-taking requirements and compelled tithing. Michael McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1467, 1469–71 (1990); *see also* An Act for Establishing Religious Freedom, *reprinted in Digest of the Laws of Virginia, of a Civil Nature and of a Permanent Character and General Operation* 681–82 (James M. Matthews ed., 1857) (enacted 1785) ("[T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical."). In short, at the Founding, citizens understood that they had the right to define the conditions of their group associations. *See Ams. for Prosperity Found.*, 594 U.S. at 619–20 (Thomas, J., concurring in part and concurring in the judgment). This included the right *not* to associate with other citizens or ideas.

The valued traditions of anonymous speech and the free association of speech did not give way to combatting corruption in elections. The Founders understood that elections involved candidates raising and spending money to buy newspaper announcements, publish pamphlets, organize public spectacles, or treat voters to food and drink (even if they were sometimes technically prohibited from doing so). *See* Anthony J. Gaughan, *Cyclical Misalignment: A History of Campaign Finance Law*, 86 Ohio St. L.J. 1195, 1198–1200, 1203–05 (2025); Robert J. Dinkin, *Voting in Revolutionary America: A Study of Elections in the Original Thirteen States, 1776-1789*, at 79, 82–83 (1982) ("Increasingly [during the 1780s], party chiefs sent agents from one county to another, providing money, printed matter, or political expertise in order to bolster their group's position in a tight race."). This continued even after the Revolution, when American elections were increasingly

won by candidates with humble backgrounds rather than those with significant means. *See* Gaughan, 86 Ohio St. L.J., at 1202 (citing a study of three States' legislatures showing that "[c]andidates from ordinary backgrounds rose from 17% of seats before the Revolution to 62% after the war").

Yet in regulating elections at the time, merely providing monetary support for political speech wasn't considered "corruption." "Corruption" required much more. This was true even though the Founders shared a similarly broad understanding of "corruption" as we do today. *See* 1 N. Webster, *An American Dictionary of the English Language* (1828) (defining "corruption" in elections as "[d]epravity; wickedness; perversion or deterioration of moral principles; loss of purity or integrity"); *see also* S. Johnson, *A Dictionary of the English Language* (4th ed. 1773) (similar). Despite the increasing importance of newspapers, pamphlets, and handbills in Ratification-era electioneering, Dinkin, *Voting in Revolutionary America*, at 85–87, no laws required political authors or financial supporters to expose themselves to prevent "corruption" (or for any other reason). Rather, in combatting "corruption," state laws prohibited quid pro quo bribery and vote-buying. *See, e.g.*, An Act to Regulate Elections within this State, *reprinted in* 1 *Laws of the State of New York Passed at the Sessions of the Legislature Held in the Years 1777–1784*, at 36 (Weed, Parsons & Co., 1886) (stating in 1778 "[t]hat whosoever shall by bribery[,] menace[,] or other corrupt means or device whatsoever either directly or indirectly attempt to influence any free elector of this State . . . shall forfeit and pay . . . 500 pounds [per offense]"); An Act for Regulating the Election of the Governor, Lieutenant Governor, Assistants, &c., *reprinted in Acts and Laws of the State of Connecticut in America* 153 §§ 12–13 (Hudson & Goodwin,

1796) ("[W]hereas undue Influence, Bribery, and Corruption in Elections are of pernicious Tendency in a State . . . no Person or Persons shall offer, accept, or receive any Sum or Sums of Money, or other Matter or Thing . . . on account of any Vote or Suffrage given or to be given in any Election" to State office); An Act for Regulating the Election of Senators and Representatives, for this State, in the Congress of the United States, *reprinted in Acts and Laws of the State of Connecticut in America* 155–56 § 8 (extending the same to federal Senate and House of Representatives elections). Under any view of "corruption," then, the Founders never forced officials or candidates to disclose the identities of their supporters.

## C.

## Post-Ratification History

Anonymous political speech continued post-Ratification. For example, in 1793, Alexander Hamilton and James Madison argued about the constitutionality of President Washington's Neutrality Proclamation through pseudonymous publications. Turley, 2001–2002 Cato Sup. Ct. Rev., at 60. In 1798, Thomas Jefferson and James Madison secretly authored the Kentucky and Virginia Resolutions opposing the Alien and Sedition Acts. Adrienne Koch & Harry Ammon, *The Virginia and Kentucky Resolutions: An Episode in Jefferson's & Madison's Defense of Civil Liberties*, 5 Wm. & Mary Q. 145, 147–49 (1948). And two decades later, Chief Justice John Marshall responded anonymously to attacks against the Supreme Court's then-recent decision in *McCulloch v. Maryland*, writing under pennames such as "A Friend of the Union" and "A Constitutionalist." 4 Albert J. Beveridge, *The Life of John Marshall* 318–19 (1919). Indeed, "[b]etween 1789 and

1809 no fewer than six presidents, fifteen cabinet members, twenty senators, and thirty-four congressmen published political writings either unsigned or under pen names." Note, *The Constitutional Right to Anonymity: Free Speech, Disclosure and the Devil*, 70 Yale L.J. 1084, 1085 (1961).

Post-Ratification history also confirms the Founding generation's deeply rooted practice of anonymously writing *and funding* political speech without fear of compelled disclosure. Early in the Republic's history, political campaigns were rarely sophisticated operations controlled by candidates. *See* Sean Wilentz, *The Rise of American Democracy: Jefferson to Lincoln* 50–51 (2005) (describing the near-impossibility in the late 1700s of creating effective partisan machines across and between States). In fact, most candidates did their best to appear like they were not campaigning at all. *See* Dinkin, *Voting in Provincial America*, at 57, 93. So electoral politics depended on the support of political parties that "routinely solicited donations from wealthy supporters to fund public rallies, publish campaign pamphlets, fund partisan newspapers, and circulate party literature." Gaughan, 86 Ohio St. L.J., at 1209.

Our Founders commonly funded political campaigns in secret. Our first Secretary of State, Thomas Jefferson, for example, hired Philip Freneau as a State Department clerk with the secret purpose of subsidizing his relentless newspaper criticisms of President Washington and Alexander Hamilton before the 1792 election. *See* Amar, *The Words That Made Us*, at 430–32. Jefferson explicitly denied any involvement with Freneau in a letter to the President relying on his anonymity. *Id.* at 431. Jefferson also funded a "most notorious" critic, James Thompson Callendar, to attack leading Federalists. *See id.* at 432–33;

*see also* Gaughan, 86 Ohio St. L.J., at 1209–11 (recounting additional secret fundraising efforts by Jefferson in early American political campaigns). Callendar not only shamed Hamilton in public for alleged corruption, but his targeting of President Adams and later imprisonment would "in no small measure" lead to Jefferson's presidential victory. Amar, *The Words That Made Us*, at 433. Jefferson's anonymous contributions thus helped to sway the public's perception of their elected officials and change election outcomes. Far from an outlier, this practice ran rampant in the early republic. *See generally id.* 431–34.

Despite this practice, no election laws required compelled disclosures of election-related donations until long after the post-Ratification period. Of course, governments continued to prohibit acts akin to bribery and vote-buying. *See, e.g.*, A Supplement to an Act Entitled, An Act to Reduce into One the Several Acts of Assembly Respecting Elections, and to Regulate Said Elections, ch. 204, 1812 Md. Laws 229, 229. But it wasn't until 1867 that the federal government began regulating campaign contributions at all. *See* An Act Making Appropriations for the Naval Service for the Year Ending Thirtieth June, Eighteen Hundred and Sixty-Eight, § 3, 14 Stat. 492 (1867) ("[N]o officer or employee of the government shall require or request any workingman in any navy yard to contribute or pay any money for political purposes . . . ."). And most federal or state legislation on that score was passed towards the end of the nineteenth century. *See* John S. Bottomly, *Corrupt Practices in Political Campaigns*, 30 B.U. L. Rev. 331, 344 (1950).

In fact, no law of any kind in the immediate post-Founding era stripped the protection of anonymity from political speech or required political speakers to disclose

their supporters. Even the hated Sedition Act of 1798, which criminalized the publication of seditious libel against federal officials, did not demand disclosure of authors' identities. *See* An Act in Addition to the Act, Entitled "An Act for the Punishment of Certain Crimes against the United States," ch. 74, 1 Stat. 596 (1798). Instead, "[t]he first [state] statute that could be called comprehensive in attempting to publicize expenditures and contributions was enacted in New York in 1890." Bottomly, 30 B.U. L. Rev., at 344; *see also Ctr. for Ariz. Pol'y*, 592 P.3d 75, 98–100 (describing election-disclosure laws enacted by Arizona around the time it gained statehood). And it wasn't until the twentieth century that the federal government began compelling political donors to reveal themselves. *See* An Act Providing for Publicity of Contributions Made for the Purpose of Influencing Elections at which Representatives in Congress are Elected, Pub. L. No. 61-274, 36 Stat. 822 (1910). So, for over a century after the Founding, no state or federal law required supporters of political actors to publicly identify themselves. No state or federal law required political actors to report or disclose their supporters. And no state or federal law required the government to publish a list of who gave money to which political causes.

Only in the 1970s did the Supreme Court first uphold disclosure requirements against a First Amendment challenge. In *Buckley v. Valeo*, the Court examined the Federal Election Campaign Act of 1971, which attempted to seriously curb donations and expenditures in federal elections. *See* 424 U.S. at 7. The Court struck down most of the law's core limits on candidates' and independent groups' abilities to spend money for electoral purposes. *See id.* at 58–59. It generally recognized that the money used to fund political speech is integral to the speech itself, noting

that a limit on campaign spending "necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19. On the other hand, it upheld donation limits, *id.* at 58–59, and the mandatory-disclosure requirements for donors to political candidates, *id.* at 61.

Without looking to Founding-era history, the Court applied a "balancing test" to decide that mandatory-disclosure requirements outweighed individuals' First Amendment interests. *Id.* at 238 (Burger, C.J., concurring in part and dissenting in part). It specifically held that the disclosure requirements met "exacting scrutiny" because they gave the electorate information to inform its vote, prevent corruption or the appearance of it, and help enforce campaign-contribution limits. *Id.* at 65–68. So even though the Court recognized "that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute" and that "disclosure may even expose contributors to harassment or retaliation[,]" such laws were "in most applications . . . the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Id.* at 68.

*       *       *

It was likely not a coincidence that when a Founding-era writer pronounced the rights to free speech and the press to be "the grand palladium of freedom, and the scourge of tyrants," he did so anonymously. Letters of Centinel No. 1, Oct. 5, 1787, *reprinted in The Essential Federalist and Anti-Federalist Papers* 73 (David Wooton ed., 2003). So it should be no surprise that no Founding-era law, practice, or tradition demanded that those who spoke on political matters (or merely funded political speech) out themselves to the

public, or that political actors disclose their supporters. Even when it came to preventing quid pro quo corruption in elections, the Founders and their English forebears chose not to impose disclosure requirements. This was so despite the Founders being well-aware that money, speech, anonymity, and politics have long been intertwined. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 709 (1992) (Kennedy, J., concurring in the judgment) ("[T]he pamphlets of Thomas Paine were not distributed free of charge . . . ." (simplified)). Forcibly publishing the identities of those participating in public life or those who fund them, merely for speaking on public matters, was contrary to the original public meaning of the First Amendment.

With this understanding of constitutional text and its history, I turn to this case.

## III.

## PROPOSITION 211 VIOLATES THE FIRST AMENDMENT

Under our precedent, First Amendment challenges to donor-disclosure requirements must survive "exacting scrutiny." *Ams. for Prosperity Found.*, 594 U.S. at 607. "Exacting scrutiny" requires that (1) the State identify "a substantial relation between the disclosure requirement and a sufficiently important governmental interest"; (2) "the strength of the governmental interest . . . reflect the seriousness of the actual burden on First Amendment rights"; and (3) the law "be narrowly tailored to the government's asserted interest." *Id.* at 607–08 (simplified). And the constitutional text and "pre-ratification and post-ratification history" must serve "as a gravitational pull" on our application of this precedent. *See United States v.*

*Rahimi*, 602 U.S. 680, 730 (2024) (Kavanaugh, J., concurring). So in applying "exacting scrutiny," we must be mindful of the deep historical roots of anonymous political speech and the Founders' antagonism toward forced associations. Given this original understanding of the freedom of speech, Proposition 211 violates Americans for Prosperity and the Foundation's First Amendment rights.

First, because Arizona requires disclosure of donor information many steps removed from any political activity—regardless of the donor's intent to contribute to the specific political activity—the Act's relationship to the purported interest of preventing "corruption" and informing voters fails. The law does nothing to uncover quid pro quo arrangements and offers little meaningful information about who is purposefully supporting political activity in the State.

Second, Proposition 211's burden on speech is outsized: It requires speakers to investigate their donations' sources through a limitless chain of transfers and across state lines, and it risks doxxing those who had no intention of participating in political activity in Arizona at all.

Finally, the law is not narrowly tailored—it broadly sweeps in donors with little connection to political activity in Arizona and excludes favored speakers.

**A.**

**Substantial Relation to a Sufficient Interest**

Proposition 211 is not substantially related to a "sufficiently important" government interest. The Act identifies two interests: "to prevent corruption" and "to assist Arizona voters in making informed election decisions." Proposition 211 § 2(B). But its mandatory disclosure of donor information far removed from political activity

negates any substantial tie to those interests. And Arizona has no legitimate interest in curtailing political speech or forcing donors into unintentional associations.

To begin, we should be cautious in accepting government interests untethered from historical analogs and practice. *See Ramirez v. Collier*, 595 U.S. 411, 445 (2022) (Kavanaugh, J. concurring) ("[H]istory and state practice . . . help structure the inquiry [into the strength of the State's interest] and focus the Court's assessment of the State's arguments."). Analyzing state interests from the vantage of historical analogs reveals the scope of the constitutional right as originally understood. And it can uncover the few "inherent limitations on natural rights" that would justify regulations on the preexisting liberties protected by the Constitution. *See* Stephanie H. Barclay, *Replacing* Smith, 133 Yale L.J. Forum 436, 460 (2023).

So we must look to history to determine whether the government's interest is "sufficiently important" to override core liberties. Otherwise, judges are left to consult their own policy preferences. *Rahimi*, 602 U.S. at 718 (Kavanaugh, J., concurring) ("[R]eliance on history is more consistent with the properly neutral judicial role than an approach where judges subtly (or not so subtly) impose their own policy views on the American people."); *see also Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 117 F.4th 389, 401 (6th Cir. 2024) (Thapar, J., concurring) ("Looking to history rather than policy to steer our constitutional interpretation ensures that we do only our jobs, so the people remain free to do theirs."); Barclay, 133 Yale L.J. Forum, at 460 ("Relying on . . . historically recognized government interests, rather than whatever a judge deems compelling, could further curtail the political and moral determinations courts make under [the tiers of scrutiny regime] . . . ."). In

sum, we should be wary of justifying encroachment on constitutional rights based on modern government interests with no analog in Founding-era history or practice.[16]

***The Anti-Corruption Interest.*** Arizona's interest in "prevent[ing] corruption" bears little relation to the historic anti-corruption interests that justify restrictions on election speech and political discourse. Since the Founding, "[t]he

---

[16] For its part, the majority either misunderstands the historical record or deems it irrelevant. First, the majority ignores that money and political speech were closely intertwined in campaigning. The majority can't easily divorce campaign donations from speech. When then-Secretary Jefferson secretly funded journalists to oppose political rivals, he did so to influence elections that ultimately led to his and other Democratic-Republicans' success. *See* Amar, *The Words That Made Us*, at 433. But these actions never invited the same governmental restrictions that vote-buying or bribery did. That our post-Ratification America didn't employ the same campaign finance structure as today does not make this history irrelevant. Second, the majority concedes that there is "no evidence that government authorities at the Founding sought to ban or restrict anonymous donations." Maj. Op. 23. But it concludes from that absence that the First Amendment offers limited, if any, protections to anonymous political donors. That can't be right. Not only does the majority search for a "historical twin" rather than a "historical analogue," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022), but it misses what the past teaches. Anonymous political speech went unregulated for over a century after the Founding. If the absence of forced-disclosure laws means anything, it's that government should afford anonymous political speech the same degree of latitude that Jefferson, Publius, Brutus, Common Sense, and dozens of others received. The lack of Founding-era analogs on anonymous political speech counsels against—rather than supports—granting government license to infringe on speech. Third and relatedly, the majority believes that we can disregard this history and simply look to "fifty years of Supreme Court precedent." Maj. Op. 19. Of course, we are bound by precedent. But when we are asked to extend that precedent into novel territory, we should be cautious in doing so when the law runs so far afield of both that precedent and original meaning.

hallmark of corruption is the financial *quid pro quo*: dollars for political favors," *Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 497 (1985); *see also* James Cook Evans, *Digest of the Laws Relating to Bribery and Treating at Elections of Members to serve in Parliament, and for the Better Discovery Thereof* 6 (1847) ("Corrupt and illegal practices in giving rewards or making promises, in order to procure votes in the election of members to serve in parliament,—or giving refreshments to voters before the vote, in order to induce them to vote for a particular candidate[]—have been held to be bribery at common law."). Under modern precedent, government legislation "may target only a specific type of corruption—*quid pro quo* corruption." *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 146 S. Ct. 2404, 2418 (2026) (simplified).

Proposition 211 does little to combat quid pro quo corruption as commonly and traditionally understood. *See also id.* ("[Q]uid pro quo corruption . . . is something specific—contributions in exchange for official action."). Proposition 211 does not target these arrangements at all. It expressly exempts political candidates or their committees from its scope. Ariz. Rev. Stat. § 16-971(7)(b)(iii). Instead, it only requires disclosure when certain groups with no direct connection to political candidates spend money to affect Arizona politics. *See id.* And given its infinite-lookback regime, it forces disclosure of donors who may have not intended to contribute to political speech. So Proposition 211 does nothing to stop the historical understanding of "corruption." Similarly, because the law does nothing to limit the risk of quid pro quo corruption, the State cannot show that the law is needed to limit the "appearance" of that corruption. *Citizens United*, 558 U.S. at 359.

At best, Proposition 211 targets the "undue influence on candidates from outside interests." *Buckley v. Valeo*, 424 U.S. at 53. As explained above, the record of the early republic is devoid of election restrictions on this basis. And in the modern view, "the Government's desire to prevent or reduce influence, ingratiation, gratitude, access, or the like for those who spend in support of, or contribute to, political parties or candidates is not a constitutionally permissible objective for campaign finance restrictions." *Nat'l Republican Senatorial Comm.*, 146 S. Ct. at 2419. While indirect donors to successful candidates may gain influence, that is far different from the vote-buying and quid pro quo "corruption." After all, "[i]ngratiation and access . . . are not corruption," but "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *Citizens United*, 558 U.S. at 360.

Arizona also claims that Proposition 211 prevents corruption by stopping so-called "dark money" in the State's politics. Proposition 211 § C. But in this context, it appears that "dark money" means nothing but anonymous political speech. Again, stopping anonymous political speech is no basis to curtail the free speech right—even if the State likes to pejoratively call this speech "corruption." Arizona doesn't get to redefine "corruption" as it wishes to justify whatever restrictions on speech it wants.

***Informational Interest.*** Arizona next justifies Proposition 211 based on its interest in "assist[ing] Arizona voters in making informed election decisions." Proposition 211 § 2B. Courts have at times recognized that "the public has an interest in knowing who is speaking about a candidate shortly before an election." *See Citizens United*, 558 U.S. at

369. As we've said, "[u]nderstanding what entity is funding a communication allows citizens to make informed choices in the political marketplace." *No on E v. Chiu*, 85 F.4th 493, 505 (9th Cir. 2023) (simplified). And we've observed that "[a]n appeal to cast one's vote a particular way might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by another." *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1008 (9th Cir. 2010). In other words, the public may have an interest "in learning who supports and opposes ballot measures" or other political activity. *Fam. PAC v. McKenna*, 685 F.3d 800, 806 (9th Cir. 2012).

But this informational interest appears to have shallow historical roots. No Founding-era law or practice demanded that speakers disclose the source of their funds or the names of their supporters for any reason—let alone for the sake of voter information. And as explained above, political speakers didn't even have to name *themselves*. Historically, it didn't matter if a political commentator used a "creative but misleading name." *See No on E*, 85 F.4th at 505. Otherwise, neither "The Philadelphia Farmer," "Common Sense," nor "Publius" would exist. Rather, the early American republic's "nearly-universal practice" of pseudonymous political writing meant that debate took place on the power of *ideas*, not *identity*. Natelson, 9 N.Y.U. J.L. & Liberty, at 177–80; Ekstrand & Jeyaram, 28 Am. Journalism, at 45–47; *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 239 (2010) (Thomas, J., dissenting) ("People are intelligent enough to evaluate the merits of a referendum without knowing who supported it."). Thus, while Arizona's informational interest has been accepted by some courts, its

ahistorical lineage means that we should be careful in expanding its reach to curtail the free speech right.

Given that Proposition 211 mandates the disclosure of donors who may not intentionally or knowingly support or oppose specific political activity in Arizona, it doesn't substantially relate to a sufficiently important government interest. Recall that the law requires that if anyone, anywhere, and for any reason, donates more than $5,000 in two years to any organization—charitable, religious, political, or otherwise—and the money ends up being spent on a political matter in Arizona, then the person's name, address, and employer can be publicly exposed. Ariz. Rev. Stat. § 16-973(A)(6)–(7) (setting out which donors and intermediaries must be reported); *id.* § 16-971(10)(a)–(b) (setting out what information must be reported); *id.* § 16-973(H) (requiring the Secretary of State to publish the reports). The donor need not *intend* for the $5,000 to be used in a particular Arizona campaign. Indeed, indirect donors need not even *know* who or what is on the ballot. *See Ctr. for Ariz. Pol'y*, 592 P.3d at 121 (King, J., concurring in part and dissenting in part) ("[T]he opt-out notice simply notes use of the donor's funds 'for campaign media spending,' without identifying the particular candidate, ballot measure, or message the campaign media will support or oppose.").

Instead, if enough money is passed through untold intermediaries to a covered person, then the donor's name, address, and employer must be published for the world to see. *Id.* § 16-973(A)(6), (H). And though Proposition 211 has been interpreted to offer an opt-out for upstream contributors, the notice requirement is so lacking in detail that indirect donors will have little to any say on whether their monies can be used for specific political purposes. *See generally* Ariz. Rev. Stat. § 16-972(B). So perhaps a donor

might be vaguely aware that their money might somehow, someway wind its way into Arizona politics; Proposition 211 doesn't stop that person from being unintentionally, yet publicly, disclosed as a donor to a specific political group. Thus, under Proposition 211, Arizona may publicly associate donors with the political speech of another group that they never heard of, never wanted to donate to, or never agreed with.

And because Proposition 211 disregards the specific intent or knowledge of donors and only focuses on the campaign media spending of covered persons, Ariz. Rev. Stat. § 16-971(7), voters are given incomplete information about who is purposefully supporting political activity in Arizona. After all, without any particularized intent requirement, "a secondary"—or tertiary or quaternary or quinary, and so on—"contributor logically does not endorse a political speaker or the speaker's message by funding a primary contributor." *See No on E*, 85 F.4th at 530 (VanDyke, J., dissenting from denial of reh'g en banc). Imagine a pro-life, Catholic nun in Oregon. Say she donates $50 per week to a social-justice organization in California focused on homelessness; in turn, that organization ends up giving more than $5,000 to a pro-choice advocacy group in Arizona that's spending money on political activity. The result? The pro-choice advocacy group must put the Catholic nun's name on all its public donor reports. Yet how are these reports informing voters—rather than misleading them—by linking our nun to the pro-choice movement? Arizona has not shown how this forced association would matter to voters.

So intentional primary donors, unintentional secondary donors, and unwary third- or four- degree donors can all get swept up in the reports published by the Secretary of State

or in the disclaimers required on public communications. What's the public's interest in "knowing who is speaking about a candidate shortly before an election" when the "speaker" didn't intend to support the candidate? *See Citizens United*, 558 U.S. at 369. How would a voter "understand[] what entity is funding a communication" when the entity itself didn't know it was funding the communication? *See No on E*, 85 F.4th at 505 (simplified). How can a "source" of funding "prove persuasive" to a voter when a voter can't know if the "source" intentionally or knowingly supported the political spending? *See Human Life of Wash. Inc.*, 624 F.3d at 1008. Is there a public interest "in learning" potentially misleading information about "who supports and opposes ballot measures" in the State? *See Fam. PAC*, 685 F.3d at 806. In the end, the simple answer is that Proposition 211's infinite look-back regime provides neither meaningful nor accurate information to voters. And neither history nor precedent suggests that mandating disclosure of likely confusing or misleading information justifies restrictions on core First Amendment speech.

Arizona doesn't contest this defect in Proposition 211's statutory requirements. It suggests instead that, in practice, voters will still get accurate information about who is purposefully contributing to political activity in the State. To support this, however, the State makes fanciful assumptions. It speculates that all intermediaries or covered persons will locate all original donors from across the country, inform them that their identities will be disclosed, and then give them a chance to opt out by returning or not spending their monies. In essence, Arizona's hope is that a covered person's goodwill will keep them from spending money from indirect donors without the original source's specific consent to support that covered person's mission.

Or that Proposition 211's burdens will chill donors from contributing to any organization for fear of unintentionally getting involved in Arizona politics. But Arizona's unrealistic assumption about covered persons' behavior doesn't fix the statute's First Amendment problems. Nor does the possibility that donors across the country will self-censor for fear of disclosure.

And our precedent doesn't settle this matter. In *No on E v. Chiu*, we approved a city ordinance requiring covered entities' political advertising to include a disclaimer of their top three contributors. 85 F.4th at 498–99. The law also required including secondary contributors if any of the top contributors were political committees. *Id.* We justified the secondary-contributor requirement in part because it "ma[de] it more difficult to hide the sources of funding for political advertisements." *Id.* at 504–05. Proposition 211, on the other hand, is vastly more expansive. *No on E* only permitted disclosure of indirect donors merely one degree removed from political spending. *See id.* at 510–11. And it was limited to a disclaimer of the top three contributors—a targeted disclosure. But, as stated earlier, the government's interest in providing the public with donation information diminishes the further we move away from the actual political spending. And here, Arizona's regime allows for disclosure regardless of the original donor's specific intent and "regardless of whether the monies passed through one or more intermediaries." Proposition 211 § 2(A). It requires an infinite look-back, meaning that covered persons must trace and disclose every direct or indirect contributor through innumerable layers of intermediaries without looking to original donors' intentions. *See* Ariz. Rev. Stat. § 16-973(A)(6)–(7). And it mandates disclosure in a public database of every donor—direct or indirect—above a certain

threshold. *Id.* § 16-973(H). In short, the law in *No on E* looks very little like Proposition 211.

* * *

Neither of Arizona's purported justifications for Proposition 211 are substantially related to a sufficiently important government interest. As the State effectively concedes, the law does nothing to prevent quid pro quo corruption. And the infinite look-back regime and lack of any donor-intention requirement makes Proposition 211 a poor vehicle to "assist Arizona voters in making *informed* election decisions." Proposition 211 § 2B (emphasis added). It provides little meaningful information to voters—indeed, it could mislead them. Proposition 211 thus fails exacting scrutiny at the threshold.

**B.**

**The Seriousness of the Actual Burden on First Amendment Rights**

Proposition 211 also fails the next step of exacting scrutiny. "The strength of the governmental interest" in enacting Proposition 211 does not "reflect the seriousness of [its] actual burden on First Amendment rights." *Ams. for Prosperity Found.*, 594 U.S. at 607 (simplified). At this step, we must balance the State's asserted interest in informing the electorate about the sources of political spending against the burdens on political speech and free association. *No on E*, 85 F.4th at 504. While "more than a modest burden" is required to defeat a law, *id.* at 508 (simplified), the law doesn't pass constitutional muster when it poses a "widespread burden on donors' associational rights," *Ams. For Prosperity Found.*, 594 U.S. at 618. Indeed, "[t]he Supreme Court routinely invalidates laws that chill speech

far less than a disclosure rule that might scare away charitable donors." *Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 501 (D.C. Cir. 2016).

Even assuming that Arizona's informational interest would survive the first step of "exacting scrutiny," Proposition 211's administrative requirements and doxxing threat together pose a "widespread burden" on political speech that cannot outweigh its interest in informing voters about those who donate to political spending in the State. "The simple interest in providing voters with additional relevant information" does not justify all burdens on speech. *See McIntyre*, 514 U.S. at 348 (holding that the informational interest doesn't justify a "requirement that a writer make statements or disclosures she would otherwise omit"). And, as stated above, given its unprecedented reach, Proposition 211 goes far beyond a State's accepted informational interest.

First, Arizona's record-keeping requirements are excessive. Even modest administrative burdens may unconstitutionally chill speech. For instance, in *Watchtower Bible and Tract Society*, the Supreme Court invalidated a permitting ordinance for canvassers because it could have discouraged "a significant number of persons who support causes anonymously" even though the issuance of permits was ministerial, performed promptly, and cost applicants nothing. 536 U.S. at 154–55, 166, 169. And in *Citizens United*, it struck down limits on corporate expenditures for political speech in part because "[a]s a practical matter . . . a speaker who wants to avoid threats of criminal liability and the heavy costs of defending against FEC enforcement [was required to] ask a governmental agency for prior permission to speak." *Citizens United*, 558 U.S. at 335.

And the more administrative work is required for political speech, the more likely that political speakers will not speak at all. *See Citizens United*, 558 U.S. at 337–39 ("PACs have to comply with [complex FEC] regulations just to speak. This might explain why fewer than 2,000 of the millions of corporations in this country have PACs."). And here, Proposition 211 isn't a matter of merely filing paperwork. Instead, on pain of significant civil penalties, it presses covered persons and primary contributors into service as detectives before they may engage in political speech: They must track down each source of original monies above $2,500 and uncover the source's name, address, and occupation. Ariz. Rev. Stat. §§ 16-972 (D)–(E), 16-973 (A)–(B). And this duty extends to somehow giving notice and getting consent from every indirect donor of the covered person who might have contributed more than $5,000 in total. *See Ctr. for Ariz. Pol'y*, 592 P.3d at 121 (King, J., concurring in part and dissenting in part). This duty continues "regardless of whether the monies passed through one or more intermediaries." Proposition 211 § 2(A). So this investigative and record-keeping duty might be infinite for any organization that accepts donations from nearly any source.

Second, Proposition 211 risks doxxing donors with little connection to political activity in the State. Over fifty years ago, some warned that disclosure laws would chill speech because donors would fear for their reputations or jobs. *See, e.g.*, Martin H. Redish, *Campaign Spending Laws and the First Amendment*, 46 N.Y.U. L. Rev. 900, 930–31 (1971); *Buckley*, 424 U.S. at 237 (Burger, C.J., dissenting in part) ("Rank-and-file union members or rising junior executives may now think twice before making even modest contributions to a candidate who is disfavored by the union

or management hierarchy."). Today, that warning is a reality: In the internet age, anyone connected (even unintentionally) to any cause might be subject to all kinds of reputational harms, risks to job security, and harassment. *The Escalating Threats of Doxxing and Swatting: An Analysis of Recent Developments and Legal Responses*, Nat'l Ass'n of Att'ys Gen. (Aug. 12, 2025) (describing how the internet and artificial intelligence tools have shifted "doxxing from isolated conduct to a more coordinated form of digital persecution").[17] And here, Arizona mandates that any donor who gives more than $5,000 to any organization in two years is at risk of being publicly disclosed. *See* Ariz. Rev. Stat. § 16-973(A)(6)–(7). Given that this monetary threshold comes out to less than $50 per week, the disclosure requirement may ensnare big and small-dollar donors alike. And the disclosures go beyond just a donor's name—they include the donor's address, occupation, and employer. Ariz. Rev. Stat. § 16-971(10)(a)–(b).

Together, these burdens lead to an unacceptable chilling of speech. Rather than submitting themselves to onerous investigative and reporting requirements, advocacy organizations will forgo political speech. *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1130 (2026) ("An official demand for private donor information is enough . . . . to discourage groups from expressing dissident views."). Rather than face public exposure, forced associations, and doxxing, donors will just stop contributing. *Id.* As the Court has said, "disclosure requirement[s may] create[] an unnecessary risk of chilling in violation of the First Amendment," especially when the evidence includes "bomb threats, protests, stalking, and

[17] https://perma.cc/4FFD-X9YK.

physical violence." *Ams. for Prosperity Found.*, 594 U.S. at 616–17 (simplified); *see also Citizens United*, 558 U.S. at 480–82 (Thomas, J., dissenting) (recounting examples of donors who contributed to unpopular causes, had their identities published under compelled-disclosure laws, and then faced retaliatory death threats, job losses, and property damage). And according to Americans for Prosperity and the Foundation, physical threats to their donors are not theoretical. They allege it has already happened. Thus, the Complaint shows much more than just "hesitation on the part of donors," which we've said wasn't enough to invalidate a State's encroachment on the First Amendment right. *No on E*, 85 F.4th at 509. Instead, we have serious threats to those who wish to engage in political speech and their supporters.

The deterrent effect of these burdens cannot be justified by Arizona's interest in informing voters. As discussed above, little-to-no relevant information is provided to voters by a compelled-disclosure regime that does not take a specific donor's intent into account. And for this (at best) marginal value, citizens nationwide face the prospect of having their names, mailing addresses, occupations, and employers published online if too much of their donated funds somehow weave their way into speech on Arizona electoral issues. *See* Ariz. Rev. Stat. § 16-971(10)(a)–(b). In sum, the burdens that Proposition 211 imposes on speech far outweigh any permissible interest that Arizona asserts.

### C.

### Narrow Tailoring

Lastly, Proposition 211 is not "narrowly tailored to the interest it promotes." *Ams. for Prosperity Found.*, 594 U.S. at 610. While narrow tailoring under "exacting scrutiny" doesn't require least-restrictive means, the scope of the law

must still be "reasonable" in light of the government's asserted interest. *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014). Several reasons show that Proposition 211 lacks even a reasonable fit to its asserted interest.

First, Proposition 211 requires a more sweeping disclosure regime than any law ever blessed by courts. Even accepting that Arizona has an interest in providing information relevant to voters' understanding of who supports and opposes political candidates or issues, the Act's infinite look-back mandate goes far beyond that. It targets donors with the faintest connection to Arizona politics. The farther away from the direct contribution to a political organization, the less useful the information becomes to the electorate. When Person A donates money to Organization B, that likely signals a tacit endorsement of at least some of Organization B's pursuits. But when Organization B then contributes to Organization C, which then donates to Organization D, which gives money to Organization E and so on, that says almost *nothing* about Person A's views of Organizations C through Z, even if Person A was notified that the money might eventually be used for generic "campaign media spending." Thus, there's an obvious distinction between laws requiring the disclosure of primary or even secondary donors and laws requiring unbounded sets of indirect donors to be disclosed.

Indeed, when we've endorsed a secondary-contributor disclosure requirement, we only did so because that law did not have an "unconstrained reach." *No on E*, 85 F.4th at 510. The disclaimer requirement there only applied to "the top donors to a committee that is, in turn, a top donor to a primarily formed committee." *Id.* "By donating to a primarily formed committee, a secondary committee

necessarily is making an affirmative choice to engage in election-related activity." *Id.* In contrast, Proposition 211 sweeps in donors who made no "affirmative choice to engage in election-related activity." *Id.* Rather, all that's necessary is some form of notice that the money might be used for "campaign media spending" and a lack of a donor's explicit refusal to allow the funds to be used for that purpose.

Second, Proposition 211 doesn't limit disclosure only to donors who intend to influence Arizona political activity. Unlike several other laws courts have upheld, Proposition 211 has no earmarking or "major purpose" requirement that more appropriately tailors its reach. For example, we've approved a disclosure law that "does not extend to all groups with 'a purpose' of political advocacy, but instead is tailored to reach only those groups with a 'primary' purpose of political activity." *Human Life of Wash.*, 624 F.3d at 1011. This limitation was important because it "ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *Id.*; *see also Smith v. Helzer*, 95 F.4th 1207, 1219 (9th Cir. 2024) (upholding an Alaska disclosure law that only applies to those who continuously donate to an organization that "has made, will make, or is likely to make independent expenditures"); *Indep. Inst. v. Williams*, 812 F.3d 787, 797 (10th Cir. 2016) (upholding a Colorado disclosure law that only requires disclosure of donors who specifically earmarked their contributions for electioneering purposes); *Van Hollen*, 811 F.3d at 501 (upholding a federal disclosure law's "purpose requirement" because the "tailoring . . . balance[s] the competing values that lie at the heart of campaign finance law"). Requiring disclosure only of donors who earmark contributions to an organization for

specific political purposes or donate to organizations that have a "major purpose" to support particular political activity in Arizona would make the law a more snug fit to the State's purported interest. But requiring disclosure of donors with no purposeful involvement in Arizona politics provides little meaningful information to voters.

Third, several aspects of Proposition 211 exacerbate the lack of tailoring. To begin, its disclosure requirement applies to any donations made over two years. *See* Ariz. Rev. Stat. § 16-971(8). So a donor may give to an organization long before any election-related spending—when political spending was completely unforeseeable. Next, the exposure of indirect donors' occupations and employers in publicly available reports is more likely to lead to harassment of donors and their employers than to offer useful information to voters. This is especially problematic when donors didn't purposefully engage in political activity. *See id.* §§ 16-973(A)(6)–(7), 16-971(10)(a).

Finally, any reasonable fit is undermined by exceptions to Proposition 211's scope. *See IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1126 (9th Cir. 2020) ("[A] state fails to narrowly tailor a speech-restrictive law where it eliminates one form of speech while at the same time allowing unlimited numbers of other types . . . that create the same problem." (simplified)). The Act exempts several groups from its scope, including institutional media. Ariz. Rev. Stat. § 16-971(2)(b)(i). *But see Citizens United*, 558 U.S. at 352 (rejecting "the proposition that the institutional press has any constitutional privilege beyond that of other speakers" (simplified)).

Labor unions and membership organizations are also expressly exempted from Proposition 211's disclosure

requirements if they don't collect more than $5,000 in dues per member in a calendar year. Ariz. Rev. Stat. § 16-971(1)(b), (7)(b)(ii). But "the Government may commit a constitutional wrong when by law it identifies certain preferred speakers." *See Citizens United*, 558 U.S. at 340. Compare a union with Americans for Prosperity. A union can collect $10,000 from its members in a two-year election period. It can then plow unlimited amounts of money directly into political activity without having any reporting requirement under Proposition 211. But if Americans for Prosperity collects the same $10,000 from several supporters in the two-year period and spends enough on campaign-related speech, it is subject to Proposition 211 and must report those contributors. Yet Arizona voters should have the same interest in knowing who is behind the political activity—regardless of whether it is a union or an advocacy group.

Thus, Arizona fails its burden to show that Proposition 211 is narrowly tailored for its permissible purpose.

## IV.

Having an informed electorate is, of course, valuable. But we can't sacrifice core constitutional rights to achieve that goal at all costs. The First Amendment's longstanding protections for political speech and free association are first-order values that should not give way lightly. Because Proposition 211 forces disclosure of supporters of political speech and compels donors to be associated with speech they may disagree with, it contradicts those venerable values.

I respectfully dissent.